ORAL ARGUMENT NOT YET SCHEDULED

No. 12-1375

## IN THE UNITED STATES COURT OF APPEALS
## FOR THE DISTRICT OF COLUMBIA CIRCUIT

————————————————

SEAWORLD OF FLORIDA, LLC,

*Petitioner,*

v.

THOMAS E. PEREZ, SECRETARY OF LABOR,
U.S. DEPARTMENT OF LABOR

*Respondent.*

————————————————

On Petition For Review Of An Order
Of The Occupational Safety and Health Review Commission

————————————————

## OPENING BRIEF FOR PETITIONER
## SEAWORLD OF FLORIDA, LLC

————————————————

Carla J. Gunnin
BAKER, DONELSON, BEARMAN,
  CALDWELL & BERKOWITZ, PC
Monarch Plaza, Suite 1600
3414 Peachtree Road, NE
Atlanta, Georgia 30326
(404) 589-3404

Eugene Scalia
  *Counsel of Record*
Baruch A. Fellner
Scott P. Martin
Daniel P. Rathbun
GIBSON, DUNN & CRUTCHER LLP
1050 Connecticut Avenue, N.W.
Washington, D.C. 20036
(202) 955-8500

*Counsel for Petitioner SeaWorld of Florida, LLC*

## CERTIFICATE AS TO PARTIES, RULINGS, AND RELATED CASES

Pursuant to Circuit Rule 28, Petitioner SeaWorld of Florida LLC ("Sea-World") respectfully submits this Certificate as to Parties, Rulings, and Related Cases:

### A.     Parties and Amici.

Complainant before the Occupational Safety and Health Review Commission ("OSHRC") and Respondent in this Court is Thomas E. Perez, Secretary of Labor, U.S. Department of Labor.

Respondent before the OSHRC and Petitioner in this Court is SeaWorld of Florida LLC, which owns and operates a marine-life based zoological park located in Orlando, Florida, that trains, cares for, and displays killer whales and other marine animals for educational and entertainment purposes.  The parent corporation of SeaWorld of Florida LLC is SeaWorld LLC, and its parent is SeaWorld Parks & Entertainment, Inc.  No publicly held corporation owns more than ten percent of the stock of SeaWorld of Florida LLC.

Intervenors before the OSHRC were Scott Brancheau, Marion Loverde, Charles Loverde, and Debora Frogameni.  Counsel is aware of no Intervenors before this Court.

There were no *amici curiae* before the OSHRC, and counsel is aware of no *amici curiae* before this Court.

**B.    Rulings Under Review.**

Petitioner SeaWorld seeks review of the May 30, 2012 decision and order of Administrative Law Judge Ken S. Welsch in OSHRC case number 10-1705, which became a final order of the OSHRC on July 16, 2012.  Administrative Law Judge Welsch's decision has not been published in an official reporter but is available electronically at 2012 WL 3019734.

**C.    Related Cases.**

In OSHRC case number 12-1697, Petitioner SeaWorld has requested Administrative Law Judge Welsch to modify the "abatement date" approved in his May 30, 2012 decision.  The outcome of SeaWorld's pending petition in case number 12-1697 does not implicate the merits of Judge Welsch's May 30, 2012 decision, however, and it will not affect the issues before this Court.  Counsel is not aware of any other related cases within the meaning of Circuit Rule 28(a)(1)(C).

**TABLE OF CONTENTS**

Page

GLOSSARY OF ABBREVIATIONS AND ACRONYMS ................................ IX

INTRODUCTION ................................................................................1

JURISDICTIONAL STATEMENT ......................................................3

RELEVANT STATUTES AND REGULATIONS.................................3

STATEMENT OF ISSUES PRESENTED FOR REVIEW .....................4

STATEMENT OF THE CASE.............................................................4

STATEMENT OF FACTS ...................................................................5

    A.    The Nature Of SeaWorld's Operations ................................6

        1.    The Use Of Operant Conditioning To Train
            Killer Whales ..........................................................7

        2.    The Development And Maintenance Of
            Whale-Specific Protocols.........................................8

        3.    The Rigorous Path To Becoming A Killer
            Whale Trainer .......................................................10

        4.    The Importance Of Trainers' Close Contact
            With Whales...........................................................11

    B.    SeaWorld's Emergency Procedures ...................................12

    C.    The Death Of Dawn Brancheau And The Resulting
        Investigations.....................................................................14

    D.    The Secretary's Citations And The ALJ's Decision ...........15

SUMMARY OF ARGUMENT ............................................................17

# TABLE OF CONTENTS
## (continued)

Page

STANDING ..................................................................................21

STANDARD OF REVIEW ...........................................................21

ARGUMENT ...............................................................................22

I.    SeaWorld Did Not Expose Employees To A "Recognized Hazard." ...........22

      A.    The ALJ's "Recognized Hazard" Findings Are
            Unsupported By Substantial Evidence ...............................23

      B.    Activity That Is Integral To SeaWorld's Business, And
            Which Inevitably Involves Some Controlled Risk, Does
            Not Constitute A Recognized Hazard ................................33

      C.    The ALJ Erred By Crediting OSHA's Expert Witness......................43

II.   The Secretary Has Not Proven Feasible Abatement Methods. ....................49

      A.    The ALJ Erred By Upholding The Feasibility Of
            "Physical Barriers" And "Minimum Distances." ...............................49

      B.    The ALJ Failed To Consider Significant Unrebutted
            Evidence That The Secretary's Abatement Measures
            Present Additional Hazards. .................................................52

      C.    The ALJ Erred By Finding That Abatement Is Feasible
            Because Eliminating All Close Contact Changes The
            Fundamental Nature Of A Trainer's Job As Defined Over
            The Past Fifty Years. ...........................................................54

III.  The General Duty Clause is Unconstitutionally Vague As Applied,
      And SeaWorld Lacked Fair Notice Of The Secretary's Abatement
      Measures. ..............................................................................56

CONCLUSION .............................................................................61

iv

## TABLE OF AUTHORITIES

Page(s)

### Cases

*Am. Wrecking Corp. v. Sec'y of Labor*,
  351 F.3d 1254 (D.C. Cir. 2003) ........................................................................21

*Armstrong Cork Co.*,
  8 BNA OSHC 1070, 1980 WL 10754 (No. 76-2777, 1980)..............................42

*Asamera Oil (U.S.), Inc.*,
  9 BNA OSHC 1426, 1980 WL 81803 (Nos. 79-949 & 79-1756, 1980) ...... 56, 57

*Brennan v. OSHRC*,
  494 F.2d 460 (8th Cir. 1974) ...........................................................................43

*Cargill, Inc.*,
  8 BNA OSHC 1745, 1980 WL 10234 (Nos. 78-4482 & 78-5289, 1980) .... 31, 32

*Connally v. Gen. Constr. Co.*,
  269 U.S. 385 (1926) .........................................................................................56

*\*Daubert v. Merrell Dow Pharm., Inc.*,
  509 U.S. 579 (1993) .........................................................................................46

*Davey Tree Expert Co.*,
  11 BNA OSHC 1898, 1984 WL 34818, (No. 77-2350, 1984).............................57

*\*Donovan v. Royal Logging Co.*,
  645 F.2d 822 (9th Cir. 1981) ................................................................ 19, 51, 57

*Erickson Air-Crane, Inc.*,
  No. 07-0645, 2012 WL 762001 (OSHRC Mar. 2, 2012).....................................59

*Fabi Constr. Co. v. Sec'y of Labor*,
  508 F.3d 1077 (D.C. Cir. 2007) ............................................................... 18, 43

*Horne Plumbing & Heating Co. v. OSHRC*,
  528 F.2d 564 (5th Cir. 1976)............................................................................56

\*  Authorities upon which we chiefly rely are marked with asterisks.

v

# TABLE OF AUTHORITIES
## (continued)

Page

*Indus. Union Dep't., AFL-CIO v. Am. Petroleum Inst.*,
448 U.S. 607 (1980) .................................................................. 33, 55

*Inland Steel Co.*,
12 BNA OSHC 1968, 1986 WL 53521 (No. 79-3286, 1986)..............51

*Kokosing Constr. Co.*,
17 BNA OSHC 1869, 1996 WL 749961 (No. 92-2596, 1996)............52

*Kumho Tire Co. v. Carmichael*,
526 U.S. 137 (1999) .....................................................................48

*L.H.C., Inc.*,
7 BNA OSHC 1672, 1979 WL 8039 (No. 78-3229, 1979)................31

*L.R. Willson & Sons, Inc.*,
698 F.2d 507 (D.C. Cir. 1983) ......................................................51

*Marsh v. Or. Nat'l Res. Council*,
490 U.S. 360 (1989) .....................................................................22

*Martin v. OSHRC*,
499 U.S. 144 (1991) .....................................................................58

*Megawest Financial, Inc.*,
17 BNA OSHC 1337, 1995 WL 383233 (No. 93-2879, 1995)..................... 38, 39

*Miami Industries, Inc.*,
15 BNA OSHC 1258, 1991 WL 195208 (No. 88-671, 1991)............59

*Millard Refrigerated Servs., Inc. v. Sec'y of Labor*,
___ F.3d ___, 2013 WL 2450521 (D.C. Cir. June 7, 2013)................22

*Nat'l Fuel Gas Supply Corp. v. FERC*,
468 F.3d 831 (D.C. Cir. 2006) ......................................................22

*\*Nat'l Realty & Constr. Co. v. OSHRC*,
489 F.2d 1257 (D.C. Cir. 1973) ............................... 18, 19, 30, 33, 39, 49, 55, 57

vi

# TABLE OF AUTHORITIES
## (continued)

Page

*Oil, Chemical & Atomic Workers International Union v. American
Cyanamid Co.*,
741 F.2d 444 (D.C. Cir. 1984) .................................................................... 40, 41

*\*Pelron Corp.*,
12 BNA OSHC 1833, 1986 WL 53616 (No. 82-388, 1986)............. 18, 33, 41, 56

*Pepperidge Farm, Inc.*,
17 BNA OSHC 1993, 1997 WL 212599 (89-265, 1997) ....................................23

*\*Ramsey Winch Inc. v. Henry*,
555 F.3d 1199 (10th Cir. 2009)..................................................................... 38, 39

*\*Royal Logging Co.*,
7 BNA OSHC 1744, 1979 WL 8506 (No. 15169, 1979)....................... 19, 51, 53

*SEC v. Chenery Corp.*,
318 U.S. 80 (1943) .........................................................................................22

*SEC v. Chenery Corp.*,
332 U.S. 194 (1947) .........................................................................................58

*The Timken Co.*,
No. 97-0979, 1998 WL 754132 (ALJ, Oct. 23, 1998) .........................................30

*Trump Plaza Assocs. v. NLRB*,
679 F.3d 822 (D.C. Cir. 2012) ..................................................................... 22, 33

*Tuscan/Lehigh Dairies, Inc.*,
22 BNA OSH 1870, 2009 WL 3030764 (08-0637, 2009) ........................... 18, 38

*U.S. Postal Serv.*,
No. 04-0316, 2006 WL 6463045 (OSHRC Nov. 20, 2006) ...............................30

*United States v. Law*,
528 F.3d 888 (D.C. Cir. 2008) ..................................................................... 47, 48

## TABLE OF AUTHORITIES
### (continued)

<u>Page</u>

*Wheeling-Pittsburgh Steel Corp.*,
  16 BNA OSHC 1218, 1993 WL 155695 (89-3389, 1993) .................................24

**Statutes**

5 U.S.C. § 706(2)(A)......................................................................................22

29 U.S.C. § 654(a)(1)......................................................................................17

29 U.S.C. § 659(c) ...........................................................................................3

29 U.S.C. § 660..............................................................................................21

29 U.S.C. § 660(a) ...........................................................................................3

**Other Authorities**

2013 Association of Zoos and Aquariums Accreditation Standards and
  Related Policies .........................................................................................54

Marisol Bello, *So Far in 2011, Fewer Deaths in National Parks*, USA
  Today .........................................................................................................37

United States Department of Homeland Security, *2012 Recreational Boating
  Statistics*....................................................................................................37

**Rules**

Fed. R. Evid. 702 ..................................................................................... 46, 47

**Regulations**

29 C.F.R. § 1910.23(d)(1)(iii)..........................................................................5

29 C.F.R. § 2200.90(d) ...............................................................................3, 5

## GLOSSARY OF ABBREVIATIONS AND ACRONYMS

| | |
|---|---|
| Administrative Law Judge | ALJ |
| Association of Zoos and Aquariums | AZA |
| California's OSHA Agency | Cal/OSHA |
| Occupational Safety and Health Act | OSH Act |
| Occupational Safety and Health Administration | OSHA |
| Occupational Safety and Health Review Commission | OSHRC or Commission |
| SeaWorld of Florida LLC | SeaWorld |
| Section 5(a)(1) of the Occupational Safety and Health Act | The General Duty Clause |
| Standard Operating Procedures | SOP |

## INTRODUCTION

This case concerns the interaction between humans and whales at SeaWorld of Florida ("SeaWorld"). SeaWorld is "'the world leader in the caring for, display and showing for entertainment purposes' of killer whales and other marine animals." Order 19 (citation omitted). Its pioneering work in caring for whales includes an extraordinary training regimen for whales' trainers—who typically cannot come into contact with whales for years after arriving at SeaWorld—and voluminous safety protocols that have been developed and refined with thought and care over more than fifty years. When asked at trial how SeaWorld could improve its safety practices, the government's expert demurred, "[Y]ou guys are the experts . . . . [Y]ou've got all the history, and a lot of creativity . . . ." Tr. 798.

SeaWorld offers the public an opportunity to observe humans' interaction with killer whales. This brings profound public educational benefit, is integral to SeaWorld's care of the whales, and responds to an elemental human desire to know, understand, and interact with the natural world. Interacting with nature is not without risk—not when mountain climbing or kayaking, not when sailing or swimming in the ocean, not when visiting our national parks. On rare occasions, killer whales can be dangerous. SeaWorld has taken extraordinary measures to control that risk. But it cannot eliminate it while facilitating the interaction between humans and whales that is integral to its mission.

1

This case stems from SeaWorld's first and only employee fatality involving a killer whale—Dawn Brancheau's tragic death on February 24, 2010, after the whale known as Tilikum pulled her into a pool from an area of ankle deep water. Despite the absence of prior relevant citations or agency or industry guidelines, the Secretary of Labor now uses Tilikum's admittedly unexpected behavior to indict SeaWorld for conduct it has engaged in for the entirety of its fifty-year history, and to prohibit "close contact" between SeaWorld's staff and killer whales. The citations depend on a novel application of Section 5(a)(1) of the Occupational Safety and Health Act (the "General Duty Clause") to define controlled interactions with highly-trained animals as a "recognized hazard" in need of "elimination," and to require "abatement" measures that the Secretary himself is unable to define.

The case is fundamentally misguided, and the decision of the administrative law judge below must be reversed. As the Supreme Court has instructed and courts have repeatedly affirmed, the OSH Act does not require risk-free workplaces, only the feasible reduction of hazards. SeaWorld has made extraordinary steps in that regard—it is the industry leader, and is constantly learning and improving. The General Duty Clause cannot be used to force a company to change the very product that it offers the public, and the business it is in. The Clause is no more an instrument for supervising the interactions between whales and humans at Sea-World, than it is a charter to prohibit blocking and tackling in the NFL or to post

2

speed limits on the NASCAR circuit.  Moreover, OSHA improperly failed to iden-

tify reasonable and feasible additional safety measures SeaWorld should have im-

plemented, indeed, its unprecedented use of the OSH Act in this case has failed to

afford SeaWorld proper notice and constitutional due process.

The decision below should be reversed, and OSHA's citations dismissed.

## JURISDICTIONAL STATEMENT

The Secretary issued two citations alleging that SeaWorld violated the Gen-

eral Duty Clause of the OSH Act by allowing trainers to contact Tilikum and other

whales without "adequate protection." Order 14.  These citations were affirmed on

June 11, 2012, under Section 10(c) of the OSH Act, *see* 29 U.S.C. § 659(c).  The

ALJ's decision became a final order of the Occupational Safety and Health Review

Commission ("Commission") on July 16, 2012, after the Commission declined re-

view.  *See* 29 C.F.R. § 2200.90(d).  This Court has jurisdiction pursuant to 29

U.S.C. § 660(a) because SeaWorld filed its petition for review in this Court on

September 7, 2012, within sixty days of the Commission's final order.

## RELEVANT STATUTES AND REGULATIONS

The "General Duty Clause" of the OSH Act provides:

"Each employer—(1) shall furnish to each of his employees employ-
ment and a place of employment which are free from recognized haz-
ards that are causing or are likely to cause death or serious physical
harm to his employees."

29 U.S.C. § 654(a).

3

## STATEMENT OF ISSUES PRESENTED FOR REVIEW

**I.**     Whether the Secretary established that trainers' exposure to killer whales at SeaWorld presented a "recognized hazard" where (a) the risk of unpredictable whale behavior was substantially reduced by safety protocols, training, and emergency procedures, and (b) the Supreme Court has instructed that the OSH Act does not require "risk free workplaces."

**II.**     Whether the ALJ erred by admitting and relying on Dr. David A. Duffus as an expert despite his admitted lack of expertise with respect to the behavior of trained whales in captivity.

**III.**     Whether the Secretary established feasible methods for abating the cited hazard, considering that SeaWorld's safety protocols already met industry standards and other state and federal agency requirements, and that the Secretary's witnesses all conceded that they lacked necessary expertise to define feasible abatement measures.

**IV.**     Whether SeaWorld constitutionally can be subject to civil fines absent fair notice of the specific abatement measures the Secretary now mandates for the first time.

## STATEMENT OF THE CASE

On August 23, 2010, the Secretary issued two citations alleging that Sea-World "willfully" violated the General Duty Clause by allowing trainers to contact

4

Tilikum and other whales without "adequate protection," which exposed them to "struck-by" and "drowning" hazards. Order 14. Following a nine-day trial, the ALJ issued an order on June 11, 2012 rejecting the Secretary's "willful" classification but otherwise affirming the citation, and assessing a $7,000 penalty. *See id.* 44, 47.[1]

SeaWorld sought review from the Commission on July 5, 2012. The Secretary conditionally cross-petitioned with regard to the ALJ's ruling on "willfulness." Review was not granted, and thus the ALJ's decision became a final order on July 16, 2012. *See* 29 C.F.R. § 2200.90(d). SeaWorld petitioned this Court for review on September 7, 2012.

## STATEMENT OF FACTS

SeaWorld of Florida owns and operates a marine-life based zoological park in Orlando, Florida. *See* Order 1. Its mission is to entertain and educate, as well as to conserve marine life by, among other things, studying and displaying animals, advancing the veterinary and educational benefits of trainer-animal interactions, and rescuing wounded animals from the wild. *See* Order 3-4, 7-8; Tr. 25, 34, 109, 1718-1736. SeaWorld has been pursuing its unique mission since the mid-1960s, along with sister parks in San Antonio and San Diego. *See* Order 3. Together, the-

---

[1] The Secretary also issued a citation alleging a "serious" violation of 29 C.F.R. § 1910.23(d)(1)(iii), which provides standards for employers to guard wall openings and holes. *See* Order 10. This citation is not at issue in SeaWorld's petition for review.

se parks house a vast collection of animals, including the world's largest collection of killer whales.

### A.     The Nature Of SeaWorld's Operations

SeaWorld has always made killer whales the centerpiece of its mission. *See* Order 1. It has pioneered the use of close-proximity interactions between whales and trainers, and its trainers have regularly and safely conducted such interactions. *See* Tr. 638, 1460-61. These whale-trainer interactions have advanced zoologists' knowledge of killer whales, improved veterinary practice, enthralled audiences, and inspired scores of people to support conservation and animal education, and in many cases, to devote their careers to SeaWorld's mission. *See id.* at 25, 34, 1581-82, 1718.

SeaWorld complies with all relevant permitting requirements and industry guidelines governing the proper care and display of killer whales, including those of the National Fisheries Service, the Department of Agriculture, and the Association of Zoos and Aquariums ("AZA"). *See* Tr. 881, 942, 1775-77. Additionally, SeaWorld is universally recognized for setting industry standards in the use of "operant conditioning" and the instruction of killer whale trainers. *See* Order 19-20; Tr. 1791-95.

### 1.    The Use Of Operant Conditioning To Train Killer Whales

The success of SeaWorld's killer whale program is attributable to operant conditioning—a scientific method that professional animal trainers have used for decades.  *See* Tr. 805, 1604-05.  Through rigorous efforts, trainers gradually increase the frequency of desired animal behavior, and minimize the occurrence of undesirable behavior, by encouraging the former with "positive reinforcement" and ignoring (and thereby discouraging) the latter.  *See* Order 5.

SeaWorld pioneered the use of these principles for killer whale training.  *See* Tr. 638-39.  Killer whales are given fish and Jell-O, and petted by trainers, for example, to provide positive reinforcement that makes them accustomed to close human interactions and teaches them to perform specific behaviors.  *See* Order 5-6. Conditioning renders whales' behavior "very predictable," and trainers are able to maintain ongoing close contact.  Tr. 126-28, 368, 1413.  An experienced trainer has dozens of close interactions every day, and hundreds each week.  *See id.* 625, 1357.

The success of conditioning depends on trainers interacting with the whales in a variety of contexts.  For example, to prevent whales from associating certain interactions with uncomfortable "husbandry" or medical procedures, trainers practice those interactions in non-medical settings and as part of "fun" activities, like public performances. ("Husbandry" refers to procedures to monitor and maintain

7

whales' health, such as drawing blood.) *See* Tr. 105-09, 1307-10. Similarly, trainers practice non-medical interactions with the whales in designated "medical" pools, and practice medical procedures in pools designated for entertainment. *See id.*

Over the course of its history, SeaWorld has set standards for the use of operant conditioning. *See* Tr. 638, 1794-95. Its programs are replicated in zoos throughout the world, for animals of all kinds. *See id.* These programs have ensured a high level of safety—incidents at SeaWorld have consistently declined over time, with no incidents whatsoever in a nearly five-year span preceding Ms. Brancheau's death. Tr. 487. Yet despite its great successes, SeaWorld has never purported to eliminate *all* risks attendant to working with animals. *See id.* Its safety documents acknowledge the reality that killer whales have the capacity to act unpredictably, and that working with them involves residual risks that can never be eliminated despite the best training and conditioning. *See id.* at 113-14, 1047.

### 2.    The Development And Maintenance Of Whale-Specific Protocols

Though all whales are susceptible to being trained, they have different characteristics and learning abilities. *See* Tr. 1048, 1315; *see also* Ex. C-7 (noting, as part of each whale's "animal profile," its "reinforcers" and what it "finds aversive").

8

In recognition of these differences, SeaWorld develops specific protocols for each whale. *See*, *e.g.*, Tr. 648; *see also* Exs. C-6, C-7 (compiling SeaWorld's "incident reports"). Whales that cannot be acclimated to particular interactions are treated accordingly. For example, the whale known as Tilikum has always been designated as a "drywork" whale. Order 26. This means that trainers were only allowed to work with Tilikum in water shallower than their knees. *See Id.* at 5.[2]

For every whale, training and safe handling are ongoing processes that require a high degree of skill and attention. After initial conditioning, trainers must continually practice and reinforce desired behaviors. *See* Tr. 105-09, 1726-27. They must also pay close attention to changes indicating that certain means of reinforcement need to be altered. *See id.* at 1128-29, 1795-96, 1806.

To best monitor whales' behavior and maintain the effectiveness of operant conditioning, trainers are assigned to specific whales' "team[s]." *See* Tr. 718. Only those trainers may have close interactions with the whale. *See id.* They maintain "daily animal records" that chronicle every detail of the whale's behavior. *See id.* at 620-21. They also develop "incident reports" to describe behavior inconsistent with trainer expectations. *See id.* at 1008-09; *see also* Ex. C-6. These reports are circulated to park managers, who work with the trainers to implement any necessary adjustments to protocols. *See* Tr. 450, 1008-09; *see also* Ex. C-7.

---

[2] "Waterwork" is in water deeper than a trainer's knees. Since the Brancheau accident, SeaWorld has prohibited "waterwork" with any whale.

9

### 3.     The Rigorous Path To Becoming A Killer Whale Trainer

Like the process of operant conditioning, the path to becoming a killer whale trainer is lengthy and demanding.  Initially, new trainers merely observe whales. Tr. 1271.  More senior trainers act as "coaches" and teach the new trainers about recognizing and responding to whale behaviors, using operant conditioning, and understanding individual whales' personalities.  *Id.* at 1271-81.

New trainers must complete an "orientation checklist" that tests their mastery of necessary skills.  Tr. 1283-84; Ex. C-5.  They must also demonstrate an understanding of SeaWorld's standard operating procedures ("SOP"), which are general and specific safety protocols, including a chapter on Tilikum-specific protocols.  *See* Tr. 270-71; Ex. C-1.  Eventually, new trainers sign a form stating their understanding of the SOP and that working with large animals involves residual risks.  *See* Tr. at 51-52.

Senior trainers decide when new trainers are ready to accept additional responsibilities.  Tr. 1268, 1290.  In no case may a trainer with fewer than eighteen months' experience have close contact with a whale, nor may a trainer with fewer than three years' experience direct a whale's behavior.  *See id.* 87-88.  Once a trainer is assigned to a whale's "team," she must familiarize herself with its "profile" and "incident reports," and may progress from non-tactile to tactile work depending on senior trainers' approval.  *Id.* at 296-99, 677-78, 690, 1297.  This sys-

10

tem results in trainers being able to understand and predict with great accuracy behavioral cues and "precursors" to negative conduct.  *Id.* at 56, 435, 1046-47.

Throughout their career, trainers must continually demonstrate their knowledge and fitness.  Each year, they must review and re-sign the SOP.  *See* Tr. 1283.  Trainers view their job as a personal "calling" and express profound satisfaction from the work they do.  Order 41; Tr. 1274, 1335.

### 4.    The Importance Of Trainers' Close Contact With Whales

Trainers' close contact with whales makes them the primary agents of SeaWorld's institutional mission.  It allows them to facilitate necessary husbandry procedures and veterinary care, *see* Tr. 1717-20; it enables them to stabilize whale populations through artificial insemination, *see id.* at 1725; it helps them to detect and understand the causes of whales' behavior, *see id.* at 1739; and it allows them to provide a potentially life-changing experience for audiences, *see id.* at 1581. Guests have repeatedly written that watching trainers touch and direct whales' behavior has inspired and "changed them."  *Id.*

Trainers' close contact with whales also makes them the primary source of information for SeaWorld's management.  *See* Tr. 620-21, 1009-10, 1362-63. Trainers are uniquely positioned to interpret and anticipate whales' behavior.  *See id.* at 435, 1046-47.  Correspondingly, they are the only people from whom the whales will take direction.  *See id.* at 605-07.  Recognizing this, SeaWorld pro-

11

motes a culture of "empower[ment]" whereby trainers determine the nature of each interaction, including the content of public performances. *See id.* at 89-90, 1380-81, 317-18, 1468, 1793. They are free to stop or alter any interaction based on a whale's behavior cues. *See id.* And they are encouraged to approach management with any suggested adjustments to protocol. *See id.* at 1362.

Finally, close contact is essential to whales' and trainers' safety. Whales cannot be anesthetized due to their size, so veterinarians depend on trainers' ability to feel physical deformities and other signs of illness. Tr. 1739. Because contact increases the predictability of whales' behavior, it decreases the likelihood of unforeseeable aggressive behavior, including when whales receive veterinary treatment. *See id.* at 877, 1319-21, 1796.

### B.    SeaWorld's Emergency Procedures

SeaWorld has instituted extensive emergency procedures to protect trainers' safety, and has only had approximately a dozen recorded injuries over a history of millions of trainer-whale interactions. Tr. 628. (The number of incidents has decreased drastically over time. *See id.* at 1460-61.) During all interactions, additional trainers stand poolside as "spotters" to provide assistance as necessary. *Id.* at 89, 206. They sound an alarm if the trainer is injured or at risk of injury. *See id.* at 654, 1300. Upon hearing an alarm, trainers immediately report to the relevant pool and provide aid using methods including the following: (a) calling whales to

12

the front of the pool with cues—such as underwater tones and hand slaps on the surface of the water—that are practiced in the conditioning process; (b) gathering whales into a desired area of the pool using large, poolside nets; and (c) supplying the trainer with "spare air" by means of a "trot line," *i.e.*, a rope with small oxygen tanks attached. *Id.* at 611-13, 1035-36, 1300-03.

In the few instances when unexpected behavior has resulted in injuries, SeaWorld has promptly reviewed the incident and applied its expertise to implement any changes that it believed could prevent similar occurrences. Tr. 535, 640-46, 1130-32, 1149, 1221-23. For example, SeaWorld required all trainers to wear wet suits after a whale mouthed a trainer's loose clothing. *See id.* at 1465-66.

Together with its diligent efforts to keep "animal profiles," to log unusual "incidents," and to advance the effectiveness of its conditioning and training, SeaWorld's constantly refined emergency procedures have resulted in trainers' jobs continually becoming safer, with a corresponding drop in injuries and "near misses" over time. Tr. 487-88, 509.

As the ALJ properly recognizes, SeaWorld's emergency procedures and general safety procedures set the "industry standard," Order 19, and are indicative of a "safety conscious employer" that has "continuously refin[ed]" its procedures over time, *id.* at 43-45. The Secretary's expert testified similarly, conceding that

13

"you guys [*i.e.*, SeaWorld personnel] are the experts" when asked to define safe and appropriate means of interacting with trained whales. Tr. 798.

### C.    The Death Of Dawn Brancheau And The Resulting Investigations

Dawn Brancheau was one of SeaWorld's most experienced trainers. Tr. 93. On February 24, 2010, she had just concluded a performance and decided to initiate a "relate," or relationship-building, session with Tilikum, as she had done countless times before. *See id.* at 284-85. She lay down on the poolside, signaling Tilikum to mimic her behavior by rolling over, an interaction known as a "layout mimic." *See id.* at 753. Instead, without warning or precedent, Tilikum pulled her into the pool, where she experienced traumatic injuries and drowned. *See id.* at 286.

As the Secretary's expert admitted, SeaWorld could not have predicted this terrible incident. *See* Tr. 844-45, 886-87. It was unexpected for several reasons, including:

- Brancheau had a long, positive history with Tilikum, *see id.* at 93-94;

- In the moments before the incident, Tilikum did not exhibit any signs, or "precursors," to aggression, *see id.* at 58, 436;

- Although SeaWorld recognized that Tilikum could not be conditioned for waterwork, he had never tried to pull people into the water or given any indication that layout mimics could expose trainers to danger, *id.* at 471-72, 1340, 1395.

14

As the result of an immediate internal investigation, SeaWorld confirmed that the incident had been unpredictable and was not due to trainer error. *See* Tr. 58, 1391. Nevertheless, in response to this tragic accident, SeaWorld instituted a number of changes—including the suspension of all "waterwork"—and examined other potential changes.

### D.    The Secretary's Citations And The ALJ's Decision

On August 23, 2010, the Secretary issued two "willful" citations against SeaWorld under Section 5(a)(1) of the OSH Act. Order 2, 14-15. The first alleged that trainers "were exposed to struck-by and drowning hazards in that they were allowed unprotected contact with Tilikum while conducting 'drywork' performances." *Id.* at 14. The second alleged that trainers were exposed to "struck by and drowning hazards in that they were allowed to engage in 'waterwork' and 'drywork' performances" with killer whales other than Tilikum. *Id.* The citations alleged that feasible controls included physical barriers or other measures that provide the same or greater protection. *Id.* Yet, the Secretary admittedly did not have expertise to define these alleged abatement measures. His witnesses maintained that only SeaWorld had "expertis[e]" to define these measures, Tr. 792, and that they would not "second guess" the instincts of "an experienced trainer" with respect to appropriate "proximity" to whales, *id.* at 903.

15

The ALJ rejected the Secretary's "willful" classification because he found "no evidence" that SeaWorld "disregarded the requirements of the Act," but instead found that SeaWorld "constantly emphasized safety training, was continuously refining its safety program," and was a "safety conscious employer." Order 44-45. Nevertheless, the ALJ affirmed the Secretary's citations as "serious" because he found that "the emotions inspired by the grandeur of humans interacting with killer whales" were not "worth the dangers created by the interactions." *Id.* at 42. With respect to the Tilikum-specific citation, the ALJ concluded that "working in close contact with Tilikum during drywork performances" was a "recognized hazard" because (a) SeaWorld's Tilikum-specific protocols demonstrated "recognition that [Tilikum] is a dangerous animal," and (b) Tilikum had been involved in prior human deaths (none of which involved SeaWorld trainers).[3] *Id.* at 25-27. The ALJ credited the Secretary's assertion that "using physical barriers and minimum distances eliminates the trainers' exposure to the recognized hazard of working with killer whales." *Id.* at 41.

With respect to the citation regarding whales "other than Tilikum," the ALJ found that "close contact" was a "recognized hazard" based on "numerous com-

---

[3] The first incident involved a trainer at the company that owned Tilikum before SeaWorld acquired him. The trainer had slipped into the pool where Tilikum was swimming, and Tilikum submerged her, resulting in her death. The second incident involved a man who was found dead in Tilikum's pool after apparently having snuck into the park after closing. It is unclear what role, if any, Tilikum played in his death. Order 19-20.

16

ments made over the years by SeaWorld management personnel" in SeaWorld in-cident reports ranging from 1995 to 2009. *Id.* at 14, 29. Here too, the ALJ deter-mined that "physical barrier[s]" and "minimum distance[s]" were feasible means of abatement because he concluded (without citing any evidence) that SeaWorld had "banned waterwork" and "perform[ed] drywork from behind barriers," and "there was no evidence adduced that the elimination of waterwork or the imple-mentation of barriers for drywork has had a negative impact on SeaWorld's prof-its." Order 41.

Although the citations drew no clear distinction between "shows" and other SeaWorld activities, the ALJ limited his decision to "show performances" and in-dicated that it should not affect "[o]ther activities during which trainers are in close contact with killer whales." Order 43-45. The ALJ declined to restrict contact during husbandry activities, for example, because he found that, "[a]s the custodian of its killer whales, SeaWorld ha[d] an ethical duty to provide health and medical care to them." *Id.* at 45.

## SUMMARY OF ARGUMENT

The OSH Act's General Duty Clause is a default provision that requires em-ployers to "furnish . . . employment and a place of employment which are free from recognized hazards that are causing or are likely to cause death or serious physical harm to [] employees." 29 U.S.C. § 654(a)(1). To prove a General Duty

Clause violation, the Secretary "must establish that: (1) an activity or condition in the employer's workplace presented a hazard to an employee, (2) either the employer or the industry recognized the condition or activity as a hazard, (3) the hazard was likely to or actually caused death or serious physical harm, and (4) a feasible means to eliminate or materially reduce the hazard existed." *Fabi Constr. Co. v. Sec'y of Labor*, 508 F.3d 1077, 1081 (D.C. Cir. 2007). The General Duty Clause does not "impose strict liability," *Nat'l Realty & Constr. Co. v. OSHRC*, 489 F.2d 1257, 1265-66 (D.C. Cir. 1973), and requires only a "material[l] reduct[ion]" in a recognized hazard, not its complete elimination. *Fabi Constr. Co.*, 508 F.3d at 1081. Employers are accountable only for "conditions . . . over which [they] can reasonably be expected to exercise control," *Pelron Corp.*, 12 BNA OSHC 1833, 1986 WL 53616, at *3 (No. 82-388, 1986), and "some industrial activities are by their very nature dangerous." *Id.* In those circumstances, the "normal activities in such an industry" cannot "be defined as a 'recognized hazard,'" since doing so would "eliminate an element of the Secretary's burden of proof." *Id*. Likewise, "[f]reakish and unforeseeable" circumstances cannot "trigger statutory liability under the general duty clause." *Tuscan/Lehigh Dairies, Inc.*, 22 BNA OSH 1870, 2009 WL 3030764, at *14 (08-0637, 2009).

The Clause's requirements that a hazard be "recognized," and that an employer take only those steps that would be taken by "a reasonably prudent employ-

18

er in the industry," *Donovan v. Royal Logging Co.*, 645 F.2d 822, 831 (9th Cir. 1981), are ultimately requirements of a constitutional dimension, for they help "dissipate" (*id.*) "certain problems of fair notice" that otherwise are raised by "any statute . . . imposing general obligations." *Nat'l Realty*, 489 F.2d at 1268 n.41.

These standards are not satisfied in this case, the ALJ erred in concluding otherwise, and his decision must be reversed.

**I.**     The ALJ erred by determining that the Secretary met his burden of proving that SeaWorld exposed trainers to "recognized hazards."  Killer whales undoubtedly present risk, but the task before the ALJ was to determine whether a recognized hazard existed at SeaWorld within the meaning of the OSH Act and in the context of trainers' carefully-conducted interactions with whales.  Instead, the ALJ based his decision on potential risk presented by whales *generally*, and discounted the protections supplied by SeaWorld's extensive protocols even as he improperly used those protocols to infer "recognition" of a hazard that, in fact, the protocols help control.

More fundamentally, the ALJ erred by supposing that SeaWorld was required to eliminate all risk—including unexpected risks arising from interactions with nature—and that the "close contact" that is integral to SeaWorld's mission, business, and to what it offers the public could be deemed a "recognized hazard" and simply banned.  The ALJ's conclusion that close contact is a recognized haz-

ard when conducted to educate and entertain the public and develop a rapport with a whale, but is *not* a recognized hazard when performed for husbandry and medical purposes, is arbitrary, capricious, and grounded in nothing but the ALJ's own personal cost-benefit analysis of the relative "worth" of different parts of SeaWorld's mission. That conclusion, moreover, is flatly contradicted by undisputed record evidence that "close contact" in these different contexts cannot be separated; rather, effective husbandry and medical care *require* close contact in other settings. Finally, the ALJ erred by relying on an expert witness who had no expertise in the subject at hand—the handling and behavior of whales in captivity—and who readily conceded that on that subject, it was SeaWorld who was the world's foremost authority.

II.     The ALJ also erred by concluding that the Secretary met his burden of proving feasible controls by insisting upon no contact between whales and trainers. The Secretary's witnesses acknowledged their inability to establish the efficacy of the abatement measures set forth in the citation and instead repeatedly deferred to SeaWorld's "expertise" in this regard. The record is clear that SeaWorld and its industry had never viewed these measures as feasible or necessary. The measures are also infeasible because eliminating contact presents additional hazards to trainers and whales and is tantamount to eliminating trainers' jobs.

20

**III.**    Finally, the ALJ erred by failing to sustain SeaWorld's affirmative defenses.  The General Duty Clause is unconstitutionally vague as applied to require the elimination of close contact through the nebulous abatement measures the Secretary now attempts to invoke for the first time.  SeaWorld lacked fair notice of these measures, especially considering its prior receipt of conflicting guidance from the California OSHA agency.

**STANDING**

SeaWorld is an employer that received citations from OSHA.  The Occupational Safety and Health Review Commission declined review of the ALJ's decision affirming OSHA's citations. Thus, SeaWorld is a party aggrieved by a final order of the Commission, and has standing to appeal the Commission's decision under 29 U.S.C. § 660.

**STANDARD OF REVIEW**

This Court will vacate an order of the Commission if its findings of fact were not "supported by substantial evidence."  *Am. Wrecking Corp. v. Sec'y of Labor*, 351 F.3d 1254, 1261 (D.C. Cir. 2003).  To make this determination, the Court looks to the record "as a whole," recognizing that "evidence that is substantial when viewed in isolation may become insubstantial when contradictory evidence is taken into account."  *Id.*

21

This Court will also vacate an order of the Commission if it is "arbitrary, capricious, an abuse of discretion, or otherwise not in accordance with law."  5 U.S.C. § 706(2)(A); *see also Millard Refrigerated Servs., Inc. v. Sec'y of Labor*, ___ F.3d ___, 2013 WL 2450521, at *2 (D.C. Cir. June 7, 2013).  To make this determination, the reviewing court "must consider whether the decision was based on a consideration of the relevant factors and whether there has been a clear error of judgment." *Marsh v. Or. Nat'l Res. Council*, 490 U.S. 360, 378 (1989).  Further, "[w]here an agency departs from established precedent without reasoned explanation, its decision will be vacated as arbitrary and capricious." *Trump Plaza Assocs. v. NLRB*, 679 F.3d 822, 827 (D.C. Cir. 2012).

Agency action may only be affirmed on the grounds identified in the agency's decision.  *SEC v. Chenery Corp.*, 318 U.S. 80, 88 (1943).  Where multiple grounds are given for an agency decision and even one is deficient, this Court will vacate unless the agency made clear that it would have reached the same decision even absent the invalid factor.  *Nat'l Fuel Gas Supply Corp. v. FERC*, 468 F.3d 831, 839 (D.C. Cir. 2006).

## ARGUMENT

## I.    SeaWorld Did Not Expose Employees To A "Recognized Hazard."

To establish a "recognized hazard" under the General Duty Clause, the Secretary must prove that a hazard exists which is "either actually known to the par-

ticular employer or generally known in the industry." *Pepperidge Farm, Inc.*, 17 BNA OSHC 1993, 1997 WL 212599, at *12 (89-265, 1997). The ALJ erred by concluding that the Secretary made that showing, here, because (a) the ALJ's findings with respect to the alleged hazards and the effectiveness of SeaWorld's existing precautions are unsupported by substantial evidence, (b) the cited hazard of "close contact" cannot constitute a recognized hazard as a matter of law, and (c) the ALJ conclusions are dependent on the Secretary's manifestly unqualified expert.

### A.    The ALJ's "Recognized Hazard" Findings Are Unsupported By Substantial Evidence

The ALJ lacked substantial evidence for his findings regarding the alleged hazards pertaining to Tilikum and other whales, and his finding that SeaWorld's existing safety protocols were inadequate.

**1.**    With respect to Tilikum, the ALJ found the recognized hazard to be "close contact with Tilikum during drywork performances." Order 25. That finding is arbitrary, capricious, and unsupported by substantial evidence for three reasons. First, it is based on the ALJ's finding of "recognition" of something entirely different, namely, the company's purported "recognition that [Tilikum] is a dangerous animal who presents a hazard to trainers." Order 26. The truism that killer whales are potentially dangerous does not, however, establish that SeaWorld recognized Tilikum to be hazardous *in the circumstances in which trainers interacted*

23

*with him under the company's carefully-designed drywork protocols*, which is the subject of the citation at issue. It is the latter circumstance that the Secretary had to show to be a "recognized hazard." He failed to do so.

Instead of acknowledging SeaWorld's understanding that its drywork protocols for Tilikum properly *controlled* the risk that killer whales can present, the ALJ relied almost exclusively on those protocols to *establish* recognition of a hazard. He found that a Tilikum-specific SOP chapter and other "special treatment" showed SeaWorld's "recognition that he [was] a dangerous animal who present[ed] a hazard to trainers." Order 25-27. But SeaWorld's use of these precautions, to control interactions with an animal that undeniably can present danger if not handled properly, does not support a finding that SeaWorld believed a hazard to be present when these precautions *were followed*. Nor can SeaWorld's use of precautions show recognition of the need for additional precautions. *See Wheeling-Pittsburgh Steel Corp.*, 16 BNA OSHC 1218, 1993 WL 155695, at *5 (89-3389, 1993) (precautions used to prevent a locomotive from shutting down automatically did not show recognition of the need for further precautions). By implementing its precautions, SeaWorld reasonably believed it had mitigated the special risks associated with Tilikum, Tr. 596-98. Indeed, trainers said that Tilikum was "exceptionally" obedient in "drywork," *id.* at 598-99; *see also id.* at 472

24

("[W]e never had an incident with [Tilikum] that would have showed us any type of aggression with anybody in a land situation").

Second, the ALJ impermissibly based his "recognized hazard" determination about *drywork* with Tilikum on other, *non-drywork* activities. For instance, immediately after concluding that SeaWorld "recognized the hazard . . . during drywork performances," the ALJ cited two pieces of evidence: (1) a fatal waterwork incident involving Tilikum at another park approximately 20 years earlier (which was the reason that, from the time Tilikum arrived at SeaWorld, he was excluded from waterwork); and (2) the "special treatment" of Tilikum, described above, that SeaWorld took precisely to avert the potential hazard that he was recognized to present. Order 25-26. The ALJ also relied on Tilikum's involvement in three of the four "known human deaths" from killer whales. *Id.* at 26 n.6. But none of those deaths can corroborate the allegation that "drywork" was a recognized hazard, because they all involved people who were in the water with Tilikum. *Id.* at 42. In at least one of the instances, moreover, it is still unclear "what role, if any, Tilikum played in [the] death." *Id.* at 20.

Third and finally, the ALJ's finding is patently flawed because the "close contact" that he found to be impermissibly hazardous is, at one and the same time, conduct that he deemed acceptable so long as it is to care for the whales, *i.e.*, husbandry and other medical care. This demonstrates that the ALJ's decision was not

25

based on proper application of the "recognized hazard" requirement of the General Duty Clause, but on his own cost-benefit theorizing about the relative value of SeaWorld's public display of the interaction between whales and humans on the one hand, and its care for the whales on the other.

**2.**     With respect to whales other than Tilikum, the ALJ found the recognized hazard to be "working in close contact" with these whales during "waterwork" or "drywork." Order 32. That finding was also arbitrary, capricious, and unsupported by substantial evidence for two reasons. First, the evidence is undisputed that different whales have different characteristics and respond in different ways to different stimuli, presenting different challenges and different—remote—types of risk. And yet, based largely on the single unanticipated incident involving Tilikum, the ALJ barred close contact with all whales. That was clear error.[4]

Whales have individual "personalities"—some are more or less social, aggressive, and intelligent, among other things—and they change over time due to personal and circumstantial factors. *See* Tr. 356-60, 630, 1048, 1315, 1821. Such whale-to-whale differences are the reason SeaWorld develops whale-specific safe-

---

[4] The ALJ also based his decision on the death of a trainer at a marine park in Spain. Order 40. SeaWorld did not operate that park, and was not responsible for selecting or managing its trainers or overseeing its care of the whales. *Id.* at 44; Tr. 419. There is no evidence, let alone substantial evidence, that the other park had all the same safety protocols as SeaWorld. Accordingly, the incident is irrelevant to whether SeaWorld recognized a hazard in its program for whale-human interaction.

ty protocols, and keeps detailed "animal profiles" and "incident reports" to track any developments necessitating a change in those protocols. *See supra*, pp. 8-9. These differences are also the reason why SeaWorld matches specific whales with specific trainers according to their abilities. *See id.* Interactions that are more predictable and safe to perform with one whale may be less safe to perform with others, and certain whales require a greater level of skill to handle successfully. Tr. 150, 527-28, 677-78, 1344; *see also* Ex. C-7.

The Secretary implicitly acknowledged these differences by issuing separate citations for Tilikum and for all "other" whales. Order 14. And crucially, his expert was unable to say definitively that whales *other than Tilikum* presented any cognizable risks to trainers. Asked whether the "risks" of working with captive whales go beyond Tilikum, Dr. Duffus responded, "that's a difficult question, and to be fair, we have only seen it with Tilikum." Tr. 855-56.

In light of these differences, the ALJ could not properly have found that SeaWorld recognized "close contact" as an across-the-board hazard without conducting a whale-by-whale inquiry, and considering whether SeaWorld recognized a hazard when specific trainers interacted with specific whales according to their specific protocols. But the ALJ did nothing of the sort.

Second, the ALJ erred by relying on SeaWorld's "incident reports" to find recognition of a hazard, and thereby failing to distinguish between the background

27

risk that killer whales undeniably present and, on the other hand, SeaWorld's exacting process to monitor, evaluate, and refine its protocols to control that risk. SeaWorld used incident reports to monitor changes in behavior and to hone its whale-specific protocols. They were a means to improve operant conditioning and trainers' interaction with whales, not documentation of defects in SeaWorld's process that it recognized but had no intention to address. *See* Tr. 363-64; 514-15. Indeed, the ALJ committed clear error by using the reports as evidence of an ongoing recognized hazard even though the reports included a section titled "what corrective steps have been taken," which outlined how potential problems had been addressed. *See, e.g.*, Ex. C-6 at 501. For example, the ALJ relied on a report noting that "trainers can get too comfortable working with certain whales" (Order 31), but the same report showed that SeaWorld resolved to address the issue by, among other things, "assign[ing] 'tutor' trainers to . . . help acclimate our newest trainers on their respective animals." Ex. C-6 at 501. Similarly, another report observed that "there [are] certain killer whales in our company that should be worked as protective contact animals" (that is, subject to special practices regarding contact). Order 30. The ALJ relied on this statement without noting that the report proceeded to explain how contact with the whales at issue would be "restricted" going forward. Ex. C-6 at 1457-58. And, a report indicating that "[a]nimals with aggressive tendencies should only be worked by experienced trainers" (Order 31), went

28

on to provide that "in the future" interactions with the whales involved in the incident "shall be limited" to specific, listed trainers.  Ex. C-6 at 536.

These reports do not show "recognition" of ongoing hazards.  Instead, they show resolution of potential problems in accordance with what the ALJ recognized to be SeaWorld's process of "continuously refining" its protections.   Order 45.  And other reports quoted in the ALJ's opinion actually illustrate the effectiveness of SeaWorld's protocols, such as the observation that an incident in which "no one was hurt or even touched" provided a "great learning opportunity," and that "[n]ew staff and trainers that have never experienced aggression can learn a lot from [another] incident."  Order 29-32.

In any event, this handful of "comments"—which range from 1995 to 2009, spans all SeaWorld's parks, and refers to only a few whales and trainers—is a patently inadequate basis for the ALJ's sweeping conclusion that SeaWorld recognized close contact between *any* trainer and *any* whale as a workplace hazard.[5]  Such cherry-picking is nothing more than an improper "attemp[t] to create . . .

---

[5] The ALJ's unsupported assertion that these comments are a "sampling" from some broader pool of unidentified communications does not justify his conclusions or excuse his failure to conduct a rigorous analysis.  Order 32.

29

recognition" using the ALJ's "own interpretation of [SeaWorld's] work rules." *The Timken Co.*, No. 97-0979, 1998 WL 754132, at *6 (ALJ, Oct. 23, 1998).[6]

**3.**    In using SeaWorld's safety program to establish recognition of a hazard, the ALJ also inverted the requirement of the General Duty Clause that the Secretary, "as a threshold matter," "submit evidence proving . . . that the methods undertaken by the employer to address the alleged hazard were inadequate." *U.S. Postal Serv.*, No. 04-0316, 2006 WL 6463045, at *8 (OSHRC Nov. 20, 2006).  That is, the hazard-recognition element of the General Duty Clause inquires whether the employer recognized the need for precautions *beyond* those it had implemented. *See Nat'l Realty & Constr. Co. v. OSHRC*, 489 F.2d 1257, 1262 (D.C. Cir. 1973) (affirming ALJ's finding that the alleged hazardous activity must be present in the actual "practice[s] among employees," accounting for their use of safety precautions, rather than due to a theoretical or "rare occurrence"); *id.* at 1266 ("[t]hough a generic form of hazardous conduct . . . may be 'recognized,' unpreventable in-

---

6  The ALJ also improperly rejected the uncontradicted testimony of SeaWorld Corporate Curator Charles Tompkins that SeaWorld's ability to predict whale behavior with "more than 98 percent accuracy" obviated any recognition of a hazard.  Order 28; *see also, e.g.*, Tr. 1047, 1367, 1413 (other witnesses corroborating Tompkins' testimony).  The ALJ rejected this analysis because it was not "based on rigorously evaluated scientific data" (Order 28-29), but Tompkins was only purporting to make a simple (and informative) comparison between the low number of incident reports and the very high number of safe trainer-whale interactions that take place every day.  Tr. 487-91.

stances of it are not"). If the Secretary cannot show that the employer recognized this need to go beyond existing precautions, he has not carried his burden of proof.

Thus, in *Cargill, Inc.*, an administrative law judge vacated a General Duty Clause citation where the employer had been using a "shut off" device to abate a potential hazard; the Secretary believed the hazard "could be abated only with an alarm," but he failed to establish that the shut off device was recognized to be inadequate and, therefore, the citation was vacated. *Cargill, Inc.*, 8 BNA OSHC 1745, 1980 WL 10234, at *9-10 (Nos. 78-4482 & 78-5289, 1980). Likewise, in *LHC Inc.*, the Secretary failed to prove a recognized hazard because "no credible evidence disclose[d] that the logging industry . . . saw a necessity for [the] one-way traffic controls" the Secretary sought to impose on top of the employer's "existing precautions." *L.H.C.*, *Inc.*, 7 BNA OSHC 1672, 1979 WL 8039, at *4-5 (No. 78-3229, 1979).

Here, SeaWorld did not recognize any hazards that were not properly mitigated by its extensive existing protocols. Order 18 n.4. Trainers uniformly testified that they felt safe, that they had control over the whales, and that they were able to anticipate and extricate themselves from potential hazards. Tr. 46, 1053-54, 1364-65. (The Secretary called five current or former SeaWorld trainers as witnesses, from Florida and San Diego. Not a single one expressed opposition to SeaWorld's processes or close contact. Rather, close contact with whales is the

31

reason many of them chose to work at SeaWorld. Order 42; Tr. 1274, 1335. At trial, the Secretary's counsel said the citations "[are] not saying there's something deficient about [SeaWorld's] training program." Tr. 66, 887. Moreover, the Secretary did not contend that SeaWorld or its industry had ever prescribed "barriers" or "distances," and he was unable to define those measures at trial. *Id.* at 885-86, 905-06, 947. Instead, his witnesses insisted that only SeaWorld had the "expert[ise]" to define these measures. *Id.* at 798. The Secretary's expert witness testified that he was "pleasantly surprised" with SeaWorld's protocols, *id.* at 66, 887, and that he would not "second guess" the instincts of "an experienced trainer" with respect to appropriate "proximity." *Id.* at 903. The OSHA Area Director testified that most or all of the abatement measures listed in the Secretary's citations were items that he believed SeaWorld was "working on" but had not actually implemented at the time of the inspection. *Id.* at 961-67. The ALJ echoed these conclusions by finding that SeaWorld's methods "work[ed]" and were indicative of a "safety-conscious employer." Order 40, 45.

Ultimately, the Secretary in this case is simply exhorting SeaWorld to apply its "expertise" to implement additional precautions. Tr. at 798, 886, 947. But that is a far cry from showing that SeaWorld recognized at the time of the accident that there was a hazard not adequately addressed by its existing measures, *see Cargill, Inc.*, 1980 WL 10234, at *9-10.

32

**B.    Activity That Is Integral To SeaWorld's Business, And Which Inevitably Involves Some Controlled Risk, Does Not Constitute A Recognized Hazard**

The OSH Act "was not designed to require employers to provide absolutely risk-free workplaces whenever it is technologically feasible," but rather to reduce "significant risks of harm." *Indus. Union Dep't., AFL-CIO v. Am. Petroleum Inst.*, 448 U.S. 607, 641 (1980) (op. of Stevens, J.).  *See also Nat'l Realty*, 489 F.2d at 1265-66 ("Congress quite clearly did not intend the general duty clause to impose strict liability.").  From this it follows that when some risk is inherent in a business activity, that risk cannot constitute a "recognized hazard" for purposes of the Clause.  As the Review Commission has put it, "some industrial activities are by their very nature dangerous. To permit the normal activities in such an industry to be defined as a 'recognized hazard' . . . is to eliminate an element of the Secretary's burden of proof . . . ." *Pelron Corp.*, 12 BNA OSHC 1833, 1986 WL 53616, at *3 (No. 82-388, 1986).[7]

The ALJ committed precisely that error in this case.  SeaWorld's business—an essential element of what it offers the public, and of its care for whales—is "close contact" interaction between whale and their trainers.  The General Duty Clause does not license an administrative law judge to outlaw that part of Sea-

---

[7] The ALJ was bound by Review Commission precedent.  Moreover, "[w]here an agency departs from established precedent without reasoned explanation, its decision will be vacated as arbitrary and capricious." *Trump Plaza Assocs. v. NLRB*, 679 F.3d 822, 827 (D.C. Cir. 2012).

World's mission, any more than it authorizes OSHA to post speed limits at Daytona or to require two-hand touch in the NFL. Moreover, "close contact" cannot be considered a recognized hazard because any risk it presents results from the rare and unexpected actions of the whales, which the trainers understood and controlled their own exposure to.

1.    "Close contact" is necessary to SeaWorld's mission, its workplace, and the whales themselves. The ALJ conceded that "close contact" is necessary at SeaWorld by allowing it to continue when caring for the whales, including in "daily" husbandry procedures such as drawing blood. Order 45. Yet the Secretary's own witnesses repeatedly opined that the alleged hazards associated with "shows" were equally present in husbandry and other interactions. *See*, *e.g.*, Tr. 912 (Duffus, testifying that SeaWorld should modify its husbandry activities to incorporate barriers or distances); *id.* at 949-50 (Grove, referring to "similar" hazards in non-"show" contexts). There is no precedent for recognizing an activity—here, "close contact"—to be perfectly appropriate at a workplace in some circumstances, but an impermissible "recognized hazard of serious physical injury or death" in another circumstance at the same workplace. The ALJ's conclusion in this regard shows that he based his decision on his own personal assessment of the relative value of different aspects of SeaWorld's mission. That was arbitrary, capricious, and unsupported by substantial evidence.

34

Moreover, the ALJ's assumption that SeaWorld can engage in close contact in its "extensive health program," Order 45, with no close contact in "show" circumstances, is simply erroneous. It was directly contradicted by SeaWorld's witnesses, and has no support in the record. The effectiveness of SeaWorld's operant conditioning program depends, in large part, on trainers' ability to practice behaviors in a variety of contexts, including during shows. *See supra* pp. 7-8. For example, to prevent whales from developing negative associations with certain contacts that are necessary to husbandry and medical care, those contacts must be practiced in non-medical settings and incorporated into "fun" activities. *See id*. Likewise, to prevent whales from associating certain *areas* of the facility with uncomfortable husbandry or medical procedures, trainers must engage in non-medical contacts with whales in areas where medical attention is provided and, occasionally, perform husbandry or medical procedures in pool areas that whales associate with playful interactions. *See id*. The Secretary's own expert conceded that "frequency of contact" should "reduce the risk[s] to the trainers" because "predictability rises with more contact." Tr. 877.

The undisputed evidence is also that close contact is an integral part of the experience that SeaWorld offers the public. And an important part of what has drawn visitors to SeaWorld for decades. Curator of Animal Training Kelly Clark testified without contradiction that it is the close contact between humans and kill-

35

er whales that for years has "inspired" visitors to SeaWorld, forever "changing" some of them.  Tr. 1579-82.  Close contact is also essential to operant conditioning.  Supervisor of Animal Training Jenny Mairot testified that she could not imagine "training of killer whales with no contact" because "you need to feel the animal . . . to feel how they're responding."  Tr. 1334.  And close contact is the single means by which SeaWorld has advanced society's scientific knowledge of, and ability to care for, killer whales.   Veterinarian Chris Dold explained that "[m]edicine, animal husbandry, animal training in any way, shape or form is a contact scenario."  Tr. 1783.

In his Order, the ALJ articulated his own personal conclusion that "the emotions inspired by the grandeur of humans interacting with killer whales" are not "worth the dangers created by the interactions."  Order 42.  But that is not a matter the General Duty Clause addresses, and is not a judgment it empowers a single administrative law judge to render, any more than it would authorize a judge to change the rules of contact in the NFL or to post speed limits at the Daytona 500.

Nor is the OSH Act a charter by which an administrative law judge may calibrate the right interaction between man and nature.  The world around us poses risks—To people who travel to remote locations to study flora and fauna; to mountain climbers and the workers who guide them; to the visitors to our national parks, who every year are injured in a thousand predictable and unpredictable ways that

society nonetheless considers worth the "grandeur" of the experience.  *See* Marisol

Bello, *So Far in 2011, Fewer Deaths in National Parks*, USA Today, *available at*

http://usatoday30.usatoday.com/news/nation/2011-08-07-national-parks-

accidental-dealths_n.htm ("On average, 155 people die accidentally every year in

[national] parks."); United States Department of Homeland Security, *2012 Recrea-*

*tional Boating Statistics*, at 47, *available at* http://www.uscgboating.org/assets/1/

workflow_staging/Page/705.PDF (indicating 52 deaths from canoeing accidents

and 50 deaths from kayaking accidents in 2012).  Killer whales are magnificent,

powerful creatures.  They can also present risk.  No one has done more than Sea-

World to educate the world about killer whales, and no one has done more to con-

trol the attendant risks, through a safety program that sets the "industry standard"

(Order 19) and has resulted in a single, tragic, death to a trainer in the last 50 years.

SeaWorld provides a valued national service, indeed, it is a national institu-

tion.  If the judgment is nonetheless to be made that the "grandeur" of the natural

world on display at SeaWorld is not "worth" the carefully-controlled risks present-

ed by killer whales, that is a conclusion on a matter of social policy to be reached

by a legislature.  It may not be imposed by an administrative law judge wielding a

statutory provision intended for utterly different circumstances.

    **2.**    The ALJ's decision was also in error because it is based on the low

likelihood of exceptional and unpredictable whale behavior.  But behavior that is

"unpredictable" cannot provide the basis for a "recognized hazard" citation, as the Review Commission and the courts have recognized.  In *Megawest Financial, Inc.*, 17 BNA OSHC 1337, 1995 WL 383233, at *1 (No. 93-2879, 1995), the Secretary cited an employer for "failing to . . . minimize or eliminate employee exposure to assault and battery by tenants of [his] apartment complex."  This citation was erroneous, the administrative law judge explained, because it did not pertain to "inanimate objects or processes over which [the employer could] exercise a certain degree of control."  *Id.* at *9.  By attempting to hold the employer accountable for spontaneous violence, the Secretary failed to realize that people are "not always amenable to control" like traditional subjects of OSHA regulation because they "have a will, an intention, and an intellect that drives their behavior." *Id.*; *see also Tuscan/Lehigh Dairies, Inc.*, 22 BNA OSH 1870, 2009 WL 3030764, (08-0637, 2009) ("Freakish and unforeseeable" circumstances cannot "trigger statutory liability under the general duty clause.").

In *Ramsey Winch Inc. v. Henry*, the Tenth Circuit relied on *Megawest* to prevent the Secretary from using the General Duty Clause to ban guns from workplace parking lots, explaining: "[A]n employee's general fear that he or she may be subject to violent attacks is *not* enough to require abatement of a hazard under the

38

general duty clause." 555 F.3d 1199 at 1206 (10th Cir. 2009).[8]  The court also not-

ed OSHA's "express restraint in policing social behavior via the general duty

clause."  *Id.*; *see also Nat'l Realty*, 489 F.2d at 1266 ("A demented, suicidal, or

willfully reckless employee may on occasion circumvent the best conceived and

most rigorously enforced safety regime.").

Here, as in the above cases, the Secretary has cited an employer for behavior

that is "not always amenable to control."  *Megawest*, 1995 WL 383233, at *9.

Whales, like humans, have "a will, an intention, and an intellect that drives their

behavior."  *Id.*; *see also* Tr. 195-98.  The risks associated with these characteristics

are not a "recognized hazard" under the General Duty Clause because they are

fundamentally unlike the traditional subjects the OSH Act was designed to regu-

late.  *Megawest*, 1995 WL 383233, at *9; *see also* Tr. 1983 (ALJ, acknowledging

the "unusual" and "very complicated" issues presented by the Secretary's cita-

tions).  The instant citations may open the door for the Secretary to prohibit or pe-

nalize the use of animals in films or other entertainment, as well as to limit their

use for critical, safety related tasks, such as drug-sniffing—each of which clearly

crosses the Secretary's "red line" of impermissible contact with unpredictable ani-

mals.

---

[8]  That finding applies equally in this case because the trainers perceived no dan-
ger in their interactions with killer whales, including Tilikum, given the overall
effectiveness of operant conditioning and their rigorous training.  *See* Tr. 46,
598-99, 1053-54, 1364-65.

**3.**     The Secretary's citations are premised on the assumption that Sea-World knew about, and failed to protect trainers from, risks of "close contact" that trainers did not fully understand.  *See*, *e.g.*, Tr. 1246. Yet trainers not only "underst[ood] exactly what [management] kn[ew]," *id.* at 466, they were the primary source of management's knowledge, *id.* at 620-21, 1009-10, 1362-63.  By the time trainers had "close contact" with whales, they had spent years observing and learning about them, including about "precursors" to aggression and avoiding potentially hazardous interactions.  *See supra* pp. 7-10.  In addition to understanding the risks of their jobs, trainers formally accepted and controlled their own exposure to those risks.  By signing the SOP acknowledgement form on an annual basis, trainers accepted that working with whales involved a small, "calculated risk" that could not be eliminated. Tr. 52; *see also* Ex. C-1.  SeaWorld fostered a culture of "empower[ment]" that allowed trainers to decide, within the contours of Sea-World's safety protocols, when and where to perform specific interactions, and which encouraged trainers to end interactions that made them uncomfortable based on a whale's behavioral cues.  *See supra* pp. 11-12.

Under these circumstances, the case law makes clear that SeaWorld did not expose trainers to a "recognized hazard."  In *Oil, Chemical & Atomic Workers International Union v. American Cyanamid Co.*, 741 F.2d 444, 445 (D.C. Cir. 1984), for example, the Secretary issued a General Duty Clause citation based on an em-

ployer's "fetus protection policy" whereby women aged 16 through 50 had to un-

dergo surgical sterilization to remain eligible for jobs involving exposure to lead

pigments. The Commission vacated the Secretary's citation, and this Court af-

firmed, because "employees' decision to undergo sterilization in order to gain or

retain employment gr[ew] out of economic and social factors which operate pri-

marily outside the workplace," and which "[t]he employer neither control[led] nor

create[d]." *Id.* at 447 *see also Pelron Corp.*, 1986 WL 53616, at *6 (vacating ex-

plosion-hazard citation where employees "were properly instructed in the . . . es-

sentials of safety," and "there was no showing that [they] would have acted differ-

ently" if the employer had taught them more about the "cause[s]" of explosions as

the Secretary urged).

    Here too, SeaWorld's trainers embrace the opportunity for "close contact"

based on "factors which operate[d] primarily outside the workplace." *Am. Cyana-*

*mid*, 741 F.2d at 447. They are "intelligent, caring people . . . devoted to a calling

of working with killer whales." Order 41. The Secretary and the ALJ admitted

that trainers are "properly instructed in the . . . essentials of safety," *Pelron Corp.*,

1986 WL 53616, at *6, and trainers and veterinarians uniformly testified that they

disfavor the "abatement" measures the Secretary now requires, *see* Tr. 131-32;

1333-34; 1783-86. The ALJ's attempt to downplay the extent to which trainers

understood, accepted, and controlled their own exposure to the alleged hazards are

unconvincing. *First*, the ALJ's claim that SeaWorld "discourage[d]" trainers from ending unsafe interactions is contrary to the evidence. Order 36. His only support for this claim is a single "incident report" in which a manager criticized—but in no way prevented—a trainer's decision to end a performance *based on the manager's judgment that the trainer's actions had reinforced an unsafe behavior*. *Id.* at 36-37; *see also* Ex. C-6 at 681-88. The ALJ contradicted himself elsewhere by finding that SeaWorld was a "safety-conscious employer" that "constantly emphasized safety training." Order 45. And, indeed, trainers testified that they felt no pressure to perform activities that made them uncomfortable. *See* Tr. 309, 1049-54, 1362-64.

*Second*, the ALJ's reliance on *Armstrong Cork Co.*, 8 BNA OSHC 1070, 1980 WL 10754 (No. 76-2777, 1980), to assert that SeaWorld improperly "shift[ed] . . . responsibility to its employees" is likewise misplaced. Order 36. In that case, the employer attempted to shift its responsibility to find and fix equipment malfunctions to its employees. 1980 WL 10754, at *2-3. Here, the trainers who have developed individual relationships with specific whales over many years are, indeed, the eyes and ears of SeaWorld, which can only act based on the knowledge of its expert trainers. *See supra* pp. 7-10.

* * *

42

The OSH Act does not require employers to provide "certainty" or eliminate all "inherent" risks, but only to take "reasonable precautionary steps" against "foreseeable" hazards. *Brennan v. OSHRC*, 494 F.2d 460, 463 (8th Cir. 1974). The ALJ purported to respect this principle, stating that SeaWorld must only "*materially reduce*" a hazard. Order 40. But in actuality the ALJ applied a different, improper standard—as reflected in his statement, on the same page of his Order, that SeaWorld "did not eliminate the recognized hazard." *Id.*

## C.     The ALJ Erred By Crediting OSHA's Expert Witness

The ALJ's decision was based on unreliable expert testimony. This Court will overturn an ALJ's decision to credit expert testimony if it is "patently unsupportable." *Fabi Constr. Co. v. Sec'y of Labor*, 508 F.3d 1077, 1082 (D.C. Cir. 2007). Here, Dr. David A. Duffus was decidedly unqualified to testify about the level of "unpredictability" remaining after the implementation of SeaWorld's precautions, or—more importantly—the extent of any hazard presented by such unpredictability, and the ALJ should have exercised his "gatekeeper" role to exclude Duffus's testimony.

Although initially questioning the "weight" he would afford to Dr. Duffus's testimony, Tr. 822-23, the ALJ cautiously "qualified Dr. Duffus as an expert in de-

43

termining the predictability of behavior in killer whales." Order 17.[9]  As demonstrated at trial, Dr. Duffus lacks the expertise to make any such determination.[10] Dr. Duffus observes *wild* whales to predict their seasonal movements and to understand whether whale-watching "disturb[s]" them.  Tr. 772-75.  He has not conducted "any studies" on captive whales, *id.* at 794, and "do[es not] know" whether "being in captivity alter[s] a [killer whale's] behavior," *id.* at 808.  He also has no "experience" training whales.  *Id.* at 793.  To the contrary, he actively avoids close interactions, testifying that he "tr[ies] to maintain" a distance of "100 meters" during his work, and never comes within "five meters" of a whale.  *Id.* at 793-94.

Having studied operant conditioning "in a tangential way" at best—namely, by observing that whales "may become used to [boats]"—Dr. Duffus "do[es not] challenge that [whales] can be trained."  Tr. 796, 804.  He offered the following concessions at trial:

- Operant conditioning is a "scientific method," *id.* at 804;

- "Operant conditioning does work in many, many cases," *id.* at 837;

- SeaWorld's "training procedures do provide predictable outcomes," *id.* at 829;

---

 9  As discussed in Part II, *infra*, the ALJ also stretched Dr. Duffus's qualifications to include feasibility of abatement.

10  SeaWorld filed a motion *in limine* to exclude Duffus's testimony, and preserved its objection at trial and in its post-trial brief.  Order 17.

44

- SeaWorld has "many, many successful encounters" with whales, and "can diminish [their] day-to-day predatory activity," *id.* at 842; and

- "[T]he frequency of contact with the killer whale [will] reduce the risk to the trainers because the predictability [of whales' behavior] rises with more contact," *id.* at 877.

Thus, rather than impugn the effectiveness of SeaWorld's precautions, Dr. Duffus simply asserted that *no* precautions could eliminate the "element of unpredictability" in whales' behavior. He reached this conclusion based on a visit to SeaWorld—during which he observed two shows—and a review of incident reports, which suggested to him that trained whales exhibit the "same [aggressive] behaviors" that he has seen in the wild, Tr. 807, and "continually befuddl[e]" him due to the "uncertainty" of their behavior, *id.* at 831.[11]

Importantly, although Dr. Duffus testified that he believed the "uncertainty element" of whale behavior "create[d] a hazard," Tr. 850, he did not purport to specify the *level* of this "uncertainty" or the *extent* of the alleged, resultant "hazard." To the contrary, Duffus admitted that he "do[es] not know" the "level of certainty with which [whales] can be trained." *Id.* at 796. He likewise "do[es] not know" the "likelihood of [a captive] killer whale attempting to attack a person," or whether a trained whale that is "satiated" with food (as SeaWorld's whales invari-

---

[11] The ALJ's willingness to draw specific conclusions from such generic testimony is especially striking in comparison to the ALJ's rejection of testimony by SeaWorld Corporate Curator Charles Tompkins (which was not offered as expert testimony) because it was not "based on rigorously evaluated scientific data." Order 28-29.

ably are) would still engage in "aggressive behavior." *Id.* at 851, 870. In fact, he expressed "a high degree of uncertainty" as to whether the "risks" of working with trained killer whales *even "apply" to "other whales" besides Tilikum. Id.* at 855-56 (emphasis added).

The most definitive statement Dr. Duffus could manage was that SeaWorld's operant training program "d[id] not work all the time" and could not "absolutely protect every trainer in every situation." Tr. 803-04, 908. Nevertheless, the ALJ relied on this testimony to find that SeaWorld's precautions had not "reduced" the hazard of close contact "to a significant degree" and were therefore "inadequate." Order 40.

This reliance on Duffus's testimony was erroneous. Expert testimony is admissible only if "the testimony is based on sufficient facts or data, the testimony is the product of reliable principles and methods, and the expert has reliably applied th[ose] principles and methods to the facts of the case." Fed. R. Evid. 702. Judges must ensure that an expert's testimony "both rests on a reliable foundation and is relevant to the task at hand." *Daubert v. Merrell Dow Pharm., Inc.*, 509 U.S. 579, 597 (1993). It was undisputed below that the same standard was to be applied by the ALJ here. Tr. 810.

*Daubert* suggests four factors to evaluate the reliability of an expert's methods:

46

(1) whether the theory or technique can be and has been tested; (2) whether [it] has been subjected to peer review and publication; (3) [its] known or potential rate of error; and (4) whether [it] finds general acceptance in the relevant scientific community.

*United States v. Law*, 528 F.3d 888, 912 (D.C. Cir. 2008) (per curiam). Dr. Duffus's testimony meets none of these criteria.

Duffus's research on wild whales has not involved any analysis of captivity and training, which are specifically at issue in this case. Tr. 808, 793-96. Standing alone, his review of incident reports and only two shows could not provide "sufficient facts" for his sweeping conclusion that the "uncertainty element" of whale behavior still "creates a hazard" after SeaWorld's application of admittedly effective safety precautions. *Id.* at 850.

In reaching his conclusion, Dr. Duffus did not define "reliable principles" or "appl[y]" them "reliably . . . to the facts of th[is] case." Fed. R. Evid. 702. His only apparent "principle" was that trained whales exhibited the "same behaviors" as wild whales, although admittedly he had no experience observing or training captive whales. Tr. 807, 831. And his application of this "principle" yielded only a generic observation that SeaWorld's precautions "d[id] not work all the time" or "absolutely protect every trainer in every situation." *Id.* at 803-04, 908. This does not suggest any "reliable" or reproducible means of addressing the alleged "hazard"—as noted, Dr. Duffus cannot even say with confidence that his conclusions

47

extend to interactions not involving the single whale (Tilikum) whose actions gave rise to the Secretary's citations. *Id.* at 855.

Dr. Duffus does not purport to have tested his "theory" regarding the "uncertainty element" of trained whales' behavior, and his conceded lack of knowledge regarding the effects of training suggests he would be unable to do so. *Cf. Law*, 528 F.3d at 913. Moreover, although it is impossible to speak of a "rate of error" because there are no "standards" governing the application of Duffus's "theory," his conceded uncertainty about "level[s] of risk" would seem to acknowledge the substantial likelihood of error. *Cf. id.*

Finally, far from gaining "general acceptance," Dr. Duffus's theory is directly *contrary* to that of the "relevant scientific community." Experts with more than Duffus's "tangential" knowledge of operant conditioning uniformly believe that it increases predictability to a safe and "readily accepted" level. Tr. 1645-46. Jeffrey Andrews, whom the ALJ qualified "as an expert in operant conditioning" (Order 17), testified that operant conditioning "very effectively modifies the frequency of [whales'] behavior" to create "very predictable results." *Id.*

In short, Dr. Duffus's opinions have no "valid connection" to a reliable "factual basis." *Kumho Tire Co. v. Carmichael*, 526 U.S. 137, 149 (1999). They provide no support for the ALJ's conclusion that SeaWorld's precautions were "inadequate," and they should have been excluded.

48

## II.     The Secretary Has Not Proven Feasible Abatement Methods.

The ALJ's decision should also be reversed because the Secretary did not carry his burden of establishing feasible means to abate the alleged hazard. This is not a case where the Secretary identified abatement measures to protect against industrial accidents from unguarded machinery, for example, but an attempt to regulate the interaction between humans and whales—an issue on which the Secretary has no experience, and offered no feasible recommendations.

### A.     The ALJ Erred By Upholding The Feasibility Of "Physical Barriers" And "Minimum Distances."

The ALJ determined that the Secretary met his "feasibility" burden by simply asserting that SeaWorld could "either install physical barriers between its trainers and killer whales, or require its trainers to maintain a minimum distance from the killer whales." Order 33, 41. But this was erroneous for two reasons. *First*, the Secretary provided no evidence regarding the types of "barriers" or the amount of "distance" that he believed necessary; and *second*, the ALJ relied on the unsupported notion that SeaWorld had already implemented these measures.

To establish feasibility, the Secretary must "specify the particular steps" that the "cited employer should have taken," as well as demonstrating the "likely utility of those measures." *Nat'l Realty*, 489 F.2d at 1268. But here, the Secretary's witnesses repeatedly disclaimed having sufficient knowledge to specify what "barriers" or "distances" would be appropriate. Dr. Duffus at first appeared not to have

49

thought about the issue at all, suggesting glibly that SeaWorld should "write [him] a contract" to "engage in the idealization of what might be done." Tr. 885-86. When pressed for specifics, the best he could do was speculate—without reference to any personal or professional guidelines—that SeaWorld should keep trainers "*perhaps* five to eight feet away" from whales or use a "raised barrier" of unspecified height or composition. *Id.* at 905 (emphasis added). Area Director Les Grove, who was offered solely on the issue of abatement, was even less specific, and could offer only the tautological observation that, "[w]hen the hazard is contact with the killer whales without adequate protection . . . it's not that hard to determine that the feasible abatement method is to eliminate that unprotected contact." *Id.* at 947.

Not only were they unable to specify appropriate "barriers" or "distances," the Secretary's witnesses insisted that only SeaWorld itself had the "expertise" to define these measures. Duffus put it curtly: "you guys are the experts, you've got all the materials, you've got all the history, and a lot of creativity, SeaWorld does, so I suggest they go to work." Tr. 798. He even suggested he would not "second guess" the instincts of "an experienced trainer" with respect to appropriate "proximity." *Id.* at 903. Grove testified similarly, indicating that most or all of the abatement measures listed in the Secretary's citations were items that he believed

SeaWorld was "working on" but had not actually implemented at the time of the inspection. *Id.* at 961-67.

Yet contrary to this testimony, the record shows that neither SeaWorld nor any industry or consensus group had identified specific barriers or distances that must be applied to ensure safe interactions with all whales. *See* Tr. 131-32; 940-43, 1333-34; 1783-94. This completely defeats the Secretary's feasibility case, which requires showing that "experts familiar with the pertinent industry" would prescribe his recommended measures, *Donovan v. Royal Logging Co.*, 645 F.2d 822, 830 (9th Cir. 1981), and that "reasonably prudent employer[s] familiar with the circumstances of the industry would have protected against the hazard in the manner specified by [his] citation," *L.R. Willson & Sons, Inc.*, 698 F.2d 507, 513 (D.C. Cir. 1983); *see also Inland Steel Co.*, 12 BNA OSHC 1968, 1986 WL 53521, at *3 (No. 79-3286, 1986) (Secretary "must show that knowledgeable persons familiar with the industry would regard additional measures as necessary and appropriate in the particular circumstances existing at the employer's worksite").

The ALJ was also wrong to affirm the feasibility of "barriers" and "distances" based on the unsupported notion that SeaWorld had already "been using" those measures for whales "other than" Tilikum "since February 24, 2010." Order 41. Without citing any record evidence, the ALJ found that "physical barriers" and "minimum distance[s]" were "technologically" and "economically feasible" be-

51

cause "[t]rainers perform[ed] drywork from behind barriers or at a minimum dis-
tance." *Id.* This is categorically untrue. The record is clear that SeaWorld had *not*
uniformly taken these measures for whales other than Tilikum. Tr. 1438-43
(Mairot, explaining limited new restrictions for contact with whales' "mouth ar-
ea"); *id.* at 1517-21 (Clark, explaining that many of the changes referenced by
Mairot were a temporary response to Brancheau's death, not a feasible long-term
solution); *id.* at 1587-90 (Clark, explaining how portable railings are "in no way,
shape or form a successful barrier of any kind"). Even the Secretary's witnesses
consistently opined that SeaWorld had not implemented the recommended
measures or abated the cited hazard with respect to "other" whales. *See id.* at 936
(Grove, testifying that "I believe they're still doing dry work without a physical
barrier or other equivalent protection.").

### B.    The ALJ Failed To Consider Significant Unrebutted Evidence That The Secretary's Abatement Measures Present Additional Hazards.

The ALJ further erred by affirming the Secretary's citations despite signifi-
cant unrebutted evidence that his abatement measures present additional hazards to
trainers and whales. In a General Duty Clause case, the Secretary has the burden
to rebut any evidence that abatement would create additional hazards. *See Ko-
kosing Constr. Co.*, 17 BNA OSHC 1869, 1996 WL 749961, at *6 n.19 (No. 92-
2596, 1996) ("[I]f a proposed abatement method creates additional hazards . . . the

citation must be vacated for failure to prove feasibility; it is not the employer's burden to establish an affirmative defense of greater hazard."); *see also Royal Logging Co.*, 7 BNA OSHC 1744, 1979 WL 8506, at *8 (No. 15169, 1979) (Secretary's recommended use of seatbelts to avoid rollover hazards involving logging equipment not feasible because he failed to rebut evidence that seatbelts would leave employees exposed to the "greater" hazard of stray debris and branches).

The Secretary failed to carry that burden here because the record shows that "physical barriers," "minimum distances," and other means of reducing contact create additional hazards to trainers and whales. *First*, trainers face additional risk because contact increases the effectiveness of operant conditioning and allows whales to become familiar and comfortable with trainers. Tr. 877, 1319-21, 1796. When contact is reduced, whales are more likely to behave unpredictably or aggressively in husbandry or in response to accidental contact (*e.g.*, a trainer falling into a pool). *Id.* SeaWorld's attempts to comply with the citations have already "hurt" trainer-whale relationships (*id.* at 1061), and veterinarian Christopher Dold testified that these effects could become "extreme" over time (*id.* at 1751). The Secretary did not rebut this testimony, indeed, his expert conceded that "frequency of contact" should "reduce the risk[s] to the trainers" because "predictability rises with more contact." *Id.* at 877.

*Second*, the Secretary's abatement measures create hazards to the whales themselves. Veterinarians' ability to care for killer whales is largely dependent on trainers' use of close contact to feel physical deformities before they develop into serious illnesses. *See supra* pp. 7-10. And if whales do not "cooperate" with husbandry and medical procedures, veterinarians will be less able to provide treatment. Tr. 1735-37. SeaWorld's ability to care for whales has already decreased as a result of its compliance efforts. Curator of Animal Training Kelly Clark testified that one whale's death might have been prevented if trainers had been able to discover the nature of her illness through close contact. *Id.* at 131. Dr. Dold corroborated this testimony, noting that the Secretary's abatement measures did not allow SeaWorld to provide whales with an "appropriate standard of care." *Id.* at 1764, 1782-85.[12]

### C.   The ALJ Erred By Finding That Abatement Is Feasible Because Eliminating All Close Contact Changes The Fundamental Nature Of A Trainer's Job As Defined Over The Past Fifty Years.

Finally, the ALJ erred in finding feasibility because eliminating the alleged hazard of "close contact" is tantamount to eliminating trainers' jobs.

_____

[12] This implicates other obligations that SeaWorld has. *See, e.g.*, 2013 Association of Zoos and Aquariums Accreditation Standards and Related Policies, at 3, *available at* http:www.aza.org/uploadedFiles/Accreditation/Accred%20Standards%20(with%20%elephants)(1).pdf ("[f]or the purposes of AZA's accreditation program, a zoological park or aquarium is . . . a permanent institution which . . . provides its animals with appropriate care").

54

"Close contact" is the defining feature of a trainer's job.  It is the goal of her extensive training and on-the-job instruction; it is the activity by which she exhibits her particularized skill; and it is the means by which she carries out SeaWorld's institutional mission.  Without close contact, a trainer cannot establish meaningful "relationship[s]," Tr. 1061, or provide an "appropriate standard of care," *id.* at 1764.

The Secretary's statutory mandate clearly does not encompass the elimination or redefinition of jobs.  *See, e.g.*, *Indus. Union Dep't.*, 448 U.S. at 641; *Nat'l Realty*, 489 F.2d at 1266.  The Secretary has never before purported to undertake such broad-based social planning, and cannot be permitted to do so in this instance.

Area Director Grove inadvertently highlighted the absurdity of the Secretary's position by testifying that, "[w]hen the hazard is contact with the killer whales without adequate protection . . . it's not that hard to determine that the feasible method is to eliminate that unprotected contact and put [in] a barrier."  Tr. 947.  Abatement would *never* be "hard" to figure out if the Secretary was permitted simply to label a job hazardous and eliminate it altogether.  But he is not.

A measure also is not a "feasible" abatement if it forces a company to fundamentally alter the business it conducts and the product or service it offers the public.  The ALJ accepted the Secretary's drastic measures because he found "no evidence" that they would have "a negative impact on SeaWorld's profits."  Order

55

41.  But the possibility that SeaWorld could shrink its killer whale program in fa-

vor of other profitable activities does not empower OSHA to order it to do so, any

more than the Secretary can require a construction company to focus on carpentry

rather than masonry, or a retailer to move out of a crime-ridden neighborhood.

*Pelron*, 1986 WL 53616, at *3; *see also Horne Plumbing & Heating Co. v.

OSHRC*, 528 F.2d 564, 569 (5th Cir. 1976).

### III.    The General Duty Clause is Unconstitutionally Vague As Applied, And SeaWorld Lacked Fair Notice Of The Secretary's Abatement Measures.

The General Duty Clause is unconstitutionally vague as applied to require

the elimination of "close contact" in trainer-whale interactions.  "[A] statute which

either forbids or requires the doing of an act in terms so vague that men of com-

mon intelligence must necessarily guess at its meaning and differ as to its applica-

tion violates the first essential of due process of law."  *Connally v. Gen. Constr.

Co.*, 269 U.S. 385, 391 (1926).  For this reason, the OSH Act is unconstitutional as

applied unless it provides "reasonably prudent employer[s]" with "notice and

warning" of the prohibited conditions.  *Asamera Oil (U.S.), Inc.*, 9 BNA OSHC

1426, 1980 WL 81803, at *14 (Nos. 79-949 & 79-1756, 1980).

The prohibition against vague standards applies with particular force in the

context of generally-worded proscription of the General Duty Clause.  "[A]ny stat-

ute . . . imposing general obligations," such as the General Duty Clause, "raises

certain problems of fair notice." *Nat'l Realty*, 489 F.2d at 1268 n.41.  "[T]hese problems dissipate," the Ninth Circuit has explained, only "when we read the clause as applying when a reasonably prudent employer in the industry would have known that the proposed method of abatement was required under the job conditions where the citation was issued." *Donovan*, 645 F.2d at 831; *see also, e.g.*, *Davey Tree Expert Co.*, 11 BNA OSHC 1898, 1984 WL 34818, at *1 (No. 77-2350, 1984) (finding that the "broad, generic definition" of a hazard did not "apprise [the employer] of its obligations and identify conditions or practices over which [it could] reasonably be expected to exercise control").

The Secretary's citations run afoul of these bedrock principles.  SeaWorld's precautions were more than "reasonably prudent."  As the ALJ found, they were "highly detailed," "thorough," and indicative of a "safety-conscious employer" that "constantly emphasized" and "continuously refin[ed] its safety program."  Order 45.  Moreover, there is no way that SeaWorld "would have known that the proposed method of abatement was required." *Donovan*, 645 F.2d at 831.  The Secretary *himself* does not contend that SeaWorld or relevant industry groups had ever prescribed or even considered his recommended abatement measures.  Tr. 885-86, 905-06, 947.  His witnesses admittedly lacked the "expertise" to define those measures. *Id.* at 798, 886, 947; *cf. Asamera Oil*, 1980 WL 81803, at *15-16 (finding no "appropriate basis" for identifying abatement measures where the Secretary

57

had only provided "rules of thumb").  And SeaWorld had no basis to divine that these measures were necessary only in "show" performances, whereas in other contexts it could continue the same "close contact" that, in "shows," was a purported recognized hazard.[13]

SeaWorld's lack of notice regarding the Secretary's abatement measures was exacerbated by the fact that those measures conflicted with previous guidance from California's OSHA agency ("Cal/OSHA").  In 2006, based on an inspection at SeaWorld San Diego, Cal/OSHA found that SeaWorld "ha[d] taken reasonable and responsible steps to correct [any] hazard in accordance with industry practices." *See* Narrative Summary of Inspection at 18; *see also* Ex. R-3.  Cal/OSHA thus refrained from issuing any citations.  Instead, it issued an "information memorandum" providing "suggestions" for "possible ways to improve employee safety." *See* Ex. R-3 at SEA 2200-01.  Nowhere in the accompanying 18-page memorandum did Cal/OSHA suggest the use of physical barriers or minimum distances. *See* Narrative Summary.  It recognized that close contact was essential to SeaWorld's goals of conservation and husbandry.  *See id.* at 5-7.  And unlike the ALJ,

---

[13] If OSHA regulation in this area were proper at all (it is not), it should have been through rulemaking rather than adjudication employing the blunt instrument of the General Duty Clause.  *See SEC v. Chenery Corp.*, 332 U.S. 194, 202 (1947) (instructing that agencies should perform "[t]he function of filling in [statutory] interstices . . . as much as possible, through the quasi-legislative promulgation of rules"); *see also Martin v. OSHRC*, 499 U.S. 144, 158 (1991)  ("the decision to use a citation as the initial means for announcing a particular interpretation may bear on the adequacy of notice to regulated parties").

but consistent with SeaWorld's testimony in this case, it recognized that SeaWorld needed to practice close contact in "fun" contexts. *Id.* Based on this precedent, SeaWorld could only have concluded that contact was permissible and that only risk-mitigating protocols were necessary.

Absent fair notice, the Secretary's citations have been repeatedly vacated in other, similar circumstances. In *Miami Industries, Inc.*, 15 BNA OSHC 1258, 1991 WL 195208 (No. 88-671, 1991), for example, a compliance officer told the employer that a specific guarding device was "satisfactory" to abate a previously-cited hazard. *Id.* at *2. Ten years later, another compliance officer found that device insufficient and issued a citation. *Id.* at *3-4. The Commission vacated the citation, explaining that the employer was "reasonable" to rely on the compliance officer's previous statement (even though it was "unofficial"). *See id.* at *5. The Commission also credited the employer's reliance on "the fact that OSHA issued no citations" for ten years, because OSHA had visited the facility seven times in that period, and "Miami could understandably have concluded that the lack of citations . . . corroborated the [earlier] statements and actions by the [compliance officer]." *Id.* at *8; *see also Erickson Air-Crane, Inc.*, No. 07-0645, 2012 WL 762001, at *3 (OSHRC Mar. 2, 2012).

Here, as in *Miami Industries*, SeaWorld was entitled to rely on Cal/OSHA's previous guidance to support the sufficiency of its safety precautions. *See* Ex. R-3.

SeaWorld's actual reliance on this guidance was apparent from the testimony of Mr. Tompkins that SeaWorld had implemented most or all of the feasible items from Cal/OSHA's "information memorandum." Tr. 588-94. And that reliance was all the more reasonable considering the absence of any citations between 2006 and 2010—which, given inspections during this period by both Cal/OSHA and federal OSHA, seemed to "corroborate" Cal/OSHA's guidance. See Occupational Safety and Health Administration, Establishment Search Page, available at http://www.osha.gov. As Area Director Grove admitted, SeaWorld had been openly advertising its close contact with whales since the 1960s. During this time, OSHA could have opened an investigation at any time if it believed that close contact presented a recognized hazard. Tr. 966.

## CONCLUSION

For the foregoing reasons, the Court should reverse the ALJ's decision and vacate the Secretary's citations.

Dated: July 29, 2013                    Respectfully submitted,

                                        /s/ Eugene Scalia
Carla J. Gunnin                         Eugene Scalia
BAKER, DONELSON, BEARMAN,                  *Counsel of Record*
  CALDWELL & BERKOWITZ, PC               Baruch A. Fellner
Monarch Plaza, Suite 1600               Scott P. Martin
3414 Peachtree Road, NE                 Daniel P. Rathbun
Atlanta, Georgia 30326                  GIBSON, DUNN & CRUTCHER LLP
(404) 589-3404                          1050 Connecticut Avenue, N.W.
                                        Washington, D.C. 20036
                                        (202) 955-8500
                                        EScalia@gibsondunn.com

*Counsel for Petitioner SeaWorld of Florida, LLC*

## CERTIFICATE OF COMPLIANCE

1.    This brief complies with the type-volume requirement of Federal Rule of Appellate Procedure 32(a)(7) because this brief contains 13,914 words, as determined by the word-count function of Microsoft Word 2003, excluding the parts of the brief exempted by Federal Rule of Appellate Procedure 32(a)(7)(B)(iii); and

2.    This brief complies with the typeface requirements of Federal Rule of Appellate Procedure 32(a)(5) and the type style requirements of Federal Rule of Appellate Procedure 32(a)(6) because this brief has been prepared in a proportionally spaced typeface using Microsoft Word 2003 in 14-point Times New Roman font.

Dated: July 29, 2013

/s/ Eugene Scalia
Eugene Scalia
GIBSON, DUNN & CRUTCHER LLP
1050 Connecticut Avenue, N.W.
Washington, D.C. 20036
(202) 955-8500
EScalia@gibsondunn.com

*Counsel for Petitioner SeaWorld of Florida, LLC*

## CERTIFICATE OF SERVICE

I hereby certify that on July 29, 2013, I electronically filed the foregoing Opening Brief for Petitioner SeaWorld of Florida, LLC with the Clerk of the Court for the United States Court of Appeals for the D.C. Circuit by using the appellate CM/ECF system.  Service was accomplished on counsel of record by the CM/ECF system.


Dated: July 29, 2013                    /s/ Eugene Scalia
                                        Eugene Scalia
                                        GIBSON, DUNN & CRUTCHER LLP
                                        1050 Connecticut Avenue, N.W.
                                        Washington, D.C. 20036
                                        (202) 955-8500
                                        EScalia@gibsondunn.com

                    *Counsel for Petitioner SeaWorld of Florida, LLC*