ORAL ARGUMENT SCHEDULED FOR NOVEMBER 12, 2013

# No. 12-1375

IN THE UNITED STATES COURT OF APPEALS
FOR THE DISTRICT OF COLUMBIA CIRCUIT
_____

SEAWORLD OF FLORIDA, LLC,

Petitioner,

v.

THOMAS E. PEREZ, SECRETARY OF LABOR,

Respondent.
_____

On Petition for Review of a Final Order of the
Occupational Safety and Health Review Commission
(Administrative Law Judge Ken S. Welsch)
_____

BRIEF FOR RESPONDENT SECRETARY OF LABOR
_____

M. PATRICIA SMITH
Solicitor of Labor

JOSEPH M. WOODWARD
Associate Solicitor for
   Occupational Safety and Health

CHARLES F. JAMES
Counsel for Appellate Litigation

KRISTEN M. LINDBERG
AMY S. TRYON
Attorneys
U.S. Department of Labor
200 Constitution Ave., NW
Room S-4004
Washington, DC 20210
(202) 693-5445

September 9, 2013

# CERTIFICATE AS TO PARTIES, RULINGS, AND RELATED CASES

1. *Parties and Amici*

 All parties, intervenors, and amici appearing before the Occupational Safety and Health Review Commission ("Commission") and this court are listed in the Brief for Petitioner SeaWorld of Florida, LLC ("SeaWorld"), except for the following:

- People for the Ethical Treatment of Animals (potential amicus);
- Animal Legal Defense Fund (potential amicus).

2. *Ruling Under Review*

 The ruling being appealed by SeaWorld is the June 11, 2012 ruling by Administrative Law Judge ("ALJ") Ken S. Welsch in Commission case number 10-1705, as modified by the Order of Erratum issued on June 13, 2012.  The June 11, 2012, ruling became a final order of the Commission on July 16, 2012.  It is available electronically at 2012 WL 3019734.

3. *Related Cases*

 On July 27, 2012, shortly after the ALJ's decision became final, SeaWorld filed a petition for modification of abatement date ("PMA"), seeking an extension of time to abate the hazard.  The PMA was referred to ALJ Welsch under Commission docket number 12-0697.  The ALJ granted the PMA on August 6, 2013, extending the abatement deadline retroactively to January 27, 2013.

Decision and Order Granting Petition for Modification of Abatement Date,

OSHRC No. 12-1697 (August 6, 2013) (attached as Addendum).

On December 13, 2013, the Occupational Safety and Health Administration

("OSHA") filed a Petition to Enforce Administrative Subpoenas Ad Testificandum

in the United States District Court for the Middle District of Florida, seeking to

enforce subpoenas it had issued to three SeaWorld employees.  The district court

granted the petition on April 4, 2013.  *See Solis v. SeaWorld of Florida, LLC*, 2013

WL 1365763 (M.D. Fla. Apr. 4, 2013).

On June 7, 2013, OSHA issued a citation to SeaWorld for a repeat violation

of 29 U.S.C. § 654(a)(1).  OSHA withdrew this citation following the ALJ's grant

of SeaWorld's PMA.

## TABLE OF CONTENTS

**Page**

**CERTIFICATE AS TO PARTIES, RULINGS AND
    RELATED CASES**

**TABLE OF AUTHORITIES** ...................................................................iv

**GLOSSARY**……………………………………………………………ix

**STATEMENT OF ISSUES** ................................................... 1

**RELEVANT STATUTE** ........................................................ 1

**STATEMENT OF FACTS** ..................................................... 1

    1.    SeaWorld's Operation and Killer Whales ........................... 1

    2.    Operant Conditioning and Its Drawbacks .......................... 3

    3.    The Death of Dawn Brancheau ........................................... 6

    4.    Tilikum's "Negative History" ............................................. 7

    5.    Other Trainer Deaths and Near Misses ............................... 9

    6.    Procedural History ............................................................. 12

**SUMMARY OF THE ARGUMENT** ................................... 13

**ARGUMENT**

    **I.**    **The Citation Should Be Affirmed Because the Secretary
        Established the Elements of the General Duty Clause
        Violation** ....................................................................... 15

        **A.**    **Introduction** ........................................................... 15

        **B.**    **The Substantial Evidence Standard of Review** .... 16

i

**C.**    **Substantial Evidence Supports the Finding that Working in Close Contact with Killer Whales Is a Recognized Hazard** ...................................................................17

    1.    Wild Animals, Including Killer Whales, Are an Obvious Danger to Humans ...........................................17

    2.    SeaWorld's Incident Reports Demonstrate that SeaWorld Recognized the Ongoing Hazard of Close Contact with Killer Whales ...........................................20

    3.    SeaWorld Recognized a Hazard Specific to Tilikum.....23

**D.**    **Substantial Evidence Supports the Finding That Barriers and Distance are Feasible Means of Eliminating or Materially Reducing the Risk of Close Contact with Killer Whales** ...........................................................24

    1.    SeaWorld Failed to "Free" Its Workplace of a Preventable Hazard .......................................................24

        a.    "Incidents" Occurred Regularly for Twenty Years Despite SeaWorld's Efforts to Prevent Them ...............................................................25

        b.    Operant Conditioning Does Not Keep Trainers Safe.........................................................29

        c.    SeaWorld's Emergency Procedures Do Not Keep Trainers Safe ................................................32

    2.    Barriers and Distance Are Feasible Means of Eliminating or Materially Reducing the Hazard Posed by Close Contact with Killer Whales...................34

        a.    SeaWorld Already Uses Barriers and Distance ................................................................37

b.    Barriers and Distance Neither Create Greater
Hazards Nor Change the Nature of Trainers'
Jobs   .................................................................41

c.    It Is Appropriate for the Secretary to Leave
SeaWorld with Some Discretion in How to
Implement the Abatement ...................................44

**E.    The ALJ Properly Permitted the Secretary's Expert to
Testify**.................................................................................47

**II.   SeaWorld Was Afforded Proper Notice of the Violations**...............49

**III.  SeaWorld's Miscellaneous Legal Arguments Are Without
Merit**   ..............................................................................51

A.    The Secretary Did Not Overreach By Applying the General
Duty Clause to the Hazard of Close Contact With Killer
Whales.........................................................................51

B.    The ALJ Made No Findings on the Hazards of Husbandry
Procedures And Did Not Rely Upon Personal Conclusions.....54

**CONCLUSION**   ...........................................................................57

**CERTIFICATE OF COMPLIANCE**

**CERTIFICATE OF SERVICE**

**ADDENDUM**

iii

# TABLE OF AUTHORITIES

**CASES:**                                                                                    **Page**

*A.E. Staley Manuf. Co.*,
  19 BNA OSHA 1199 (Nos. 91-0637 & 91-0638, 2000).............................55

*Acme Energy Servs. dba Big Dog Drilling*,
  23 BNA OSHC 2121 (No. 08-0088, 2012) ...................................................43

*Active Oil*, *Serv.*,
  21 BNA OSHC 1184 (No. 00-0553, 2005) ...................................................40

*Am. Textile Mfrs. Inst., Inc. v. Donovan*,
  452 U.S. 490 (1981)........................................................................... 35, 41

*\*Andrew Catapano Enter., Inc.*,
  17 BNA OSHC 1776 (No. 90-0050 et. al., 1996) ........................................39

*Armstrong Cork Co.*,
  8 BNA OSHC 1070 (No. 76-2777, 1980) ....................................................31

*Armstrong Steel Erectors, Inc.*,
  18 BNA OSHC 1630 (No. 97-0250, 1999) ...................................................39

*\*Baroid Div. of NL Indus., Inc. v. OSHRC*,
  660 F.2d 439 (10th Cir. 1981) ......................................................... 17, 35, 41

*Boise Cascade Corp.*,
  14 BNA OSHC 1993 (Nos. 89-3087 & 89-3088, 1991) ..............................55

*Brennan v. OSHRC*,
  501 F.2d 1196 (7th Cir. 1974) ....................................................................17

*Bristol Steel & Iron Works, Inc. v. OSHRC*,
  601 F.2d 717 (4th Cir. 1979) ......................................................................53

***Authorities chiefly relied upon are marked with an asterisk.***

iv

*Brock v. L.E. Myers Co.*,
   818 F.2d 1270 (6th Cir. 1987) ......................................................30

*Brown & Root, Inc.*,
   8 BNA OSHC 2140 (No. 76-1296, 1980) ....................................35

*Cargill, Inc.*,
   10 BNA OSHC 1398 (No. 78–5707, 1982) ..................................42

*Carlyle Compressor Co., Div. of Carrier Corp. v. OSHRC*,
   683 F.2d 673 (2d Cir. 1982) ........................................................35

*Cedar Const. Co. v. OSHRC*,
   587 F.2d 1303 (D.C. Cir. 1978) ..................................................50

*\*Cerro Metal Prods. Div., Marmon Grp., Inc.*,
   12 BNA OSHC 1821 (No. 78-5159, 1986) ................................. 25, 34, 35

*Chevron Oil Co.*,
   11 BNA OSHC 1329 (No. 10799, 1983) ......................................43

*Cleveland Wrecking Co.*,
   2010 WL 9438598 (OSHRC No. 07-0437, 2010)........................20

*\*Con Agra, Inc.*,
   11 BNA OSHC 1141 (No. 79-1146, 1983) ..................................37

*Daubert v. Merrell Dow* Pharm.,
   509 U.S. 579 (1993)................................................................ 47-48

*Davey Tree Expert* Co.,
   11 BNA OSHC 1898 (No. 77-2350, 1984) ..................................24

*Ensign-Bickford Co. v. OSHRC*,
   717 F.2d 1419 (D.C. Cir. 1983)..................................................49

*Eyrich v. Earl*,
   495 A.2d 1375 (N.J. Super. Ct. App. Div. 1985) ........................18

*Fabi Const. Co., Inc. v. Sec'y of Labor,
    508 F.3d 1077 (D.C. Cir. 2007).................................................. 13, 15, 16, 34

Gen. Dynamics Land Sys. Div., Inc.,
    15 BNA OSHC 1275 (No. 83-1293, 1991) ........................................... 40, 46

Grey Wolf Drilling Co. LP,
    20 BNA OSHC 1293  (No. 02-1228, 2003) ..................................................37

In re Zyprexa Prods. Liab. Litig.,
    489 F.Supp.2d 230 (E.D.N.Y. 2007).............................................................48

Industrial Union Department, AFL-CIO v. American Petroleum Institute,
    448 U.S. 607 (1980)......................................................................................11

Int'l Harvester, Co.,
    7 BNA OSHC 2194 (No. 76-4572, 1980) .....................................................55

Irvine v. Rare Feline Breeding Ctr., Inc.,
    685 N.E. 2d 120 (Ind. Ct. App. 2007) ..........................................................18

Kokosing Construction Company,
    17 BNA OSHC 1869 (No. 92-2596, 1996) ....................................................43

Litton Sys., Inc.,
    10 BNA OSHC 1179 (No. 76-900, 1981) ......................................................19

Marshall v. L.E. Myers Co.,
    589 F.2d 270 (7th Cir. 1978) ........................................................................36

Marshall v. OSHRC,
    635 F.2d 544 (6th Cir. 1980) ........................................................................55

Miami Industries, Inc.,
    15 BNA OSHC 1258 (No. 88-671, 1991) ................................................ 49-50

Murphy Enter.,
    17 BNA OSHC 1477 (No. 93-2957, 1995) .............................................. 53-54

*National Realty & Constr. Co., Inc.*,
    489 F.2d 1257 (D.C. Cir. 1973).............. 24, 25, 29, 31, 34, 35, 36, 40, 49, 51

*Pepperidge Farm, Inc.*,
    17 BNA OSHC 1993 (No. 89-265, 1997) ....................................................46

*Royal Logging Co.*,
    7 BNA OSHC 1744 (No. 15169, 1979) ......................................................42

*SeaWorld of Florida, LLC*,
    2012 WL 3019734 (No. 10-1705, May 30, 2012)......................................... 2

*S&H Riggers & Erectors, Inc. v. OSHRC*,
    659 F.2d 1273 (5th Cir. 1981) ...................................................................20

*S. Ohio Bldg. Sys., Inc. v. OSHRC*,
    649 F.2d 456 (6th Cir. 1981) ......................................................................53

*Seibel Modern Mfg.& Welding Corp.*,
    15 BNA OSHC 1218 (No. 88-821, 1991) ....................................................50

*Southern Cotton Oil. Co. v. Anderson*,
    86 So. 629 (Fla. 1920) ................................................................................18

*Tampa Shipyards Inc.*,
    15 BNA OSHC 1533 (Nos. 86-360 & 86-469, 1992) ...................................46

*Tri-State Roofing & Sheet Metal, Inc. v. OSHRC*,
    685 F.2d 878 (4th Cir. 1982) ............................................................... 19, 31

*United States v. Day*,
    524 F.3d 1361 (D.C. Cir. 2008)...................................................................48

*United States v. Law*,
    528 F.2d 888 (D.C. Cir. 2008)....................................................................48

*Wal-Mart Stores, Inc. v. Sec'y of Labor*,
    406 F.3d 731 (D.C. Cir. 2005)....................................................................16

*Wal-Mart Stores, Inc.*,
    OSHRC No. 09-1013, 2011 WL 7143222 (April 5, 2011) ..........................53

*Whirlpool Corp. v. OSHRC*,
    645 F.2d 1096 (D.C. Cir. 1981).....................................................................16

## STATUTES AND REGULATIONS:

Occupational Safety and Health Act,

    29 U.S.C. § 654(a)(1) ...................................................... 1, 12, 13, 15

    29 U.S.C. § 660(a) .............................................................. 13, 16, 41

29 C.F.R. §1903.19...............................................................................40

29 C.F.R. § 2200.90(d) .........................................................................13

29 C.F.R. § 2200.91(b) .........................................................................13

## MISCELLANEOUS:

S. Rep. No. 1282, 91st Cong. 2d Sess. 10 (1970) ..........................................52

H. Rep. No. 1291, 91st Cong. 2d Sess. 21-22 (1970) ....................................53

AZA Standards for Elephant Management and Care, §§ 4.2.1 & 4.2.2,
available at http://www.aza.org/accred-materials/ .......................................54

AZA Animal Care Manual for Lions, § 2.2, available at
http://www.aza.org/animal-care-manuals/ ...................................................54

OSHA Inspection Results
    https://www.osha.gov/pls/imis/InspectionNr.html ...........................53

viii

# GLOSSARY

| | |
|---|---|
| Administrative Law Judge | ALJ |
| Association of Zoos and Aquariums | AZA |
| California Division of Occupational Safety and Health | Cal/OSHA |
| Occupational Safety and Health Act | OSH Act or Act |
| Occupational Safety and Health Administration | OSHA |
| Occupational Safety and Health Review Commission | Commission or OSHRC |
| Petition for Modification of Abatement Date | PMA |
| SeaWorld of Florida LLC | SeaWorld |
| Standard Operating Procedures | SOP |
| 29 U.S.C. § 654(a)(1) | General Duty Clause |

## STATEMENT OF ISSUES

1.      Whether substantial evidence supports the ALJ's findings that: (1) working in close contact with killer whales is a recognized hazard and (2) requiring trainers to use physical barriers or maintain a safe distance from the whales is a feasible means of abating the hazard.

2.      Whether SeaWorld was afforded fair notice of its obligations under the General Duty Clause of the Occupational Health and Safety Act of 1970, 29 U.S.C. § 654(a)(1).

## RELEVANT STATUTE

"Each employer shall furnish to each of his employees employment and a place of employment which are free from recognized hazards that are causing or are likely to cause death or serious physical harm to his employees."
29 U.S.C. § 654(a)(1).

## STATEMENT OF FACTS

**1.     SeaWorld's Operation and Killer Whales**

SeaWorld of Florida, LLC ("SeaWorld") is a theme park in Orlando, Florida, that keeps and displays several different species of marine animals, including dolphins, sea lions, otters, and orcas, otherwise known as killer whales. Tr. 4, 34.  In the wild, killer whales are "apex predators," positioned at the top of the food chain.  Tr. 842.  SeaWorld's captive killer whales are the park's

1

"signature attraction." *SeaWorld of Florida, LLC*, 2012 WL 3019734, 1 (No. 10-1705, May 30, 2012) ("Decision").

SeaWorld of Florida is one of three such theme parks owned and operated by SeaWorld Parks and Entertainment, LLC. The other two are SeaWorld of San Diego, California, and SeaWorld of San Antonio, Texas. There was also a SeaWorld of Ohio park, which is now closed. Tr. 570. All three parks house and display killer whales. Tr. 352. SeaWorld of Florida currently keeps seven killer whales and employs approximately 27 whale trainers. Tr. 38. Most of SeaWorld's adult whales are between seventeen and nineteen feet long and weigh between 5,000 and 6,000 pounds. SeaWorld's largest whale, Tilikum, measures 22 feet long and weighs approximately 12,000 pounds. Ex. R-2.

SeaWorld's mission is "To bring people together of all ages, cultures, and backgrounds to enjoy the highest international theme park standards of quality, fun, and entertainment." Ex. R-1 at 1515. Visitors to the park can pay to attend shows, or performances, during which trainers interact with killer whales. Tr. 40-41, 278. Many shows take place at "Shamu Stadium." Tr. 279. These shows often feature a musical soundtrack along with assorted props and scripted narration by the trainers. Tr. 319, 324, 1310; Ex. R-2 at 1909, 1912. During the shows, the whales perform various tricks, which SeaWorld calls "behaviors," that they have

been trained to do.  Tr. 42-43.  Park visitors may also observe trainers and whales

interacting in public settings outside of the formal "Shamu" shows.  Tr. 110-13.

SeaWorld divides trainers' physical interactions with whales into two types:

"waterwork" and "drywork."  "Waterwork" is defined as an interaction with a

killer whale where the trainer is in water higher than knee-deep, including

swimming with whales in pools more than twenty-five feet deep.  Tr. 124, 747.

"Drywork" – which is something of a misnomer – is any interaction where the

trainer is out of the water entirely or in water less than knee-deep.  Tr. 128.  Killer

whales are trained to perform a large repertoire of both drywork and waterwork

behaviors.  Tr. 287, 325-26; Ex. C-1 at 76-88.  Waterwork behaviors range from

the "basic" – including "hula rides" and "standing mans" – to the "advanced,"

including "hydro hop" and "rocket hop with trainer 1½ flip."  Ex. C-1 at 108-10.

## 2.    Operant Conditioning and Its Drawbacks

SeaWorld uses a method called "operant conditioning" to train its whales.

Tr. 128.  The whales are trained to perform various show behaviors as well as to

comply with the slate of medical procedures SeaWorld conducts on them.  Tr. 97-

99.  SeaWorld employs operant conditioning in all of its trainer-whale interactions,

which occur in performance settings as well as backstage and in the medical pools.

Tr. 1748.

Operant conditioning is a recognized scientific method that involves giving an animal positive reinforcement to encourage desired behaviors while ignoring undesired behaviors. Tr. 128-29, 804. The types of positive reinforcement SeaWorld trainers provide to the killer whales include food – primarily fish – as well as various touches, rubs, hugs, kisses, and other "tactile" that SeaWorld believes the whales find rewarding. Tr. 837, 1053, 1361, 1519; Ex. R-4. SeaWorld has no written protocol for how to train killer whales.[1] Instead, the company relies on a sort of oral tradition wherein newer trainers learn from more experienced trainers. Tr. 86-87, 115, 362, 469.

Operant conditioning also functions as SeaWorld's safety program. Trainers are expected to recognize "precursors" to aggressive behavior. Tr. 116, 508. At the hearing, Kelly Flaherty Clark, curator in charge of animal training, listed about twenty precursors that trainers must recognize, including "any time a killer whale puts their head down," "opening their eyes wider, opening their mouth towards another animal," "pulling back," and "a tightening in their body." Tr. 145. After

---

[1]     SeaWorld has a document called "Animal Training SOP," which includes information on how to perform rescues and the process by which trainers are approved to perform behaviors with the animals. Notably, the document includes no methodology, rules, or instructions for training animals. Ex. C-1. As SeaWorld's expert, Jeffrey Andrews, admitted, the company has conducted no scientific studies to evaluate how successful its training program is. SeaWorld's belief that its program is a success is based, rather, on "anecdotal evidence." Tr. 1643-53. SeaWorld does not require its animal training supervisors – much less its trainers – to have any formal education in animal training or a related field. Tr. 1378-79.

recognizing a precursor, trainers are expected to encourage a change in the whale's behavior before aggression or injury occurs. However, SeaWorld does not specify exactly how trainers should respond to particular precursors. In the words of the curator of zoological operations for all SeaWorld parks, "All I can do is give you a rough general idea and the protocol you would follow in most situations, and it's up to [trainers] to analyze the environment, what's happening in that environment and make your best judgment call." Tr. 423.

Operant conditioning is not foolproof. It allows trainers to correctly predict what whales will do in many, but not all, situations. Tr. 368, 829-30, 1069. As SeaWorld employees acknowledge, some incidents of whale aggression are not in fact preceded by any "precursors." Tilikum, for example, did not display any precursors before killing trainer Dawn Brancheau, the event that triggered the investigation in this case. Tr. 152, 500-501. SeaWorld's own expert witness agreed that killer whales sometimes engage in unpredictable aggressive behavior. Tr. 1911.

In the same vein, trainers are not always able to avert or stop harmful whale behavior even if they can predict it. SeaWorld trainers are taught signals that are supposed to "call back" a whale to trainer control, such as slapping the surface of the pool or sounding a tone beneath the water. Tr. 120. However, these callback signals are not always effective. In fact, SeaWorld acknowledges that callbacks

5

are particularly ineffective when a whale is doing something undesirable.  Tr. 190, 1220-21.  Callback signals were attempted to no avail in two trainer deaths as well as two dramatic submerging incidents, all described below.  Tr. 192, 755-76; Ex. C-6 at 749, 1474, 2725.

In short, while operant conditioning is regarded as a largely successful technique, the behavior of killer whales trained using operant conditioning is far from one hundred percent predictable.  Forty-plus years of history at the SeaWorld parks have yielded occasion after occasion where captive killer whales have not responded as their trainers intended.

### 3.     The Death of Dawn Brancheau

On February 24, 2010, a senior SeaWorld whale trainer named Dawn Brancheau was interacting with killer whale Tilikum during a performance called "Dine with Shamu."  Tr. 109-10.  The program took place in "G Pool" and consisted of audience members eating a meal while watching Ms. Brancheau and Tilikum interact.  Tr. 110-11, 219.  Near the end of the show, Ms. Brancheau entered a shallow area of G Pool and lay down on her back on the "slideout," a platform that extends into the pool several inches below the surface of the water. Tr. 753.  Tilikum was in the water, parallel to Ms. Brancheau.  This was the first step of a behavior called a "layout mimic," in which Tilikum was supposed to

6

imitate Ms. Brancheau's posture and turn over onto his back.  Tr. 745.  Instead, the

whale grabbed Ms. Brancheau and pulled her underwater.  Tr. 253-54.

The trainer who was serving as "spotter" during the performance attempted

to halt Tilikum's behavior by slapping the water and sounding a recall tone.

Tilikum did not respond to these signals.  Tr. 192, 755-56.  By the time Tilikum

allowed emergency personnel to retrieve Ms. Brancheau from the pool forty-five

minutes later, she was dead.  Tr. 756.  She had suffered traumatic injuries.  Tr. 470.

The Secretary's expert witness, Dr. David Duffus, reported that "[t]he description

of the Brancheau death exemplifies the same behavior I have seen in probably 100

foraging encounters in the wild with killer whales."  Ex. C-12 at 14.  Ms.

Brancheau had done nothing that broke with SeaWorld's policies or protocols in

any way.  Tr. 75, 601.

After Dawn Brancheau's death, SeaWorld suspended waterwork with all of

its whales.  That suspension continues today.  Tr. 78, 660.  SeaWorld has

continued to put on shows and performances with its killer whales, and debuted a

new non-waterwork show, "One Ocean," in 2011.  Tr. 82-83, 1360.

**4.     Tilikum's "Negative History"**

Dawn Brancheau's death was not the first caused by Tilikum.  He was

responsible for the first recorded death of a human caused by a killer whale, in

1991 at Sealand of the Pacific, a now-closed park in Canada.  Tr. 783.  In that

incident, Tilikum was in a sea water pen with other whales when a trainer named

Keltie Byrne slipped and fell into the water. Tilikum grabbed her by the thigh and

plunged her under the water multiple times. Witnesses estimated that Ms. Byrne

was conscious for anywhere from ten minutes to an hour. Ex. C-12 at 11. All

attempts to control or distract Tilikum failed, and it took almost two hours for

rescue workers to recover Ms. Byrne's body from Tilikum. Dr. Duffus, who

served on the coroner's jury investigating Ms. Byrne's death, observed that

"Tilikum actively killed the trainer in a manner not dissimilar to the way [killer

whales] kill seals in local waters." Ex. C-12 at 11.

In the second fatality connected with Tilikum, a SeaWorld employee

reported to work on July 6, 1999 and discovered a dead body in the pool with

Tilikum. Tr. 185, 1340, 1534; Ex. C-8. The body was of a man, Daniel Dukes,

who had apparently hidden in the park when it closed the night before and then

entered Tilikum's pool. Tr. 175. It was never determined precisely what role

Tilikum played in his death. Tr. 123-24.

SeaWorld purchased Tilikum from Sealand of the Pacific in 1992, and the

whale was transferred to Orlando. Tr. 96; Ex. C-12 at 11. In recognition of

Tilikum's "negative history with trainers in the water," Ex. C-8, and possessive

tendencies regarding objects in the water (including humans), SeaWorld has, since

first acquiring Tilikum, required special precautions for working around him. Tr.

8

273-74.  Tilikum has his own dedicated chapter in SeaWorld's operating manual.

Ex. C-1 at 141.  All trainers, on their first day of work, receive the "Tili Talk," in

which management warns them that "if you fall into [Tilikum's] pool and he is

able to get ahold of you . . . we will not be able to get you back."  Tr. 1342-43.

Only experienced trainers were permitted to interact with Tilikum, Tr. 152, 277,

595, and waterwork with Tilikum was never allowed.  Tr. 159-60.  Drywork,

however, was permitted, and because drywork encompasses interactions in water

up to one's knees, trainers regularly touched Tilikum, stood and knelt near him,

and lay in shallow water next to him, as Dawn Brancheau was doing when she was

killed.  Tr. 173-74, 286.

**5.     Other Trainer Deaths and Near Misses**

Just two months before Dawn Brancheau's death, a trainer was killed by a

killer whale at a marine park in Spain called Loro Parque.  Loro Parque was, at the

time, exhibiting five killer whales, all owned by SeaWorld Parks & Entertainment

and on loan to Loro Parque.  Tr. 353, 379.  Several Loro Parque trainers had

previously spent two years at SeaWorld parks being trained in SeaWorld's operant

conditioning training methods.  Tr. 379-80.  An experienced SeaWorld of

California trainer, Brian Rokeach, was spending several months at Loro Parque,

serving as supervisor there and continuing with training.  Tr. 385, 1113, 1181. On

December 24, 2009, trainer Alexis Martinez was working with a killer whale

named Keto, with Mr. Rokeach acting as spotter. Keto had just failed to perform several behaviors correctly and Mr. Rokeach "took control" of the whale from the side of the pool. Keto then "left" Mr. Rokeach's control, spun around, swam after Mr. Martinez, and pushed him to the bottom of the pool. Tr. 1219-20. At some point, Keto rammed him in the chest. Mr. Martinez died of massive internal bleeding. Tr. 408. The recall slaps and emergency alarms attempted by trainers outside the pool were completely ineffective. Ex. C-6 at 2725. After Mr. Martinez's death, Loro Parque permanently ceased all waterwork with its killer whales. Tr. 563.

    In addition to the deaths, there have been multiple injuries and "near misses" at SeaWorld and its sister parks. SeaWorld keeps incident reports to record aggressive or other unwanted whale behaviors. Tr. 363. Each report is written up by the trainer involved, reviewed by a supervisor, and then sent to corporate headquarters, the other SeaWorld parks, and Loro Parque for review and comment. Tr. 1009, 1572-73. The reports document at least 100 incidents of whale aggression from the years 1989 through 2009, resulting in at least eleven injuries, and it is clear that some incidents were not recorded.[2,3]  Ex. C-6; Tr. 451-57, 478-

---

[2]      While eleven injuries may seem few, it is important to note that the SeaWorld parks employ only a small number of killer whale trainers (27 at SeaWorld of Florida). For comparison, note OSHA's use of the "one in a thousand" metric to determine whether there exists a "significant" risk of a given occupational injury or illness in the rulemaking context, which was approved by

80.  In one particularly chilling incident at the San Diego SeaWorld, of which video was shown at trial, the killer whale Kasatka grabbed a trainer named Ken Peters by the foot and dragged him to the bottom of the pool.  Ex. C-6 at 1474. Over the next eight minutes, Kasatka continued to hold Mr. Peters underwater and take him repeatedly to the very bottom of the pool.  The whale surfaced with Mr. Peters for brief intervals, but was not deterred by hand slaps or other emergency callbacks.  Mr. Peters eventually broke free and swam to safety; he suffered puncture wounds and a broken foot and nearly drowned.

In a much-publicized incident in 2004, trainer Steve Aibel was engaged in waterwork with a whale named Kyuquot at SeaWorld in San Antonio when the whale began refusing to do the behaviors Mr. Aibel requested of him.  Ex. C-6 at 749; Tr. 1194, 1586.  After refusing several behaviors, Kyuquot blocked Mr. Aibel from exiting the pool.  As Mr. Aibel kept attempting to swim toward the pool edge, Kyuquot became increasingly agitated and repeatedly swam over Mr. Aibel for more than two minutes.  The whale did not respond to repeated hand slaps and

---

the Supreme Court in *Industrial Union Department, AFL-CIO v. American Petroleum Institute*, 448 U.S. 607, 655 (1980).

[3]      The incident reports omitted at least four incidents involving the killer whale Kayla, at least one incident involving the whale Katerina, and one incident with the whale Ikaika, as well as Dawn Brancheau's death.  Tr. 451-55, 478-81, 692-93, 1537-37.

recall tones.  Ex. C-6 at 749.  Mr. Aibel eventually exited the pool with the assistance of another trainer.

**6.      Procedural History**

In response to media reports surrounding Ms. Brancheau's death, a compliance officer with the Occupational Safety and Health Administration ("OSHA") performed an inspection of SeaWorld and, in August 2010, issued citations.  Decision 1-2.  At issue in this appeal is Citation 2, which alleged two instances of willful violations of the General Duty Clause of the Occupational Health and Safety Act of 1970 ("OSH Act"), 29 U.S.C. § 654(a)(1), based on SeaWorld's failure to protect its trainers from the hazard of working in close contact with Tilikum and other killer whales during performances.

SeaWorld timely contested the citation and a nine-day hearing was held before ALJ Ken Welsch in Sanford, Florida.  On June 11, 2012, the ALJ issued a decision and order affirming both instances of Citation 2, holding that SeaWorld had violated 29 U.S.C. § 654(a)(1) by exposing its employees to hazards when performing with killer whales in shows.  The ALJ found that SeaWorld recognized the hazard of working in close contact with both Tilikum and other killer whales and that the Secretary had demonstrated a feasible means of abatement to reduce the hazard.  Decision 32-42.  In doing so, he held that SeaWorld's existing training program did not materially reduce the cited hazard as required by the OSH Act.

Decision 40. The ALJ also downgraded the citation from "willful," as the

Secretary had characterized it, to "serious," and assessed a penalty of $7,000.

Decision 44, 47.

Both parties sought discretionary review by the Occupational Safety and

Health Review Commission ("Commission"). *See* 29 C.F.R. § 2200.91(b).

Review was not directed and, on July 16, 2012, the ALJ's decision became the

final decision of the Commission. *See* 29 C.F.R. § 2200.90(d). On September 7,

2012, SeaWorld petitioned this Court for review of the final Commission decision,

as authorized by 29 U.S.C. § 660(a).

## SUMMARY OF THE ARGUMENT

The General Duty Clause of the OSH Act requires employers to keep their

workplaces free of "recognized hazards" that can kill or seriously harm their

employees. 29 U.S.C. § 654(a)(1). The Secretary is charged with proving General

Duty Clause violations by demonstrating the existence of a hazard, that the hazard

was recognized by the employer or its industry, that the hazard was likely to cause

death or serious physical harm, and that there is a feasible means of abating the

hazard. *Fabi Const. Co., Inc. v. Sec'y of Labor*, 508 F.3d 1077, 1081 (D.C. Cir.

2007). At issue in this case are two prongs of this test: whether the Secretary

provided substantial evidence of a recognized hazard and whether he demonstrated

a feasible means of abatement.

SeaWorld exposed its employees, killer whale trainers, to the hazard of working in close contact with killer whales. This hazard has caused two deaths and multiple injuries. SeaWorld and the other marine parks in the captive killer whale industry recognized this hazard consistently over the past twenty years because it is obvious and because they documented dozens of incidents of dangerous killer whale behavior and made statements acknowledging the danger and unpredictability of killer whales.

The Secretary also met his burden of proving a feasible means of abating the preventable hazard posed by close contact with killer whales. He established that SeaWorld's existing safety program is insufficient to protect its employees from the hazard. The Secretary then proved two possible means of abatement: barriers and distance between the trainers and the whales. These methods are feasible both as a matter of common sense and because SeaWorld has already implemented them to a certain degree.

SeaWorld was afforded adequate notice of its obligations under the General Duty Clause because, as this Court has held, due process is satisfied by construing the Clause to require elimination of only preventable recognized hazards. The hazard in this case was well-known to SeaWorld and fully capable of being prevented.

14

The Secretary did not overreach in applying the General Duty Clause to SeaWorld in this case because the clause is meant to address unusual hazards for which there are no promulgated standards, just like the hazard present here.

The ALJ acted properly in this case by limiting his holding to the context of show performances and did not rely on his own personal values. The ALJ also properly permitted the Secretary's expert witness to testify because the witness had extensive relevant knowledge and experience and his testimony was helpful to the ALJ.

## ARGUMENT

### I.   The Citation Should Be Affirmed Because the Secretary Established the Elements of the General Duty Clause Violation.

#### A.   Introduction

The General Duty Clause of the OSH Act requires an employer to provide a work environment "free from recognized hazards that are causing or are likely to cause death or serious physical harm to his employees." 29 U.S.C. § 654(a)(1).  To establish a violation of the General Duty Clause, the Secretary must demonstrate that: (1) an activity or condition in the employer's workplace presented a hazard to an employee, (2) either the employer or the employer's industry recognized the condition or activity as a hazard, (3) the hazard was likely to or did cause death or serious physical harm, and (4) there existed a feasible means to eliminate or materially reduce the hazard.  *Fabi Const. Co., Inc.*, 508 F.3d at 1081 (citation

omitted).  In this appeal, SeaWorld contests two of these elements: recognized hazard and feasible abatement.  As shown below, substantial evidence in the record supports the finding of a recognized hazard – close contact with killer whales during performances[4] – as well as the finding that feasible abatement – barriers and distance – exists which would materially reduce or eliminate the probability of other trainers suffering the same fate as Dawn Brancheau.

### B.    The Substantial Evidence Standard of Review

The OSH Act sets out the standard of review for purely factual issues such as those before the Court today.  "The findings of the Commission with respect to questions of fact, if supported by substantial evidence on the record considered as a whole, shall be conclusive."  29 U.S.C. § 660(a).  Under the substantial evidence standard of review, the Court "must uphold the Commission's findings of fact as long as there is enough evidence in the record for a reasonable mind to agree with the Commission."  *Fabi Const. Co., Inc.*, 508 F.3d at 1081; *Whirlpool Corp. v. OSHRC*, 645 F.2d 1096, 1101 (D.C. Cir. 1981).  This "standard of review is deferential."  *Wal-Mart Stores, Inc. v. Sec'y of Labor*, 406 F.3d 731, 734 (D.C. Cir. 2005).

---

[4]    "Close contact" is used throughout this brief as shorthand to describe the hazard at issue here.  The citations described the hazards as struck-by and drowning hazards while trainers engaged in unprotected contact with Tilikum during drywork and with other killer whales during waterwork and drywork. Decision 14.

### C.    Substantial Evidence Supports the Finding that Working in Close Contact with Killer Whales Is a Recognized Hazard.

A "recognized hazard" is "a condition that is known to be hazardous, and is known not necessarily by each and every individual employer but is known taking into account the standard of knowledge in the industry." *Brennan v. OSHRC*, 501 F.2d 1196, 1201 (7th Cir. 1974). "Whether a condition at the worksite constitutes a 'recognized hazard' is a question of fact as to which the findings of the Commission that are supported by substantial evidence on the record are conclusive." *Baroid Div. of NL Indus., Inc. v. OSHRC*, 660 F.2d 439, 446 (10th Cir. 1981).

Ample evidence in the record establishes that working in close contact with killer whales, as SeaWorld employees regularly do during show performances, is a hazard recognized by both SeaWorld individually and the captive killer whale industry generally. This evidence includes incident reports documenting more than twenty years of dangerous killer whale behavior towards trainers, SeaWorld's unsuccessful attempts to prevent additional incidents, and the fact that killer whale Tilikum dragged a SeaWorld trainer into the water and killed her.

### 1.    Wild Animals, Including Killer Whales, Are an Obvious Danger to Humans.

It is a matter of both common sense and the common law that a wild animal – in this case, one that weighs several tons and is an apex predator by nature –

17

poses a danger to humans.  "A dangerous propensity is presumed in wild animals . . . . No member of such a species, however domesticated, can ever be regarded as safe, and liability does not rest upon any experience with the particular animal." *Eyrich v. Earl*, 495 A.2d 1375, 1377 (N.J. Super. Ct. App. Div. 1985) (quoting *Prosser and Keeton on the Law of Torts* § 76, at 42 (5th ed. 1984)); *see also Irvine v. Rare Feline Breeding Ctr., Inc.*, 685 N.E. 2d 120, 124 (Ind. Ct. App. 2007); *Southern Cotton Oil. Co. v. Anderson*, 86 So. 629, 632 (Fla. 1920) (wild animals "are dangerous per se.").

SeaWorld glosses over this inherent danger, repeatedly likening its captive killer whales to domesticated animals and even to house pets.  Head animal trainer Kelly Flaherty Clark testified: "You have to know how to move around a horse or you would be putting yourself in danger.  I teach the trainers how to move around the killer whales."  Tr. 114.  "[D]o you have a dog? You know your dog, and we know our killer whales."  Tr. 132.  Corporate head of animal operations Chuck Tompkins: "[W]e read our animals every single day every time we step in front of them. . . . It's just like having the dog at home."  Tr. 366; *see also* Tr. 1311 (yet another dog comparison).  Likening the training of captive killer whales to bonding with one's pet dog allows SeaWorld to maintain the "mythology among the trainers that they have a deep understanding of the whales."  Ex. C-12 at 6.  It also defiantly ignores reality.  Their sheer size and mass give killer whales the ability to

18

easily kill humans.  Killer whales "are large powerful predators with strong jaws, well-rooted, conical gripping teeth, and they can stay underwater far longer than a human.  All whales [including those in captivity] have some instinctual ability to capture and grasp prey."  Ex. C-12 at 14.

Any suggestion that captive killer whales have lost their natural capability to promptly dispatch with human life and limb is proven false by the facts.  Tilikum has killed at least two people in a manner consistent with hunting prey in wild.  Ex. C-12 at 11, 14.  Killer whale Keto killed a trainer by ramming him in the chest.  Tr. 408, 1219-20.  Kasatka closed her jaws around a trainer's foot, dragged him underwater, and held him on the bottom of the pool.  Ex. C-6 at 1474.  Kyuquot aggressively swam over a trainer, "showing a behavior similar to that which killer whales use to subdue large prey by jumping on top of their target."  Ex. C-12 at 14.

When a hazard is obvious, it is proper to infer employer recognition of that hazard.  *Litton Sys., Inc.,* 10 BNA OSHC 1179, 1182 (No. 76-900, 1981) (inferring recognition of hazard posed by 30-ton vehicle driving with 30-foot blind spot through area regularly traversed by employees).  "Obvious and glaring" hazards may be deemed recognized "without reference to industry practice or safety expert testimony."  *Tri-State Roofing & Sheet Metal, Inc. v. OSHRC*, 685 F.2d 878, 880-81 (4th Cir. 1982) (per curiam) (finding recognized hazard where workers were on unguarded platform 40 feet above cement floor with no protective equipment).

19

The obviously dangerous nature of close contact with killer whales is, by itself,

enough to establish the existence of a recognized hazard in this case.

### 2. SeaWorld's Incident Reports Demonstrate that SeaWorld Recognized the Ongoing Hazard of Close Contact with Killer Whales.

Substantial evidence shows that the hazard of working closely with killer

whales was well understood by SeaWorld management.  Twenty years of

SeaWorld's incident reports document instance after instance where killer whales

behaved unpredictably or exhibited aggression.  Some of these incidents resulted in

injury to the trainers.  Others might be termed near misses, where the killer whale

happened to let the trainer go before any serious harm was done.  Evidence

establishing near misses can show that the company "had 'actual knowledge that

[additional or different protection] was necessary under the circumstances.'"

*Cleveland Wrecking Co.*, 2010 WL 9438598, *9 (OSHRC No. 07-0437, 2010)

(quoting *S&H Riggers & Erectors, Inc. v. OSHRC*, 659 F.2d 1273, 1285 (5th Cir.

1981)).

SeaWorld denies the significance of the incident reports, calling them "a

means to improve operant conditioning and trainers' interaction with whales."

SeaWorld Br. 28.  According to SeaWorld, rather than demonstrating a hazard,

these reports simply "show resolution of potential problems."  *Id.* at 29.  However,

unexpected and "undesirable" whale–trainer interactions continued to occur:

20

whales biting trainers, knocking into trainers, pinning trainers to the pool wall, grabbing trainers' feet or hair, and pulling them underwater.

The incident reports show without a doubt that SeaWorld of Florida and its sister parks[5] have long recognized the ongoing hazard posed to their trainers by working closely with killer whales.  The following is a sampling of statements in the reports by SeaWorld staff and management that establish recognition of that hazard:

- (following March 9, 1989 incident of whale snapping her jaws at trainer): "Knootka is very old and 'cranky.'  It does not take very much to set her aggression off.  This animal demands extreme caution when interacting with her."  Ex. C-6 at 227.

- (following February 19, 1990 incident where whale "head-popped" trainer): "Knootka is a very unpredictable whale . . . Extreme caution must be used whenever trainers interact with her."  Ex. C-6 at 243.

- (following November 6, 1994 incident where whale closed mouth around trainer's waist): "Even if a whale mouths you in a non-aggressive way, a person could still be injured."  Ex. C-6 at 422.

- (following February 10, 1995 incident where whale pushed trainer): "We are very lucky that [trainer error] happened with this whale, another may not have been so forgiving."  Ex. C-6 at 435.

- (following July 16, 1995 incident where whale hit trainer with its head): "This particular accident has happened in the past."  Ex. C-6 at 447.

---

[5]    SeaWorld suggests the incident reports are not relevant because they cover events at all the SeaWorld parks (and sometimes Loro Parque).  SeaWorld Br. 24.  However, incidents at the other parks are highly relevant to the question whether the captive killer whale industry recognized the hazard presented by working closely with killer whales.

- (following September 25, 1995 incident where whale Taku grabbed trainer by the hip and pulled him underwater): "This is a perfect example of how we cannot take any of our killer whales for granted.  Taku is only two years old but very capable of seriously hurting somebody."  Ex. C-6 at 476.

- (following October 27, 1995 incident where whale Taima opened her mouth around trainer's arm): "[The trainer] is very lucky that further aggression was not exhibited by Taima."  Ex. C-6 at 487.

- (following February 2, 1996 incident where whale Orkid dunked and pushed trainer and hit trainer with her flukes): "[W]e are developing a pattern with Orkid."  Ex. C-6 at 503.

- (following November 22, 1996 incident where Orkid rose out of pool to hit kneeling trainer with her head): "Looking back on her past incidents . . . it seems that Orkid aggresses when we are in the most vulnerable position." Ex. C-6 at 555.

- (following February 20, 1998 incident where whale Taku grabbed trainer Dawn Brancheau by the foot and pulled her into the water): "Taku and Dawn had a similar incident several months ago."  Dawn "could have been injured or could have caused the whale to get more aggressive."  Ex. C-6 at 620-21.

- (following July 8, 2002 incident where whale swam aggressively toward trainer on stage): "To be honest, it's great to be able to show people that our killer whales do have the potential of getting nasty."  Ex. C-6 at 718.

- (following November 15, 2006 incident where Orkid grabbed trainer by foot and pulled him underwater): "[The incident] fits a pattern that we have seen with Orkid three times now."  Ex. C-6 at 1364.

The incident reports demonstrate that SeaWorld and its sister parks knew about the injuries, near misses, and patterns of aggression and unwanted behavior displayed by the killer whales on a regular basis.  SeaWorld managers discussed potential ways to avert further incidents.  They acknowledged that killer whales

22

behave in ways they do not understand and cannot predict.  There can be no doubt that all of the SeaWorld parks recognized the hazard posed to their trainers by close contact with killer whales.  The ALJ's finding of a recognized hazard in this case is supported by substantial evidence and should be upheld.

### 3.     SeaWorld Recognized a Hazard Specific to Tilikum.

In addition to the hazard posed by close contact with killer whales generally, SeaWorld recognized a hazard specific to close contact with Tilikum.  Even before Tilikum killed Dawn Brancheau, SeaWorld knew that Tilikum had killed one trainer and had been involved in a second death.  Ex. C-8.  Since Tilikum's arrival in Orlando, SeaWorld maintained special Tilikum protocols, including prohibiting waterwork with him, because of his "negative history with trainers in the water." *Id.*  SeaWorld knew that Tilikum was possessive of objects in the water.  Tr. 273-74.  SeaWorld management warned new employees of the likely demise awaiting them should they find themselves in the water with Tilikum.  Tr. 262, 1342-43.

In short, SeaWorld knew that for a trainer to be in deep water with Tilikum was tantamount to death.  It also knew that whales pulled trainers in the pool or underwater fairly regularly.  SeaWorld nevertheless permitted Dawn Brancheau to lie down next to Tilikum in shallow water.  Tilikum's subsequent actions in pulling Dawn Brancheau into deep water and killing her were entirely consistent with the conduct exhibited by other captive whales in SeaWorld's inventory and with the

23

orcas' natural predatory behavior.  "[S]eizing prey from shore, holding prey underwater, shaking prey items are all commonly encountered in wild whales."  Decision 39.  Substantial evidence supports the ALJ's finding that SeaWorld recognized the hazard posed to employees by close contact with Tilikum.

### D.    Substantial Evidence Supports the Finding That Barriers and Distance Are Feasible Means of Eliminating Or Materially Reducing the Risk of Close Contact with Killer Whales.

#### 1.    SeaWorld Failed to "Free" Its Workplace of a Preventable Hazard.

Congress intended that employers be accountable under the OSH Act's General Duty Clause only for hazards capable of prevention – otherwise, the employer's duty would be unachievable.  *Nat'l Realty & Const. Co., Inc. v. OSHRC*, 489 F.2d 1257, 1266 (D.C. Cir. 1973); *Davey Tree Expert Co.*, 11 BNA OSHC 1898, 1899 (No. 77-2350, 1984).  In *National Realty*, this Court explained that the Act's mandate to keep workplaces "free of recognized hazards" requires that "[a]ll *preventable* forms and instances of hazardous conduct . . . be entirely excluded."  489 F.2d at 1266-67 (emphasis added).  A central theme of SeaWorld's argument is that operant conditioning so effectively addressed the hazards of working closely with killer whales as to render any remaining risk unforeseeable and unpreventable.  SeaWorld Br. 18-19, 24-32.   SeaWorld is wrong.

Demonstrating that a hazard is preventable requires the Secretary to proffer evidence of feasible measures that "would have materially reduced the likelihood"

24

of death or serious harm to employees from such hazard. *Nat'l Realty*, 489 F.2d at 1266.  If an employer already has a safety program designed to control the recognized hazard, the Secretary bears the burden to show this program was inadequate.  *Cerro Metal Prods. Div., Marmon Grp., Inc.*, 12 BNA OSHC 1821, 1822 (No. 78-5159, 1986).  The Secretary proved the inadequacy of SeaWorld's safety measures, as they existed when Dawn Brancheau was killed, through evidence showing (1) the multitude of injuries and near misses that have occurred over the past twenty years under the auspices of SeaWorld's safety program, as well as Ms. Brancheau's death itself; (2) the shortcomings in the company's operant conditioning training method; and (3) the ineffectiveness of the company's formal emergency procedures.

### a.  "Incidents" Occurred Regularly for Twenty Years Despite SeaWorld's Efforts to Prevent Them.

SeaWorld's argument that its safety protocols and operant conditioning program provide sufficient protection to its employees is disproven by the 600 pages of incident reports documenting unanticipated and undesirable killer whale behavior with trainers.  The reports describe some 100 occurrences of killer whales biting, hitting, lunging toward, pulling on, pinning, dragging, and aggressively swimming over SeaWorld trainers.  SeaWorld claims the frequency of such incidents has tapered off over time, SeaWorld Br. 8, but there have been incidents every year but two since 1988, culminating in trainer deaths in 2009 and 2010.

25

The incident reports not only document harmful killer whale behavior, but also show that, time after time, SeaWorld had no explanation for why an incident occurred and was ineffective at preventing similar or even identical behavior from happening again. Although not all incidents resulted in serious injury, a number were chillingly similar to incidents with less happy endings. One example of whale aggression that continued regularly over twenty years is whales grabbing trainers' feet or legs, often pulling them into or under the water.

- September 13, 1989. A trainer attempted a "footpush" off killer whale Kasatka. Kasatka placed her mouth around the trainer's feet. A callback tone was sounded but Kasatka did not respond; instead, she "mouthed"[6] the trainer's feet again. Ex. C-6 at 236.

- July 15, 1993. A trainer attempted a footpush off Kasatka. "[S]he began mouthing my feet and lower legs. [S]he took me down twice, once by the knee and once by the foot. The first time I was under briefly, the 2nd time was longer and @ 15 feet deep. She applied enough pressure to break the skin and shallowly puncture my knee and foot." Ex. C-6 at 355.

- March 15, 1996. A trainer was in the water with killer whale Winnie. The whale failed to respond to a recall signal and then grabbed the trainer's foot. Ex. C-6 at 522.

- November 17, 1997. Dawn Brancheau attempted a footpush off killer whale Taku. The whale tugged on Ms. Brancheau's sock and did not let go or respond to a callback slap. Ms. Brancheau went underwater with the whale still pulling on her sock. "The day prior, Taku had also done some 'sucking' of another trainer's sock during the same [behavior]." Ex. C-6 at 602.

- December 18, 1997. A trainer was out of the pool, less than two feet from killer whale Winnie. The whale grabbed the trainer's sweatshirt with its

---

[6]     SeaWorld favors benign-sounding terms like "mouthing" and "sock play" to describe the action of killer whales closing their jaws around a trainer's body.

mouth and the trainer fell into the pool.  The whale pulled the trainer underwater and ignored two callback slaps.  The whale let go, grabbed the trainer's pant leg and pulled the trainer underwater again.  Ex. C-6 at 612.

- February 20, 1998.  Dawn Brancheau was in the water with Taku and attempted a footpush.  She felt the whale "mouthing" her sock.  She managed to get herself up on the stage while the whale still had its mouth on her right foot.  The whale then dragged her back into the water until she was up to her head in water.  "Dawn and Taku had a similar incident several months ago."  Ex. C-6 at 620-21.

- September 9, 1998.  A trainer attempted a footpush off killer whale Keto.  The whale made contact with the trainer's feet with its mouth open and pushed into the trainer.  Ex. C-6 at 659.

- June 12, 1999.  A trainer was in the water with Kasatka.  The whale swam under the trainer and used its mouth to grab the trainer's left foot, right foot, and then left hand.  The whale lifted the trainer approximately two feet up and out of the water.  The whale tried again to grab the trainer's hand before a spotter pulled the trainer out of the water.  Ex. C-6 at 684.

- July 31, 2002.  A trainer was on a concrete deck adjacent to a pool containing killer whales Orkid and Splash.  The trainer placed her foot toward the whales.  Orkid pulled the trainer into the water by her right bootie.  The trainer tried to grab a gate as she went in but could not hang on.  Orkid pulled the trainer's right bootie off.  Splash grabbed the trainer's arm and pulled her underwater.  A nearby trainer slapped the water with no response.  Ex. C-6 at 732.

- May 6, 2005.  A trainer attempted a footpush off Orkid.  The whale grabbed the trainer's right foot and pulled sharply downward.  Another trainer slapped the water and the whale did not respond.  The whale pulled the trainer by her foot approximately 30 feet straight down underwater.  Ex. C-6 at 2668.

- November 15, 2006.  A trainer was in the water with Orkid.  Orkid grabbed the trainer's ankle and pulled him underwater.  The whale did not respond to a callback tone or three hand slaps.  The whale held the trainer underwater

27

for 15-20 seconds.  The incident "fits a pattern that we have seen with Orkid three times now."  Ex. C-6 at 1152.

- November 29, 2006.  Kasatka grabbed trainer Ken Peters by the foot and dragged him to the bottom of the pool.  Kasatka held Mr. Peters underwater for the next eight minutes, surfacing occasionally.  The whale was not deterred by hand slaps or other emergency callbacks.  Ex. C-6 at 1474; Ex. C-9.

- April 6, 2007.  A trainer attempted a footpush off killer whale Tuar.  The whale put its mouth on the trainer's leg just above the knee.  Ex. C-6 at 1378.

These incidents show that SeaWorld was aware that killer whales regularly grab trainers by the feet and legs, whether the trainer is in or out of the water, sometimes pulling trainers underwater for dangerous lengths of time, and did not succeed in eliminating that hazard.

The incident reports also show numerous previous occurrences of two specific whale aggressions that contributed to Dawn Brancheau's death: grabbing trainers' hair and biting during "layout mimics."  Ex. C-6 at 236, 307, 417, 424, 480, 514, 579, 665, 697-99.  According to SeaWorld, Tilikum grabbed Dawn Brancheau by her ponytail and pulled her into the water.  Tr. 152, 466, 745-46; Ex. C-8.  At the time this happened, Ms. Brancheau was attempting a layout mimic with Tilikum.  Tr. 745.

This Court has defined unpreventable workplace conditions as those "so idiosyncratic and implausible . . . that conscientious experts, familiar with the industry, would not take [them] into account in prescribing a safety program."

28

*Nat'l Realty*, 489 F. 2d at 1266.  The threat posed by killer whales to trainers working in close contact with them is neither idiosyncratic nor implausible; it is real, regular, and documented.  The fact that the above-described incidents continued to occur demonstrates that SeaWorld's safety program was ineffective at protecting trainers from the risks of close contact with killer whales.  In addition, as discussed below, the specific techniques SeaWorld employed to prevent dangerous whale behavior and to halt it once it has begun are both ineffective.

### b.  Operant Conditioning Does Not Keep Trainers Safe.

SeaWorld depends almost exclusively on operant conditioning to ensure safe interactions with its captive killer whales.  As the implementers of operant conditioning, trainers are thus responsible for their own safety and are "the primary source of management's knowledge."  SeaWorld Br. 40.  Through operant conditioning, trainers are expected to recognize precursors to aggressive or unwanted behavior and to respond appropriately, whatever that may mean.  Tr. 53-56, 1032-33 (when presented with unexpected behavior by a killer whale, "the trainer has to make a judgment there on the spot as to how to deal with a new scenario.").

Unfortunately, operant conditioning is an imperfect system.  It has two major flaws: killer whales do unpredictable things and trainers make mistakes.  These facts are amply documented in the incident reports.  Examples include:

29

- "I think this is one of those situations where we will never quite understand the intent of [the whale's] movement.  I cannot rule out that it was done either on purpose or by accident.  I think we have learned our lesson of our unpredictability of our animals even in the best of situations."  Ex. C-6 at 725.

- "Knootka is a very unpredictable whale."  Ex. C-6 at 243.

- "Because [the whale's] never done anything like this, no one was expecting it."  Ex. C-6 at 679.

- "As evident by this episode, our whales should never been [sic] viewed as routine, nor predictable."  Ex. C-6 at 734.

- "I am still very confused that mistakes like this can be made by our senior trainers."  Ex. C-6 at 435.

- "[The trainer] put himself in a very compromising situation."  Ex. C-6 at 487.

- "[The trainer] should never have attempted to get out of the water while the whale still had a hold of her sock."  Ex. C-6 at 616.

SeaWorld argues that it learns from each incident and attempts to prevent similar recurrences.  SeaWorld Br. 28-29.  However, as the incident reports demonstrate, SeaWorld is not as successful as it purports to be in preventing recurrences of dangerous killer whale behavior.  In addition, SeaWorld's "learn as you go" approach means that trainers are continually at risk from novel or unanticipated whale behaviors.[7]

---

[7]    In contrast, the OSH Act is meant to be "forward-looking" and "to prevent the first accident."  *Brock v. L.E. Myers Co.,* 818 F.2d 1270, 1275 (6th Cir. 1987).

SeaWorld appears proud of the fact that its employees "controlled their own exposure to the alleged hazards," calling this a "culture of empowerment." SeaWorld Br. 40-41.  However, placing the responsibility for employee safety on the employees themselves is, as the ALJ correctly pointed out, in contravention of the OSH Act.  "An employer cannot shift [OSH Act] responsibility to its employees by relying on them to, in effect, determine whether the conditions under which they are working are unsafe." *Armstrong Cork Co.*, 8 BNA OSHC 1070, 1074 (No. 76-2777, 1980); *see also* Decision 36; *Nat'l Realty*, 489 F.2d at 1266 ("[f]inal responsibility for compliance with the requirements of this act remains with the employer.").  Likewise, the fact that some employees "testified that they felt safe" does not mean that they *were* safe.  SeaWorld Br. 31.  "The particular views of work[ers] are not necessarily, and often times are not, the best determination as to what is safe and what is unsafe." *Tri-State Roofing & Sheet Metal, Inc.*, 685 F.2d at 881.

Finally, SeaWorld contends that it cannot be held responsible for mitigation of the hazard posed by close contact with killer whales because all of the potential harm to its employees comes from "exceptional and unpredictable whale behavior."  SeaWorld Br. 37.  SeaWorld even suggests that Ms. Brancheau's death was beyond the company's control.  *Id.* at 14 ("SeaWorld could not have predicted this terrible incident").  But the whole point is that SeaWorld *knows* killer whale

behavior is unpredictable.  Given the known unpredictability of killer whale

behavior and the record of past incidents, it was entirely foreseeable that an event

like Dawn Brancheau's death could occur.  That Tilikum attacked Ms. Brancheau

without providing the "precursors" SeaWorld relies on shows the failure of operant

conditioning to keep trainers safe; it does not render Ms. Brancheau's death – or

the hazard of close contact with killer whales – unpreventable.

<blockquote><b>c.    SeaWorld's Emergency Procedures Do Not Keep Trainers Safe.</b></blockquote>

The second major failing in SeaWorld's operant conditioning program is

that the emergency rescue procedures meant to "recall" or distract a whale from

dangerous behavior have proven to be grossly inadequate.  The incident reports

document at least seventeen instances, dating to 1989, where killer whales ignored

attempts to "recall" them from unwanted behavior.  Ex. C-6 at 231, 424, 522, 579,

603, 612, 627, 633, 665, 693, 732, 749, 775, 1152, 1372, 2668, 2725.  Most

recently, recall attempts were useless in the deaths of both Alexis Martinez and

Dawn Brancheau.

SeaWorld's emergency procedures are contained in its "Animal Training

SOP."  Ex. C-1.  When an emergency occurs, trainers are to sound a siren, after

which "the senior ranking trainer should attempt to establish control of animal(s) in

the environment with recall stimuli."  Ex. C-1 at 977.  These "recall stimuli,"

which SeaWorld has been using at least since the late 1980s, include trainers

slapping the water and the sound of "recall tones."  Ex. C-6; Tr. 189-193.  The

killer whales are supposed to respond to these signals by "calmly swimming to

[the] stage."  Ex. C-1 at 1033.

As the incident reports recount, however, and as SeaWorld employees

admitted at the hearing, these procedures are ineffective in most serious

emergencies.  Kelly Flaherty Clark admitted that both a recall tone and recall slaps

were attempted when Dawn Brancheau was in the water with Tilikum; she also

admitted that there was no expectation that they would work.  Tr. 193.  Brian

Rokeach agreed:

> Q:     So, Sea World knows from experience that emergency call-
>        back procedures performed while the whale is in a heightened
>        state, if you will, will rarely succeed in getting the whale to
>        come back?
> A:     I guess – I'm sorry, there hasn't been a lot of success in that
>        specific scenario.

Tr. 1220-21.

In an incident in 2004, killer whale Kyuquot repeatedly swam over trainer

Steve Aibel.  Mr. Aibel wrote: "[The whale] blocked my exit from the pool and sat

in front of me.  I asked for a recall tone and paired it with a point to control.  There

[sic] were both ignored.  There were two more recall tones and three or four more

hand slaps.  All were ignored."  Ex. C-6 at 749.  Indeed, SeaWorld staff apparently

decided later that these recall tones and hand slaps did nothing but agitate the

whale further.  *Id.*  One (unidentified) SeaWorld commenter observed, "Let's face

33

it, in these types of incidents, I don't recall any whale responding to any hand slap, food bucket, or any other distraction we tried to implement."  Ex. C-6 at 762.

SeaWorld continued to use recall tones and hand slaps for more than twenty years even though such techniques were demonstrably unable to keep trainers safe. As the ALJ found, "[d]espite the repeated failures of the recall signals, SeaWorld continued to rely on them to protect its employees."  Decision 36.  In short:

> Two killer whales trained under SeaWorld's operant conditioning program killed two trainers two months apart.  Under these circumstances it cannot be said that SeaWorld's training program has reduced the recognized hazard to a significant degree.  It clearly did not eliminate the recognized hazard.  The Secretary has established SeaWorld's safety training program, both for killer whales and for its trainers, is inadequate as a means of feasible abatement.

Decision 40.  This factual finding is supported by substantial evidence and should not be disturbed by the Court.

> ### 2.    Barriers and Distance Are Feasible Means of Eliminating or Materially Reducing the Hazard Posed by Close Contact with Killer Whales.

Having proven that SeaWorld's safety program is inadequate, the Secretary must present feasible abatement measures which are capable of eliminating or materially reducing the hazard.  *See Nat'l Realty*, 489 F.2d at 1267-68, n.40; *Fabi Const. Co., Inc.*, 508 F.3d at 1081; *Cerro Metal Prods. Div.*, 12 BNA OSHC at 1822.  His burden is to "specify the particular steps a cited employer should have taken to avoid citation, and to demonstrate the feasibility and likely utility of those

measures." *Nat'l Realty*, 489 F.2d at 1268. "Feasible" in the OSHA context has

been defined as "economically and technologically capable of being done."

*Baroid Div. of NL Indus., Inc.*, 660 F.2d at 447; *see Am. Textile Mfrs. Inst., Inc. v.*

*Donovan*, 452 U.S. 490, 508-509 (1981) (defining "feasible" for OSHA

rulemaking purposes as "capable of being done").

The abatement steps proposed by the Secretary are simple – have trainers

work behind barriers or maintain a safe distance between themselves and the

whales.[8] Tr. 935. SeaWorld is not required to implement both measures; either

one suffices.[9] Both measures operate under the common-sense proposition that

keeping trainers out of reach of the whales will prevent whales from grabbing or

contacting trainers, thus materially reducing – even eliminating – the risk of deaths

or serious injuries. *See Carlyle Compressor Co., Div. of Carrier Corp. v. OSHRC*,

683 F.2d 673, 677, n.9 (2d Cir. 1982) ("Courts are entitled to base conclusions

---

[8]      The Secretary's burden is to prove "a" feasible means of abating the hazard.
*Cerro Metal Prods. Div.*, 12 BNA OSHC at 1822. Thus, if the Court finds that
either of the Secretary's proposed abatement measures has sufficient support in the
record, it must affirm the Commission's holding.

[9]      Although physical barriers were specified in both citations as an appropriate
abatement method, testimony at the hearing established that distance could serve
the same purpose and protect trainers equally well. *See* Tr. 905, 935; Decision 32-
33, 40. The citation also suggested "other engineering or administrative controls
that provide the same or a greater level of protection for the trainers." *See Brown
& Root, Inc.*, 8 BNA OSHC 2140, 2144 (No. 76-1296, 1980) ("the employer may
use any method that renders its worksite free of the hazard and is not limited to
those methods suggested by the Secretary.").

upon common sense where the facts so warrant."). The Secretary's expert witness supported this proposition, stating: "[t]he fundamental fact with captivity is the proximity . . . If you're close to a killer whale, they can potentially inflict harm." Tr. 851; Decision 41. He also opined that the "guarantee of safety is strong behind a barrier or some other mechanism," and that a distance of five to eight feet would be sufficiently protective. Tr. 853, 905.

As Leslie Grove, the OSHA Area Director who issued the citations, testified, a barrier would protect against a whale "reaching out, grabbing a trainer and pulling them in or coming out of the water and striking them." Tr. 931. It would also prevent trainers from falling into the pool with the whales. *Id.* Dr. Duffus stated in his report, "Simply keep people from falling in the pool, keep trainers behind barriers that preclude a whale seizing them, and the prospect of future death and injury is minimized." Ex. C-12 at 16. Putting a barrier or distance between Dawn Brancheau and Tilikum would have saved Ms. Brancheau's life on February 24, 2010. Tr. 853; *see Marshall v. L.E. Myers Co.*, 589 F.2d 270, 271-72 (7th Cir. 1978) (requiring evidence of feasible measures which "would have necessarily prevented [the] accident."). Thus the "likely utility" of barriers and distance is to place trainers out of reach of the killer whales, materially reducing or eliminating the hazard of close contact. *See Nat'l Realty*, 489 F.2d at 1268.

### a.   SeaWorld Already Uses Barriers and Distance.

While SeaWorld relied almost exclusively upon operant conditioning to

keep trainers safe prior to Dawn Brancheau's death, it modified its safety protocols

in the months following the accident.  SeaWorld's new protocols incorporate both

barriers and distance requirements during show performances.  Tr. 82-83, 1360,

1435-43, 1958.  The ALJ found that SeaWorld's implementation of barriers and

distance since the Dawn Brancheau accident demonstrated the feasibility of these

steps.  Decision 40 ("SeaWorld has banned waterwork with its killer whales during

performances.  .  .  .  Trainers perform drywork from behind barriers or at a

minimum distance.").  Although implementation of barriers and distance was

incomplete at the time of the hearing, sufficient progress had been made to

demonstrate that these steps are plainly feasible.  *See Con Agra, Inc.*, 11 BNA

OSHC 1141, 1145 (No. 79-1146, 1983) (feasibility was clearly shown where

abatement simply required extending the use of current work practices); *Grey Wolf*

*Drilling Co. LP*, 20 BNA OSHC 1293 1296 (No. 02-1228, 2003) (use of a flagman

to assist trucks backing up was feasible abatement where the company already

employed this measure).

SeaWorld challenges the judge's reliance on the company's post- February

2010 implementation of barriers and distance as proof of feasibility on the ground

that "SeaWorld had not uniformly taken these measures for whales other than

Tilikum." SeaWorld Br. 52. While it is true that SeaWorld had not completely

implemented the proposed abatement, it had made considerable progress by the

conclusion of the hearing in November 2011.[10] With respect to Tilikum, although

he still performs in shows, trainers direct the show from behind glass barriers. Tr.

1435-36. Trainers do not get into the pool with Tilikum at all, even in shallow

water. Tr. 1435-36. When Tilikum is on the slideout, trainers maintain a distance

of two-and-a-half to three feet. Tr. 1435-36. Interactions such as the "fish toss"

must be conducted from behind a barrier or at least five feet away. Tr. 1958. Ms.

Mairot testified that, as of the hearing date, nearly two years ago, SeaWorld was

"almost there" with respect to figuring out how to direct Tilikum's behaviors

entirely from behind a barrier. Tr. 1437-38. Contact during husbandry procedures

has similarly been reduced; medical procedures are the only context during which

---

[10]     The ALJ's finding that SeaWorld had been "using [the proposed abatement]
since February 24" is ambiguous as to whether he meant that SeaWorld had
completely abated the hazard by the close of the hearing. Decision 40. It should
be read, consistent with the record, as finding that SeaWorld had implemented
barriers and distance to a considerable degree, but not necessarily to the point of
complete abatement. In his subsequent PMA ruling, Judge Welsch clarified that
his finding that the proposed abatement was feasible left SeaWorld with discretion
to determine the minimum distance that would afford adequate protection for
employees and that the company was entitled to additional time to consult experts
in making this determination. Decision and Order Granting PMA ("PMA
Decision") at 5-6. The important measures SeaWorld had taken by the time of the
hearing, including eliminating waterwork for all whales and performing many
drywork activities from behind barriers or at a distance of three feet from the
whales, provide ample support for the ALJ's finding that the proposed abatement is
feasible.

trainers may do "tactile" with Tilikum.  Tr. 717, 1435-36.  New trainers are now

required to stay ten feet back from Tilikum (unless protected by a barrier), instead

of five.  Tr. 92.

SeaWorld has also implemented additional precautions with respect to all

other killer whales.  These measures, like the new rules for Tilikum, are designed

to protect trainers and further demonstrate that barriers and distance are feasible.

*See Andrew Catapano Enter., Inc.*, 17 BNA OSHC 1776, 1785 (No. 90-0050, et

al., 1996) (the company itself demonstrated technological feasibility by

implementing abatement after the citations were issued); *Armstrong Steel Erectors,*

*Inc.*, 18 BNA OSHC 1630, 1632 (No. 97-0250, 1999).

Most significantly, SeaWorld no longer allows waterwork with any of its

whales.  Tr. 660, 1488.  Indeed, SeaWorld has designed and implemented an entire

new show, called "One Ocean," that does not involve waterwork at all.  Tr. 82-83,

1360.  Trainers are not permitted to touch the whales on the face except when

behind some type of barrier.  Tr. 1440.  They cannot hug the whales.  Tr. 1441.

When poolside, the trainer must stand back three feet from the edge.  Tr. 1443.  In

addition to ceasing waterwork with all whales, SeaWorld of San Diego has

instituted both barriers and distance: "We have implemented using the removable

bars, staying back from the whales three feet, only touching them once the bars are

in place, there's the five-foot safety line that was implemented."  Tr. 1165-66.

Notably, SeaWorld has certified that it achieved full abatement for whales other than Tilikum by implementing "minimum distance guarding, whale positioning and in some instances, barriers." *See* Abatement Certification, April 24, 2013 (attached as Addendum); 29 C.F.R. § 1903.19.

In summary, the record demonstrates that SeaWorld made considerable progress in implementing barriers and distance requirements after Dawn Brancheau's death. Had these measures been implemented earlier, she would not have been killed. That SeaWorld's efforts were incomplete as of the date of the hearing does not show that barriers and distance are infeasible as means of abatement. In fact, these efforts show just the opposite. *See Active Oil Serv.*, 21 BNA OSHC 1184, 1186 (No. 00-0553, 2005) (feasible abatement was implementing the company's already-existing confined space entry program); *Gen. Dynamics Land Sys. Div., Inc.* 15 BNA OSHC 1275, 1287 (No. 83-1293, 1991) (company demonstrated the feasibility of substituting soap and water for freon by switching to soap and water after several incidents involving freon). Given the facts above, the feasibility of the abatement measures is self-evident.[11] Both

---

[11]    To prove a violation, the Secretary must show that feasible measures would have, at a minimum, materially reduced the hazard. *Nat'l Realty*, 489 F.2d at 1267. SeaWorld's implementation of barriers and distance from February 2010 through the close of the hearing in November 2011 materially reduced the hazard that existed at the time of Dawn Brancheau's death and thus established the feasibility of the proposed abatement. This follows notwithstanding that the Secretary believed, based on a 2012 reinspection, that more complete

barriers and distance are "capable of being done." *Am. Textile Mfrs. Inst., Inc.*, 452

U.S. at 508-509.[12]  The ALJ's decision is thus amply supported by record

evidence.

### b.   Barriers and Distance Neither Create Greater Hazards Nor Change the Nature of Trainers' Jobs.

SeaWorld argues that implementing barriers and distance would "present

additional hazards to trainers and whales."  SeaWorld Br. 52.  Once the Secretary,

as here, has "specified a method of abatement which would reduce or eliminate the

incidence of the hazard," the employer may "rebut the feasibility of that method

with evidence 'showing or tending to show that use of the method or methods

---

implementation of barriers and distance was feasible and would eliminate the
hazard.  The Secretary subsequently withdrew that citation in light of the ALJ's
ruling that SeaWorld had until January 2013 to fully implement its abatement
measures.  The Secretary's position that more complete implementation of barriers
and distance was feasible, and therefore required by the Act, comports with
this court's observation that "all preventable forms and instances of hazardous conduct
must . . . be entirely excluded from the workplace."  *Id.* at 1257.  Whether
SeaWorld can feasibly implement barriers and distance to a greater degree than it
had by the close of the hearing in November 2011 is not before the Court in this
case; it would be resolved in a separate litigation.  It is sufficient for this case that
the steps SeaWorld implemented by the close of the hearing materially reduced the
hazard.

[12]      SeaWorld waived any argument that abatement is economically infeasible
by failing to raise it before the Commission.  29 U.S.C. § 660(a) ("No objection
that has not been urged before the Commission shall be considered by the court.").
In any event, the fact that SeaWorld is still in business and offering killer whale
shows to the public demonstrates that the measures are economically as well as
physically feasible.  Tr. 82-83; *see Baroid Div. of NL Indus., Inc.*, 660 F.2d at 447.

established by [the Secretary] will cause consequences so adverse as to render their use infeasible.'" *Cargill, Inc.*, 10 BNA OSHC 1398, 1401 (No. 78–5707, 1982) (quoting *Royal Logging Co.*, 7 BNA OSHC 1744, 1751 (No. 15169, 1979)). SeaWorld presented no such evidence, and its own use of barriers and distance measures since Dawn Brancheau's death, as well as its recent certification that abatement has been completed, show that no such adverse consequences have occurred. *See* Abatement Certification, April 24, 2013.

SeaWorld nevertheless contends that when there is less contact between whales and their trainers, "whales are more likely to behave unpredictably or aggressively in husbandry or in response to accidental contact (*e.g.*, a trainer falling into a pool)." SeaWorld Br. 53. First, this claimed "greater hazard" was not demonstrated by SeaWorld. The company simply speculates that interacting with whales from behind barriers or from a safe distance would negatively impact the whales' reinforcement history, perhaps making the whales' behavior less predictable. Tr. 877, 1796; *but see* Tr. 1096-97 (admitting that it is possible to maintain a close bond with the whales in the absence of waterwork). SeaWorld presented no evidence on how this speculative result would adversely impact trainer safety, despite eighteen months of experience with the implementation of barriers and distance by the time the hearing occurred.

Second, the speculative greater hazard posited by SeaWorld pales in comparison with the very real hazard that the abatement aims to prevent. *See Acme Energy Servs. dba Big Dog Drilling*, 23 BNA OSHC 2121, 2127 (No. 08-0088, 2012) ("any adverse effects of such [abatement] would be minor compared to the safety benefits."); *Chevron Oil Co.*, 11 BNA OSHC 1329, 1334 (No. 10799, 1983) (finding that the benefit of the proposed abatement "greatly outweighs the harm that could be caused in the unlikely event that" the alleged greater hazard occurs). Under SeaWorld's operant conditioning regime, multiple trainers died, were injured, or narrowly avoided serious harm. *See* Decision 40, 42; Ex. C-6. The Secretary's proposed abatement removes the hazard and will prevent future injuries and deaths in killer whale performances. SeaWorld presented no evidence that such benefits would be outweighed by the alleged harm that could occur during killer whale interactions outside of performances.[13]

SeaWorld also argues that the Secretary's abatement would create hazards to the whales because the trainers' inability to have close contact would deprive them

---

[13]    Even the case cited by SeaWorld supports the Secretary's argument. In *Kokosing Construction Co.*, the Commission stated: "if a proposed abatement method creates additional hazards *rather than reducing or eliminating the alleged hazard*, the citation must be vacated for failure to prove feasibility." 17 BNA OSHC 1869, n.19 (No. 92-2596, 1996) (emphasis added). SeaWorld's brief excluded the italicized portion of the quoted phrase, an omission that is very misleading. The quoted phrase, in its entirety, requires vacating the citation only when the proposed abatement not only fails to reduce or eliminate the alleged hazard but also creates additional hazards. This is clearly not the case here.

of an effective means of identifying abnormalities. SeaWorld Br. 54. But
SeaWorld's own implementation of barriers and distance measures belies this
claim. Moreover, SeaWorld's veterinarian, Dr. Dold, testified that SeaWorld can
effectively care for its killer whales under the abatement proposed by the
Secretary. Tr. 1778-83. SeaWorld of San Diego has had no problems caring for
its three killer whales that have been designated drywork-only since 2006. Tr.
1161.

SeaWorld's argument that implementing barriers and distance measures
would change the nature of trainers' jobs is equally unfounded. SeaWorld Br. 54.
As discussed herein, SeaWorld substantially modified its safety protocols after
Dawn Brancheau's death to eliminate waterwork and integrate the use of barriers
and distance requirements into its drywork performances. The Secretary's
abatement order will not change the basic nature of trainers' jobs; SeaWorld has
already done that by implementing its new "One Ocean" show. The abatement
order will merely prevent SeaWorld from returning to the inadequate protocols in
effect prior to Dawn Brancheau's death.

### c.   It Is Appropriate for the Secretary to Leave SeaWorld with Some Discretion in How to Implement the Abatement.

SeaWorld complains that the Secretary did not suggest abatement measures
with sufficient specificity. SeaWorld Br. 50-51. However, SeaWorld
misunderstands the nature of what the Secretary must prove regarding abatement.

44

Mr. Groves and Dr. Duffus both addressed the question of which means of abatement would provide for sufficient protection from the drowning and struck-by hazards identified by the Secretary.  Tr. 905, 931, 935.  Both stated that barriers and distance would be effective in keeping trainers from coming within reach of the whales, but left the precise details of implementation to SeaWorld.  Tr. 905 (Dr. Duffus opining that a distance of five to eight feet would "perhaps" be sufficiently protective), 931 (Mr. Grove describing "[s]ome type of physical barrier, a wall, a guardrail or something that prevents the contact between them and Tilikum.")

It is neither necessary nor appropriate for the Secretary to propose abatement measures with more specificity than has already been provided.  The design of a barrier and the precise distance that would provide sufficient protection for trainers depend on a number of factors that are outside of the Secretary's control.  These include the configuration of the pool, what behaviors the whales perform in the shows, how the shows are designed, where the whales are located during the shows, and perhaps which whales are performing.  Dr. Duffus's testimony, which SeaWorld attacks as speculative, SeaWorld Br. 51, simply recognized these unknowns.  Tr. 905 (the precise distance "depends on what the exact configuration is.").  Only SeaWorld can know all of these factors and take them into account in designing appropriate abatement.  *See* PMA Decision at 5 ("The determination of

45

what constitutes a safe minimum distance is best left to experts in the training and behaviors of killer whales.").

The case law establishes that the Secretary is not required to provide precise design specifications for abatement methods. In *Pepperidge Farm, Inc.*, the Secretary wanted Pepperidge to adopt and evaluate various unspecified combinations of engineering and administrative controls to determine which "most efficiently reduce[d]" the ergonomics problems on its assembly lines. 17 BNA OSHC 1993, 2033 (No. 89-265, 1997). The Commission approved this proposed abatement, which "require[d] Pepperidge to follow a process of abatement rather than to implement a single specific abatement measure." *Id.* In *Tampa Shipyards Inc.*, one of the abatement methods affirmed as feasible by the Commission was for the company to develop a written crane safety policy. 15 BNA OSHC 1533 (Nos. 86-360 & 86-469, 1992). It was left to the company to develop "an outline of what it needed to teach the operators, and a formal method of evaluating whether the operators were qualified." *Id.* at 1537. Similarly, the Commission, in *General Dynamics Land System Division, Inc.,* required the employer to abate the hazard by instituting confined space entry procedures. 15 BNA OSHC at 1287. The Commission pointed out that these procedures are quite situation-specific; in this case, the employer had to formulate a procedure particular to its employees' use of freon to clean tanks. *Id.* The Secretary did not, and was not expected to, perform

46

this task for the employer.  In all of these cases, the Secretary outlined a plan for

abatement and it was left to the employer to determine how exactly to implement

it.  SeaWorld can do just that.

### E.    The ALJ Properly Permitted the Secretary's Expert to Testify.

The ALJ qualified the Secretary's expert, Dr. David Duffus, to provide

opinion testimony about the predictability of killer whale behavior and potential

safety measures for trainers.  Tr. 821-22.  In his testimony and report, Dr. Duffus

provided information about the nature of killer whales and their predatory behavior

in the wild, his assessment of SeaWorld's killer whales' behavior as depicted in the

incident reports and videos, and his opinion that keeping trainers out of reach of

the whales would be a successful safety measure.  Tr. 833-56; Ex. C-12; Decision

39-40.  The ALJ found this testimony credible and helpful.  Decision 17.

SeaWorld argues that Dr. Duffus should not have been permitted to testify

because he has no particular experience with killer whales in captivity.  SeaWorld

Br. 44-46; Tr. 809-10.[14]  However, as the ALJ recognized, how well Dr. Duffus's

experience with killer whale behavior in the wild supports his testimony about

SeaWorld's captive killer whales is a question going to the weight of the

testimony, not its admissibility.  Tr. 822; *Daubert v. Merrell Dow Pharm.*, 509

---

[14]    Even SeaWorld does not dispute that Dr. Duffus is an expert in wild killer
whale behavior.  Tr. 809-10.  Indeed, Dr. Duffus has conducted thousands of hours
of whale observation and operated a whale research laboratory.  Tr. 766-67.

U.S. 579, 595 (1993); *United States v. Law*, 528 F.2d 888, 912 (D.C. Cir. 2008).

That Dr. Duffus has not worked with captive killer whales under the exact

circumstances present at SeaWorld does not require the exclusion of his

testimony.[15]  "If the expert has educational and experiential qualifications in a

general field closely related to the subject matter in question, the court will not

exclude the testimony solely on the ground that the witness lacks expertise in the

specialized areas that are directly pertinent."  *In re Zyprexa Prods. Liab. Litig.*, 489

F.Supp.2d 230, 282 (E.D.N.Y. 2007).

 SeaWorld also complains that Dr. Duffus's testimony did not satisfy the

*Daubert* factors that can help evaluate the validity of proffered expert testimony.

However, "in reviewing challenges to the admissibility or exclusion of expert

testimony, appellate courts must afford trial judges great discretion."  *United States*

*v. Day*, 524 F.3d 1361, 1367 (D.C. Cir. 2008).  At the hearing, the ALJ evaluated

Dr. Duffus's qualifications and the reliability and relevance of his proffered

testimony, noting Dr. Duffus's extensive experience not only in studying killer

whales in the wild but in keeping his students safe around them.  Tr. 821-23.  Dr.

Duffus also served on the coroner's jury that investigated the death of Keltie

Byrne, where he concluded that Tilikum's killing of Ms. Byrne was predatory

behavior similar to that of wild killer whales – an expert opinion clearly relevant to

---

[15] Any expert with knowledge of or experience in killer whale training would
likely be a current or former SeaWorld employee.  Tr. 1694.

the Secretary's burden in this case. Decision 19-20. The ALJ acted well within the bounds of his discretion in permitting Dr. Duffus to testify.

## II.     SeaWorld Was Afforded Proper Notice of the Violations.

SeaWorld's argument that the General Duty Clause is unconstitutionally vague as applied to its workplace was rightfully rejected by the ALJ. *See* Decision 42-44. First, this Court has specifically rejected this precise argument, noting that its construction of the clause as "requiring only that employers eliminate 'preventable hazards' likely to cause death or serious injury to employees . . . provides employers with sufficiently specific notice of the requirements of the general duty clause." *Ensign-Bickford Co. v. OSHRC*, 717 F.2d 1419, 1421 (D.C. Cir. 1983) (quoting *Nat'l Realty*, 489 F.2d at 1265-66).

Second, SeaWorld's argument that it relied upon the failure of Cal/OSHA, a state agency, to issue citations after the near-drowning of Ken Peters in 2006 is not supported by the facts or the law. As the ALJ pointed out, "California is a state-plan state; SeaWorld of Florida is under the jurisdiction of Federal OSHA. SeaWorld of Florida cannot rely on the exercise of prosecutorial discretion by a California agency regulating a California corporation when evaluating its own safety program."[16] Decision 43. The case relied upon by SeaWorld, *Miami*

---

[16]      Notably, Cal/OSHA did find a hazard, stating that SeaWorld of San Diego's training regimen was "not entirely effective at stopping the unwanted behaviors of the killer whale during this attack." Ex. R-3. It also noted that waterwork put

*Industries, Inc.*, involved a federal OSHA citation for a machine-guarding device that had been specifically approved by a federal OSHA inspector ten years earlier. 15 BNA OSHC 1258 (No. 88-671, 1991).  This case clearly does not present the same issues of reliance and fair notice.

Even if the prior inspection had been conducted by federal OSHA at SeaWorld of Florida, SeaWorld would not be justified in relying on the failure to cite.  As stated by this Court, "We believe that recognizing such a right [to rely on OSHA's failure to identify violations in a previous inspection] would discourage self-enforcement of the Act by businessmen who have far greater knowledge about conditions at their workplaces than do OSHA inspectors."  *Cedar Const. Co. v. OSHRC*, 587 F.2d 1303, 1306 (D.C. Cir. 1978); *see Seibel Modern Mfg.& Welding Corp.*, 15 BNA OSHC 1218, 1224 (No. 88-821, 1991) (Commission cases "rule against deducing from uneventful prior inspections that particular operations are nonhazardous.").

Finally, incidents subsequent to Cal/OSHA's inspection constituted further notice to SeaWorld that its safety program was deficient.  Between 2006 and 2010, when Dawn Brancheau was killed, several near misses and injuries occurred.  *E.g.*, Tr. 374-86; Ex. C-6 at 1150-52, 1366-69, 1376-78, 1383-85.  There was also the

---

trainers at risk and that the park's emergency protocols were inadequate.  Ex. R-3 ("[s]hort of eliminating all of the water interactions with the killer whales, there is no guarantee that the employees can be kept safe from an attack by a killer whale.").  However, Cal/OSHA ultimately found that no state regulations applied.

Alexis Martinez death, which was thoroughly analyzed and discussed by SeaWorld management.  Ex. C-6 at 2722-28.  These events "put SeaWorld on notice that its operant conditioning program was not working sufficiently to protect its trainers."[17]  Decision 33.

## III.    SeaWorld's Miscellaneous Legal Arguments Are Without Merit.

### A.    The Secretary Did Not Overreach By Applying the General Duty Clause to the Hazard of Close Contact With Killer Whales.

SeaWorld accuses both the ALJ and the Secretary of overreaching in applying the General Duty Clause to the hazards of close contact with killer whales.  SeaWorld claims that close contact between trainers and whales is an essential element of its business and that the Secretary cannot ban such activity any more than he could ban contact in professional football or high speed in stock car racing.  SeaWorld Br. 33-34, 36.  It also claims that the citation reflects an impermissible attempt to "calibrate the right interaction between man and nature." *Id.* at 36.  These arguments are unpersuasive.

First, the record demonstrates that the types of close contact that occurred prior to Dawn Brancheau's death in 2010 are *not* essential to SeaWorld's business. SeaWorld trainers used to perform such waterwork activities as swimming with and riding on killer whales in deep water, as well as hugging and lying down next

---

[17]    Interestingly, this Court has suggested a remedy in General Duty Clause cases where an employer lacked notice that its safety program was defective – an abatement order coupled with a penalty of $0.  *Nat'l Realty*, 489 F.2d at n.41.

to whales during drywork on the slideout.  Ex. C-1 at 1040; Ex. C-6 at 280-81, 358, 363-64; Ex. R-4; Tr. 286.  However, as described above, SeaWorld ceased these interactions following Ms. Brancheau's death and has not done them for the past three years.  In the "One Ocean" show described at the hearing, trainers perform no waterwork at all and use barriers and minimum distance precautions for drywork.  It is clear from SeaWorld's adoption of these measures that close contact of the kind that resulted in Dawn Brancheau's death is not essential to SeaWorld's ability to draw visitors to its parks, to practice behaviors during shows, or to care for its whales.  By contrast, physical contact between players is intrinsic to professional football, as is high speed driving to professional auto racing.

Second, the Secretary's application of the General Duty Clause to the interaction between SeaWorld's trainers and killer whales does not implicate social policies concerning man's relationship with nature.  SeaWorld's Orlando theme park is a workplace, not a wilderness area.  That the hazards faced by SeaWorld's trainers at work are due to exposure to dangerous animals, rather than dangerous machines, does not deprive them of the Act's protections.

The General Duty Clause "insure[s] the protection of employees who are working under special circumstances for which no standard has yet been adopted." S. Rep. No. 1282, 91st Cong., 2d Sess. 10 (1970).  Thus, the clause covers a variety of hazards faced by workers in specialized industries who are not engaged

52

in typical industrial operations. *See, e.g.*, *Wal-Mart Stores, Inc.*, OSHRC No. 09-1013, 2011 WL 7143222, at *1 (April 5, 2011) (upholding citation for exposing employees to trampling hazards during a "Black Friday" promotional event) (pending Commission review). Close contact with killer whales is the type of hazard the general duty clause is meant to address: it is a hazard unique to workers within a specialized industry for which no standards have been promulgated. *See* H. Rep. No. 1291, 91st Cong., 2d Sess. 21-22 (1970); *S. Ohio Bldg. Sys., Inc. v. OSHRC*, 649 F.2d 456, 458 (6th Cir. 1981); *Bristol Steel & Iron Works, Inc. v. OSHRC*, 601 F.2d 717, 721 n.11 (4th Cir. 1979).

The Secretary has issued citations involving hazardous interactions between employees and animals in other cases. The Secretary cited the Denver Zoological Foundation for exposing employees to inadvertent contact with large carnivores and a zoo in Nebraska for exposing employees to amputation hazards posed by chimpanzees known to be aggressive toward humans. OSHA Insp. Nos. 310464581, 314059510.[18] Employees in theme parks and carnivals are likewise covered by the Act's protections. The Secretary has cited Walt Disney Entertainment for exposing employees to various hazards at Disney World, Insp. Nos. 313585895, 315465427, 312735236, and a traveling carnival for wire rope violations in setting up a Ferris wheel. *Murphy Enter.*, 17 BNA OSHC 1477, 1480

---

[18]    Available at https://www.osha.gov/pls/imis/InspectionNr.html.

(No. 93-2957, 1995).  The Secretary's approach is consistent with the actions of

industry groups involved in the care and display of dangerous animals, which

recognize the need for specific safety precautions for employees working with

these animals.  *E.g.*, AZA Standards for Elephant Management and Care, §§ 4.2.1

& 4.2.2[19] (elephant care providers "shall not share unrestricted space with

elephants"; endorsing barriers for safety); AZA Animal Care Manual for Lions, §

2.2[20] ("Free contact with adult lions . . . is not recommended under any

circumstances.").  Accordingly, the Secretary's application of the General Duty

clause in this case is neither inappropriate nor unprecedented.

### B.    The ALJ Made No Findings on the Hazards of Husbandry Procedures And Did Not Rely Upon Personal Conclusions.

Another theme of SeaWorld's argument is the notion that the judge

arbitrarily found that close contact with killer whales is a recognized hazard during

show performances, but is not a recognized hazard during husbandry or medical

procedures.   SeaWorld Br. 20, 25-26, 34.  SeaWorld asserts that the judge applied

"his own personal cost-benefit analysis of the relative 'worth' of different parts of

SeaWorld's mission."  *Id.*  This argument is particularly unfounded.

The ALJ did not make a finding that close contact "is *not* a recognized

hazard when performed for husbandry or medical purposes."  SeaWorld Br. 20

---

[19]     Available at http://www.aza.org/accred-materials/.

[20]     Available at http://www.aza.org/animal-care-manuals/.

(emphasis in original).  That is because the Secretary, in the exercise of his

prosecutorial discretion, limited the citation to hazards present during

performances.[21]  *See* Decision 14.  "[P]rosecutorial discretion in the enforcement

of the Act is vested solely in the Secretary." *Boise Cascade Corp.*, 14 BNA OSHC

1993, 1995 (Nos. 89-3087 & 89-3088, 1991) (citing *Marshall v. OSHRC*, 635 F.2d

544, 550–51 (6th Cir. 1980)).  "[I]t is within the Secretary's discretion as the

prosecutor under the Act to decide what conditions he will cite, and this discretion

necessarily includes the authority to limit the scope of any citation he issues." *Int'l*

*Harvester Co.*, 7 BNA OSHC 2194, 2197 (No. 76-4572, 1980); *see A.E. Staley*

*Manuf. Co.*, 19 BNA OSHA 1199, 1203 (Nos. 91-0637 & 91-0638, 2000).

Accordingly, the ALJ was without authority to make findings about any possible

hazards in other contexts.[22]

The judge also made no finding that SeaWorld's show performances were

not worth the dangers created by close contact interactions.  SeaWorld Br. 36.  In

---

[21]    The citation was limited to performances for several reasons, including: 1)
Dawn Brancheau's death occurred during a performance; 2) about sixty percent of
recorded incidents occurred during performances; and 3) trainers may be pressured
not to end shows early, even if a whale is behaving aggressively.  *See* Sec. Post-
Hearing Br., App. A; Ex. C-6 at 684.

[22]  The fact that the Secretary limited the investigation in this case to the hazards of
close contact during show performances does not imply that close contact is not
hazardous during husbandry and medical procedures.  The Secretary has simply
made no determination concerning the nature of the hazards in those contexts or
whether there are feasible means of reducing or eliminating them.

assessing Ms. Flaherty Clark's belief that seeing whales interact with trainers can be a life-changing experience, the judge posed a rhetorical question: "Are the emotions inspired by the grandeur of humans interacting with killer whales worth the dangers created by the interactions?"  Decision 41.  The judge reached no conclusion on this score, and his affirmance of the General Duty Clause citation in no way rested upon a "personal conclusion" about the relative value of SeaWorld's performances.  As clearly demonstrated above, the ALJ's affirmance rested on the plentiful facts establishing that close contact with killer whales is a recognized hazard and that barriers and distance measures are feasible means of eliminating or reducing the hazard.

## CONCLUSION

For the foregoing reasons, the Court should affirm the cited violations of the

OSH Act's General Duty Clause.

Respectfully submitted.

M. PATRICIA SMITH
Solicitor of Labor

JOSEPH M. WOODWARD
Associate Solicitor for
  Occupational Safety and Health

CHARLES F. JAMES
Counsel for Appellate Litigation

s/ Kristen Lindberg
KRISTEN M. LINDBERG
AMY S. TRYON
Attorneys
U.S. Department of Labor
200 Constitution Ave., NW
Room S-4004
Washington, DC 20210
(202) 693-5445
lindberg.kristen@dol.gov

# CERTIFICATE OF SERVICE

I hereby certify that, on this 9th day of September, 2013, a copy of the

foregoing was filed electronically via the Court's CM/ECF Electronic Filing

System.  Counsel for SeaWorld, below, will be served via operation of the Court's

CM/ECF Electronic Filing System.

Eugene Scalia
Baruch A. Fellner
Scott P. Martin
Daniel P. Rathbun
Gibson, Dunn &Crutcher LLP
1050 Connecticut Avenue, NW
Washington, DC 20036
(202) 955-8500

Carla J. Gunnin
Baker, Donelson, Bearman,
  Caldwell & Berkowitz, PC
Monarch Plaza, Suite 1600
3414 Peachtree Road, NE
Atlanta, GA 30326
(404) 589-3404

s/ Kristen Lindberg<br/>KRISTEN LINDBERG<br/>Attorney<br/>U.S. Department of Labor<br/>200 Constitution Ave., N.W.<br/>Room S-4004<br/>Washington, D.C. 20210<br/>(202) 693-5445

September 9, 2013

## CERTIFICATE OF COMPLIANCE

I hereby certify that Respondent Secretary of Labor's brief contains 13,993 words, excluding the parts of the brief exempted by Fed. R. App. P. 32(a)(7)(B)(iii), and complies with the type-volume limitations in Fed. R. App. P. 32(a)(7)(B). The font used was Times New Roman 14-point proportional spaced type. The brief was prepared using Microsoft Word 2010.

s/ Kristen Lindberg
KRISTEN LINDBERG
Attorney
U.S. Department of Labor
200 Constitution Ave., N.W.
Room S-4004
Washington, D.C. 20210
(202) 693-5445

September 9, 2013

# Addendum

United States of America

## OCCUPATIONAL SAFETY AND HEALTH REVIEW COMMISSION

1924 Building - Room 2R90, 100 Alabama Street, S.W.
Atlanta, Georgia 30303-3104

SeaWorld of Florida, LLC,

     Petitioner,

     v.

Secretary of Labor,

     Respondent.

OSHRC Docket No. 12-1697

Appearances:

     Carla Gunnin Stone, Esq.
     Baker, Donelson, Bearman, Caldwell & Berkowitz, Atlanta, Georgia
     For Petitioner

     Angela F. Donaldson, Esq., and Rolesia B. Dancy, Esq.
     U. S. Department of Labor, Office of the Solicitor, Atlanta, Georgia
     For Respondent

Before:    Administrative Law Judge Ken S. Welsch

## DECISION AND ORDER GRANTING
## PETITION FOR MODIFICATION OF ABATEMENT DATE

On July 27, 2012, SeaWorld of Florida, LLC, filed a petition for modification of abatement date (PMA) with the Secretary. SeaWorld requested an extension of six months to abate the hazard described in Item 1, Instance (b), of Citation No. 2, which this court affirmed in the underlying Decision and Order issued on June 11, 2012, and which became a final order of the Commission on July 16, 2012.

SeaWorld contends it required "additional guidance concerning the proper means to abate the hazard" and requested additional time "in an effort to obtain necessary guidance, clarification, and confirmation." Specifically, SeaWorld wanted to know what constitutes "an appropriate 'physical barrier,' 'minimum distance,' or other appropriate administrative controls within the meaning of this Item" (SeaWorld's PMA, ¶ 8).

On August 1, 2012, the Secretary denied the PMA. The court held a hearing in this matter on April 25, 2013, in Sanford, Florida. The parties have filed post-hearing briefs. For the reasons discussed below, the court grants SeaWorld's PMA and extends the abatement date until January 27, 2013[1].

## Background

SeaWorld trainer Dawn Brancheau was killed while working with Tilikum, SeaWorld's largest killer whale, on February 24, 2010, in Orlando, Florida. Based on the OSHA inspection triggered by Ms. Brancheau's death, the Secretary issued three citations to SeaWorld on August 23, 2010. Relevant to this proceeding, the Secretary cited SeaWorld for a willful violation of the general duty clause, § 5(a)(1) of the Occupational Safety and Health Act of 1970 (Act), 29 U.S.C. §§651-658, in Item 1 of Citation No. 2.

Item 1 of Citation No. 2 states:

a) At the Shamu Stadium pools, animal trainers working with Tilikum, a killer whale with known aggressive tendencies and who was involved in the 1991 death of a whale trainer at a marine park in Vancouver, British Columbia, were exposed to struck-by and drowning hazards in that they were allowed unprotected contact with Tilikum while conducting "drywork" performances on pool ledges, slideouts and platforms, on or about 2/24/2010.

Among other methods, one feasible and acceptable means of abatement would be to not allow animal trainers to have any contact with Tilikum unless they are protected by a physical barrier.

b) At the Shamu Stadium pools, animal trainers working with killer whales other than Tilikum were exposed to struck-by and drowning hazards in that they were allowed to engage in "waterwork" and "drywork" performances with the killer whales without adequate protection, on or about 2/24/2010.

Among other methods, feasible and acceptable means of abatement would prohibit animal trainers from working with killer whales, including "waterwork" or "dry work," unless the trainers are protected through the use of physical barriers or through the use of decking systems, oxygen supply systems or other engineering or administrative controls that provide the same or greater level of protection for the trainers.

The court affirmed this item as serious in the Decision and Order issued on June 11, 2012, which became a final order of the Commission on July 16, 2012. The court found that two forms of abatement proposed by the Secretary were technologically and economically feasible:

---

[1] The hearing was held three months after the requested January 27, 2013, abatement date. Neither party raised mootness as an issue. The instant PMA is the only one requested by SeaWorld. The extension of the abatement date is applied retroactively.

the installation of physical barriers and a requirement to maintain a minimum distance from the killer whales.[2]  The Decision states, "Prohibiting waterwork and using physical barriers and minimum distances eliminate the trainers' exposure to the recognized hazard of working with killer whales." *SeaWorld of Florida, LLC,* 2012 WL 3019734 at *30.

SeaWorld was required to abate the described violations by July 27, 2012.  On that date, SeaWorld filed the PMA at issue, asserting the violation described in Instance (a) of Item 1 (relating only to Tilikum) had been abated, but requesting an extension of six months, until January 27, 2013, to abate the violation described in Instance (b) (relating to the other killer whales in SeaWorld's facility).  The Secretary denied the PMA on August 1, 2012, giving rise to the instant proceeding.

**Analysis**

Commission Rule 2200.37(d) addresses contested PMAs.  Commission Rule 2200.37(d)(3) provides:

> An employer petitioning for a modification of the abatement period shall have the burden of proving in accordance with the requirements of section 10(c) of the Act, 29 U.S.C. § 659(c), that such employer has made a good faith effort to comply with the abatement requirements of the citation and that abatement has not been completed because of factors beyond the employer's control.

*Good Faith Effort to Comply with Abatement Requirements*

In its PMA, SeaWorld asserted it had taken a number of steps to abate the violation cited in Instance (b) of Item 1, including:

> [U]pdating its protocols for interacting with killer whales during performances (such as by suspending "waterwork" in which trainer enter the water with killer whales, establishing variable distances between trainers and animals, establishing positioning protocols relative to the animals and enhancing spotter protocols); increasing its security measures (such as by utilizing electronic gate systems, developing new operating procedures for trainers and increasing restrictions on non-trainer access to designated areas); updating emergency response protocols (such as by installing new alarm systems, increasing and repositioning nets and increasing the amount of emergency response training); and substantial modifications within the facility (such as by reconstruction and modifying the layout of the "G-pool," adding permanent and removable bars to certain pools, installing monitors and increasing trainer and spotter visibility).

---

[2] Minimum distance and physical barriers were the two abatement methods proposed by the Secretary, who established at the hearing that the methods were feasible.  SeaWorld is not limited to only these abatement methods—the company may implement another method or methods of abatement designed to protect trainers from struck-by and drowning hazards.

3

(SeaWorld's PMA, ¶ 5).

SeaWorld developed and implemented 26 protocols in an effort to abate the cited hazards. SeaWorld had implemented the protocols by the July 27, 2012, abatement date (Exhibit R-1; Tr. 81-83). Kelly Flaherty Clark, SeaWorld's curator of animal training, testified SeaWorld has experimented with the implementation of various minimum distances for trainers working with killer whales since the underlying Decision became a final order on July 16, 2012. She stated that, at the time of the PMA hearing, SeaWorld was requiring its trainers to maintain a distance of 18 inches from the edge of the pool when standing and 3 feet when kneeling (Tr. 62-64).

The Secretary contends SeaWorld did not make a good faith effort to comply with the abatement requirements. He argues SeaWorld failed to establish, in accordance with 29 C.F.R. § 1903.14a(b)(4), that it took all available interim steps to safeguard its employees during the abatement period. The Secretary faults, among other methods, SeaWorld's "whale positioning theory," which permits trainers to make contact with killer whales depending on the position of the whale in relation to the trainer's location. For example, the trainer would not approach the whale's head, but would only approach the whale's body between its blow hole and its tail (Tr. 82-83, 86).

The Secretary's argument addresses the efficacy of SeaWorld's efforts in abating the cited hazard. At times during the hearing and in his post-hearing brief, the Secretary focused on the merits of SeaWorld's abatement measures instead of the reasonableness of its request for an extension of time. The purpose of the PMA proceeding is to determine whether SeaWorld's request for an extension of the abatement date was justified, based on whether the employer made a good faith effort to abate the cited hazard and whether abatement was not completed for reasons outside the employer's control. As the court stated at the hearing, "I'm just here to decide whether or not the PMA should have been extended or should be extended for the six-month period that was asked for[.] . . . I'm not here to decide whether or not the abatement approaches that you are talking about are deemed appropriate abatement or not" (Tr. 15). The Secretary's counsel responded, "[W]e agree with your summary of the issues to be decided here today for the PMA" (Tr. 15). SeaWorld's counsel correctly noted, "[I]f the Secretary is not happy with the method of abating the prior citation, . . .they have methods in place to challenge the abatement that SeaWorld has decided to do. So, we would agree that the issue here is just to

4

decide whether or not SeaWorld took the time to develop its abatement and needed the time requested" (Tr. 16).

It is determined SeaWorld made a good faith effort to comply with the abatement requirements of the citation. It continued its suspension of waterwork and implemented minimum distance requirements. It added security and emergency response equipment. It also consulted independent experts in order to get their opinions on appropriate abatement measures. SeaWorld has met the first element of its burden.

### Factors Beyond SeaWorld's Control

SeaWorld complained repeatedly in its PMA and its post-hearing brief that the underlying Decision and Order was vague and that the company required clarification on what constitutes a safe minimum distance and a physical barrier. At the underlying hearing, the Secretary's expert Dr. David Duffus speculated that if trainers stood "perhaps 5 to 8 feet away" from the edge of the pool in which a killer whale swam, they would be safe from being pulled into the water. *SeaWorld* at *24. Dr. Duffus is an expert in the behavior of killer whales in the wild, but he has no expertise in the training of captive killer whales. Neither has the court nor the Secretary. The determination of what constitutes a safe minimum distance is best left to experts in the training and behaviors of captive killer whales.

During the original hearing, the Secretary faulted SeaWorld for its reliance on operant conditioning techniques it developed in-house to prevent the killer whales from injuring its trainers, to the exclusion of all other safety precautions. The court agreed with the Secretary, stating in the underlying Decision that SeaWorld's reliance on its operant conditioning program created a "closed system," in which "any injuries sustained by a trainer will always be traceable to human error." *SeaWorld* at *26.

Charles Tompkins is the corporate curator of zoological operations for SeaWorld, Inc. (Tr. 135). At the PMA hearing, Mr. Tompkins acknowledged the criticism that SeaWorld's approach to safety was too insular:

> I feel like at the actual trial that there was some criticism on the fact that we didn't use outside consultants as much as we could have, and I felt the personal need to make sure that we were not working in an industry bubble and making decisions on our own.

(Tr. 139).

Ms. Flaherty Clark was also in favor of seeking outside advisors:

We consider ourselves experts. We know that there's nobody else out there who has worked as intimately with killer whales as we have as long as we have. However, we wanted to be sure. We wanted outside eyes. We didn't want to say we know everything, and we absolutely valued the opportunity to be reviewed by not even necessarily peers but somebody who has killer whale experience or somebody who has experience working with large animals, just to put new eyes on it. Why? It was to keep our employees safe.

(Tr. 65-66).

SeaWorld included consultation with outside experts as a key factor in in its PMA:

Since neither Judge Welsch nor the Secretary has explained the proper manner by which SeaWorld could specifically abate the hazards alleged in Citation 2 Item 1(b) through "physical barriers," "minimum distance," or other methods, and since the Secretary has threatened additional enforcement actions, even without any guidance as to the proper manner to abate such hazards, SeaWorld requests an additional six months to examine the complex issues necessary to certify abatement of Citation 2 Item 1(b). Sea World would use this time to find and consult with experts in the field of marine animals to confirm the appropriateness of its existing precautionary measures and developing principled methods to define and continue implementing "physical barriers" and/or "minimum distances" as required by Judge Welsch's Order. It would agree to provide progress reports to the Secretary during this time.

(SeaWorld's PMA, ¶11).

Mr. Tompkins led the search for outside consultants. He testified there are few experts in the training of killer whales who do not already work for SeaWorld. By early September, Mr. Tompkins had narrowed his search to three people (Tr. 136). One of the outside experts was a member of the U. S. Navy. Mr. Tompkins explained the expert from the Navy had reservations about working with SeaWorld:

Based on his last experience with SeaWorld, apparently his organization, the Navy, felt like there was a conflict of interest. But, he said that he would go back and check with his administrator and find out if he could help in this endeavor. So, it took probably 20 or 30 days before he got back to us, but he got back to us and replied that the Navy suggested that he not help us.

(Tr. 137).

Mr. Tompkins then turned to the other two experts he had identified, one of whom works at the Georgia Aquarium and the other who works at the Atlantis Hotel in the Bahamas. Mr. Tompkins sent each of them a packet of material to review, and then set about scheduling a time when they could visit SeaWorld's Orlando Park and consult with the company.

So, it was my role to hopefully find the time where we could bring them to the park where they could review our program. And, that turned out to be very

6

difficult because, as everybody knows, November and December is an extremely popular time, especially for the Atlantis Hotel. That's when they do the majority of their work. Of course, at Sea World Park, that's when we are busy too. It's our Christmastime, Thanksgiving rush.

So, we had to work around people's schedules. We also need to remember these are top executives of companies, so they had to work within their schedules. Both of them went to the Armada Conference in December that was two weeks in Hong Kong so that took up quite a bit of time there. So, the first available time was, I think, the first week of January is when we could orchestrate a time when they could be there with us.

(Tr. 138-139).

SeaWorld has demonstrated it required the requested additional six months for abatement due to factors beyond its control, *i.e.,* the scheduling of the two outside experts. As SeaWorld points out, there are few non-SeaWorld experts in training killer whales in the world. Because they are not SeaWorld employees, SeaWorld has no control over their schedules. As executives in their own organizations, the experts reasonably accorded a lower priority to the outside consultation desired by SeaWorld. Additionally, the requests for consultation occurred just at the beginning of the holiday season, a traditionally busy time of year for their respective organizations.

As the court noted in the underlying Decision and Order, "[T]here is essentially no distinction between SeaWorld and the industry at large. . . . SeaWorld sets the industry standard for working with killer whales." *SeaWorld* at *14. When that Decision became a Final Order of the Commission, SeaWorld was required to significantly modify the training program it had developed over almost half a century. Previously, SeaWorld had refined its training program based on the experiences of its own trainers and input from its own management personnel and the personnel from other SeaWorld parks. This insular approach reflected a corporate culture that based its safety program largely on teaching its trainers operant conditioning techniques and relying on exacting observations of the whales' behaviors by the trainers. SeaWorld's business model was premised on the spectacle of close contact between the killer whales and the trainers during performances. The abatement methods of minimum distances and physical barriers, therefore, represented a stark change in policy. SeaWorld is recognized as the world leader in the training of killer whales. Now that it must overhaul its training program in order to reduce the proximity between the killer whales and its trainers, SeaWorld has a limited number of authoritative experts it can turn to for guidance.

7

SeaWorld has met the second element of its burden of proof and has thus established it is entitled to a modification of the July 27, 2012, abatement date.  The requested extension to January 27, 2013, is granted retroactively.

### Findings of Fact and Conclusions of Law

The foregoing decision constitutes the findings of fact and conclusions of law in accordance with Rule 52(a) of the Federal Rules of Civil Procedure.

### ORDER

Based on the foregoing decision, it is ORDERED that:

SeaWorld's petition for modification date is granted.  The new abatement date is January 27, 2013.

**Judge Ken S. Welsch**
1924 Building, Suite 2R90
100 Alabama Street, S.W.
Atlanta, Georgia 30303-3104
Phone (404) 562-1640; Fax (404) 562-1650

8

SeaWorld of Florida, LLC v. Secretary of Labor
Docket No.: 12-1697


I hereby certify that a copy of the decision in this case was mailed to the parties listed
below by first class mail on August 6, 2013.


_____*Nancy Sims*_____
Nancy Sims, Administrative Assistant
OSHRC
1924 Bldg., Room 2R90
100 Alabama Street, S.W.
Atlanta, Georgia 30303

Counsel for Regional Litigation
Office of the Solicitor
U. S. Department of Labor
200 Constitution Avenue, N.W.
Room S. 4014
Washington, D.C. 20210

**For the Petitioner:**

Carla J. Gunnin, Esq.
Baker, Donelson, Bearman, Caldwell & Berkowitz, PC
3414 Peachtree Road, N.E.
Suite 1600
Atlanta, GA 30326

**For the Secretary of Labor:**

Angela Donaldson, Esq.
Rolesia Dancy, Esq.
U. S. Department of Labor
Office of the Solicitor
Atlanta Federal Center, Room 7T10
61 Forsyth Street
Atlanta, GA 30303

**SeaWorld**

RECEIVED
APR 2 9 2013
Department of Labor
OSHA - Tampa Area Office

April 24, 2013

Mr. Leslie L. Grove III
Area Director
U.S. Department of Labor – OSHA
Tampa Area Office
4807 Breckenridge Parkway
Tampa, FL 33610

Re:    Abatement Certification
        SeaWorld of Florida LLC

Dear Mr. Grove:

Please accept this letter as certification of abatement of Citation 2, Item 1(b) pursuant to 29 C.F.R. §1903.19. The specific abatement certification is as follows:

On or about January 10, 2013, in response to Inspection Number 314336850, SeaWorld implemented Show Performance Safety Protocols for Killer Whales Other than Tilikum, which include minimum distance guarding, whale positioning and in some instances, barriers. These protocols were provided to the Solicitor's Office on January 9, 2013 as part of a confidential mediation in the D.C. Circuit Court of Appeals and it is SeaWorld's understanding that the Solicitor's Office subsequently transmitted these protocols to OSHA.

I attest that the information contained in this document is accurate and that affected employees are fully informed of the abatement activities described in this certification.

Sincerely,

Kelly Flaherty Clark

7007 SeaWorld Drive
Orlando, FL 32821