**ORAL ARGUMENT SCHEDULED FOR NOVEMBER 12, 2013**

**No. 12-1375**

**IN THE UNITED STATES COURT OF APPEALS
FOR THE DISTRICT OF COLUMBIA CIRCUIT**

———————————————

SEAWORLD OF FLORIDA, LLC,

*Petitioner,*

v.

THOMAS E. PEREZ, SECRETARY OF LABOR,
U.S. DEPARTMENT OF LABOR

*Respondent.*

———————————————

On Petition For Review Of An Order
Of The Occupational Safety and Health Review Commission

———————————————

**REPLY BRIEF FOR PETITIONER
SEAWORLD OF FLORIDA, LLC**

———————————————

Carla J. Gunnin
BAKER, DONELSON, BEARMAN,
  CALDWELL & BERKOWITZ, PC
Monarch Plaza, Suite 1600
3414 Peachtree Road, NE
Atlanta, Georgia 30326
(404) 589-3404

Eugene Scalia
  *Counsel of Record*
Baruch A. Fellner
Scott P. Martin
Daniel P. Rathbun
GIBSON, DUNN & CRUTCHER LLP
1050 Connecticut Avenue, N.W.
Washington, D.C. 20036
(202) 955-8500

*Counsel for Petitioner SeaWorld of Florida, LLC*

**TABLE OF CONTENTS**

Page

GLOSSARY OF ABBREVIATIONS AND ACRONYMS ................................. iv

SUMMARY OF ARGUMENT ...........................................................1

ARGUMENT .............................................................................3

I.     The Secretary's Citations Impermissibly Seek To Change The Nature
       Of SeaWorld's Business ......................................................3

II.    SeaWorld Did Not Recognize "Close Contact" As A Hazard ......................9

       A.    The Secretary's Citations Are An Impermissible Attempt
             To Impose Strict Liability ..................................................9

       B.    The ALJ's "Recognized Hazard" Conclusions Are
             Unsupported By Substantial Evidence..................................11

       C.    SeaWorld's Incident Reports Do Not Establish
             Recognition Of The Cited Hazards .....................................14

III.   The Secretary Has Not Established That SeaWorld Failed To
       Implement Any Additional And Necessary Safety Protocols .....................16

       A.    The Secretary Has Not Satisfied His Burden Of Proving
             That Barriers And Distances Are Feasible Means Of
             Abating The Alleged Hazard..............................................16

       B.    The Secretary Has Not Shown That SeaWorld's Existing
             Safety Protocols Were Inadequate .....................................22

IV.    The General Duty Clause Is Unconstitutionally Vague As Applied,
       And SeaWorld Lacked Fair Notice Of The Secretary's Abatement
       Measures .....................................................................28

CONCLUSION ..........................................................................31

# TABLE OF AUTHORITIES

Page(s)

## Cases

*Active Oil Serv., Inc.*,
   21 BNA OSHC 1184, 2005 WL 3934873 (No. 00-0553, 2005)..........................20

*Andrew Catapano Enters., Inc.*,
   17 BNA OSHC 1776, 1996 WL 559899 (Nos. 90-0050 *et al.*, 1996).................21

*Brennan v. OSHRC*,
   494 F.2d 460 (8th Cir. 1974) ...............................................................................11

*ConAgra, Inc.*,
   11 BNA OSHC 1141, 1983 WL 23849 (No. 79-1146, 1983)..............................21

*Connally v. Gen. Constr. Co.*,
   269 U.S. 385 (1926) ............................................................................................30

*Donovan v. Royal Logging Co.*,
   645 F.2d 822 (9th Cir. 1981) ...............................................................19, 28, 29

*Ensign-Bickford Co. v. OSHRC*,
   717 F.2d 1419 (D.C. Cir. 1983) ..........................................................................28

*Erickson Air-Crane, Inc.*,
   2012 CCH OSHD ¶ 33,199, 2012 WL 762001 (No. 07-0645, 2012).................30

*Fabi Constr. Co. v. Sec'y of Labor*,
   508 F.3d 1077 (D.C. Cir. 2007) .......................................................................2, 9

*Gen. Dynamics Land Sys. Div., Inc.*,
   15 BNA OSHC 1275, 1991 WL 11668263 (No. 83-1293, 1991) .................18, 21

*Grey Wolf Drilling Co.*,
   20 BNA OSHC 1293, 2003 WL 1961277 (No. 02-1228, 2003).........................21

*L.H.C. Inc.*,
   7 BNS OSHC 1672, 1979 WL 8039 (No. 78-3229, 1979) ..................................22

# TABLE OF AUTHORITIES
## (continued)

Page(s)

*L.R. Willson & Sons, Inc. v. OSHRC*,
  698 F.2d 507 (D.C. Cir. 1983) ..........................................................................19

*Megawest Fin., Inc.*,
  17 BNA OSHC 1337, 1995 WL 383233 (No. 93-2879, 1995)......................23, 24

*Miami Indus., Inc.*,
  15 BNA OSHC 1258, 1991 WL 195208 (No. 88-671, 1991).............................30

*Nat'l Realty & Constr. Co. v. OSHRC*,
  489 F.2d 1257 (D.C. Cir. 1973) .............................. 2, 9, 11, 16, 18, 23, 24, 27, 28

*Pelron Corp.*,
  12 BNA OSHC 1833, 1986 WL 53616 (No. 82-388, 1986).................1, 4, 7, 8, 9

*Pepperidge Farm*,
  17 BNA OSHC 1993, 1997 WL 212599 (No. 89-265, 1997).............................18

*Ramsey Winch Inc. v. Henry*,
  555 F.3d 1199 (10th Cir. 2009)......................................................................23, 24

*Tampa Shipyards, Inc.*,
  15 BNA OSHC 1533, 1992 WL 52938 (Nos. 86-360 & 86-469, 1992) .............18

*U.S. Postal Serv.*,
  No. 04-0316, 2006 WL 6463045 (OSHRC Nov. 20, 2006) ...............................16

*Wheeling-Pittsburg Steel Corp.*,
  16 BNA OSHC 1218, 1993 WL 155695 (No. 89-3389, 1993)...........................13

# GLOSSARY OF ABBREVIATIONS AND ACRONYMS

| | |
|---|---|
| Administrative Law Judge | ALJ |
| Brief for Respondent Secretary of Labor | Sec'y-Br. |
| California's OSHA Agency | Cal/OSHA |
| Occupational Safety and Health Act | OSH Act |
| Occupational Safety and Health Administration | OSHA |
| Occupational Safety and Health Review Commission | OSHRC or Commission |
| Opening Brief for Petitioner SeaWorld of Florida, LLC | SeaWorld-Br. |
| SeaWorld of Florida LLC | SeaWorld |
| Section 5(a)(1) of the Occupational Safety and Health Act | The General Duty Clause |

iv

## SUMMARY OF ARGUMENT

As explained in a recent ruling by the ALJ in this case, SeaWorld's "business model was premised" for nearly 50 years on the "spectacle of close contact" between killer whales and trainers.  Sec'y-Br. Add. 7.  The Secretary now claims that this contact—which was performed publicly every day to widespread acclaim—has been a patent hazard and a violation of federal law all along.  The government therefore seeks, in the ALJ's words, a "stark change" in SeaWorld's business model—and with it, a sweeping expansion of OSHA's authority under the General Duty Clause.  The Secretary pretends that his approach here could not be extended to professional football, automobile racing, or other areas because some risk of injury is supposedly "intrinsic" to those businesses, but the undisputed evidence shows that the same is equally true for trainers' interactions with killer whales at SeaWorld.  Simply put, "[s]ome industrial activities are by their very nature dangerous," and the "normal activities in such an industry" are not a "recognized hazard" within the meaning of the General Duty Clause.  *Pelron Corp.*, 12 BNA OSHC 1833, 1986 WL 53616, at *3 (No. 82-388, 1986).

The Secretary compounds this error by faulting SeaWorld's safety protocols because they could not make close contact with killer whales "one hundred percent" safe.  But while the Secretary supports this argument by citing tort cases involving strict liability for wild-animal attacks, the OSH Act does not impose strict

1

liability.  Instead, the statute requires a "materia[l] reduc[tion]" in a "recognized hazar[d]." *Fabi Constr. Co. v. Sec'y of Labor*, 508 F.3d 1077, 1081 (D.C. Cir. 2007) (citation omitted).  That is precisely what SeaWorld has accomplished through operant conditioning and its industry-leading safety protocols, which had resulted in only a handful of mostly minor injuries until Dawn Brancheau's unexpected death in 2010.  The Secretary cannot properly dismiss SeaWorld's use of an established "scientific method" for training killer whales because it "allows trainers to correctly predict what whales will do in many," just not "all," "situations." Sec'y-Br. 4-5.  The Secretary does not suggest a single specific means by which SeaWorld could have improved operant conditioning or its safety protocols, and indeed disclaims any expertise to do so.

Instead, the Secretary attempts to invoke SeaWorld's *own* responses to Dawn Brancheau's death to satisfy his burden of showing that SeaWorld could feasibly adopt the abatement measures that he proposed—undefined barriers and distance.  But the Secretary bears the burden of "specify[ing] the particular steps" that the employer "should have taken." *Nat'l Realty & Constr. Co. v. OSHRC*, 489 F.2d 1257, 1268 (D.C. Cir. 1973).  And even as he relies on SeaWorld's existing practices to claim feasibility, the Secretary does not argue that those practices are sufficient to abate the alleged hazards; to the contrary, he issued a "repeat" citation to SeaWorld over the practices and, in a separate proceeding, asserted that Sea-

World had not attempted abatement in "good faith." Sec'y-Br. Add. 4. Before this Court, the Secretary claims that SeaWorld's existing measures have not "necessarily" resulted in "complete abatement" for shows, Sec'y-Br. 38 n.10, while also suggesting that certain abatement measures might also be required during "husbandry and medical procedures," *id.* at 55 n.22. The Secretary's position creates nothing but confusion: SeaWorld's safety precautions are insufficient, he claims, but nonetheless establish that additional measures are feasible—measures that neither the Secretary nor anyone else can identify. The General Duty Clause and basic principles of due process require more.

This Court should reverse the ALJ's decision and vacate the Secretary's citations.

## ARGUMENT

### I.    The Secretary's Citations Impermissibly Seek To Change The Nature Of SeaWorld's Business.

The ALJ's order must be overturned because so-called "close contact" between whales and trainers is the cornerstone of SeaWorld's mission, and requiring its elimination is tantamount to prohibiting the product that SeaWorld has offered the public for nearly 50 years. The ALJ found, and the Secretary does not dispute, that SeaWorld's safety precautions "se[t] the industry standard for working with killer whales." Order 19.

3

**A.**     The OSH Act makes employers accountable only for "conditions … over which [they] can reasonably be expected to exercise control." *Pelron Corp.*, 12 BNA OSHC 1833, 1986 WL 53616, at *3 (No. 82-388, 1986).  The Commission has accordingly recognized that the Secretary's ability to require safety precautions does not allow him to enjoin employers from inherently hazardous activities that are intrinsic to their business.  As the Commission has explained, "[s]ome industrial activities are by their very nature dangerous.  To permit the normal activities in such an industry to be defined as a 'recognized hazard' … is to eliminate an element of the Secretary's burden of proof." *Id.*

The Secretary concedes that he may not use the General Duty Clause to "ban … contact in professional football or high speed in stock car racing."  Sec'y-Br. 51.  But he attempts to distinguish these examples by claiming that "physical contact between players is intrinsic to professional football, as is high speed driving to professional auto racing."  *Id.* at 52.  In contrast, he claims that "close contact" is "not essential" to SeaWorld's operations, *id.*, and thus that his citations do "not change the basic nature" of the business, *id.* at 44.

The Secretary's attempt to distinguish these other businesses is unconvincing.  The element of "contact" in professional football is not "intrinsic" in any abstract sense; the game could be changed to flag football, which is widely played by adults.  Similarly, there is no reason why stock-car racing could not be subjected to

4

a speed limit to reduce the number of wrecks. Instead, the irreducible level of risk associated with these businesses stems from the businesses' decisions to produce a *particular* product that the public enjoys more than a potentially safer alternative: football involving tackling, and racing involving high speeds. This risk is "intrinsic," that is, only because it is an essential part of the product being offered to the public.

The changes that the Secretary seeks to make to SeaWorld are—in the ALJ's words—no less "stark." Sec'y-Br. Add. 7. The record in this case reveals that "close contact" with killer whales is essential to the product offered by SeaWorld, and is indeed the primary reason trainers and audiences have been drawn to Sea-World for nearly 50 years:

- Close contact allows trainers to care for whales. As veterinarian Christopher Dold testified, "[m]edicine [and] animal husbandry" are necessarily "a contact scenario." Tr. 1783; *see also id.* at 1717-20, 1725 (describing trainers' use of contact in husbandry and medical procedures, as well as in conservationist practices like artificial insemination). Although the Secretary now claims that SeaWorld "can effectively care for its killer whales" under his proposed abatement measures, Sec'y-Br. 44, Dold explained that SeaWorld *cannot* provide an "appropriate standard of care" for its whales absent close contact, Tr. 1764; *see also id.* at 1762, 1782-85. Indeed, close contact with

5

humans during "fun" activities is essential to prevent whales from associating such contact only with uncomfortable husbandry practices such as giving shots and brushing teeth. *See id.* at 105-09, 1307-10.

- <u>Close contact is a primary draw for trainers and visitors</u>. Curator of Animal Training Kelly Clark testified that contact between trainers and whales is what "inspire[s]" SeaWorld's visitors; "volumes of letters and cards" attest to the "chang[e]" that these shows can produce in visitors. Tr. 1579-82. And Supervisor of Animal Training Jenny Mairot explained that she "decided" to "dedicate [her] life" to creating a "stimulating" environment for killer whales by "training" and "teaching" them through contact. *Id.* at 1335.[1]

- <u>Close contact allows trainers to train whales</u>. Mairot testified that she could not imagine "training of killer whales with no contact" because "you need to feel the animal … to feel how they're responding." Tr. 1334. By decreasing the effectiveness of operant conditioning, reducing "close contact" increases the likelihood that whales will behave unpredictably and aggressively, and thus decreases their ability to be trained effectively for shows. *Id.* at 877, 1319, 1796.

---

[1] For example, SeaWorld's "Believe" show, which was its marquee show before 2011 and involved trainers riding whales and swimming with and hugging them, is available at http://www.youtube.com/watch?annotation_id=annotation_690226&feature=iv&src_vid=HAfTHFiiNF8&v=Uh5Eigt_dhQ.

6

**B.**    The Secretary cannot meaningfully dispute any of these points, but instead insists that SeaWorld has "already" changed "the basic nature of trainers' jobs" by ceasing waterwork and experimenting with other means to reduce contact. Sec'y-Br. 44, 52.  SeaWorld did indeed make significant changes in the wake of Dawn Brancheau's death, including reductions in close contact.  But the fact that SeaWorld may decide to make changes to its operations does not mean that OSHA can order it to do so.  *See Pelron*, 1986 WL 53616, at *3.

Moreover, the Secretary's citations require the elimination of *all* "close contact," Order 32-34, 41, not simply (as the Secretary suggests) "the types of close contact that occurred prior to Dawn Brancheau's death," Sec'y-Br. 51.  If the Secretary were satisfied with the measures that SeaWorld had *already* implemented, then he would not have required additional abatement measures in his citations. Nor would he have contested SeaWorld's petition to modify the citations' abatement date.  Nor would he have issued a "repeat" citation on June 7, 2013, alleging ongoing hazards presented by SeaWorld's safety protocols.  *See id.* at 40-41 n.11.

Indeed, even now the Secretary refuses to concede that SeaWorld's changes are sufficient to "completely implemen[t] the proposed abatement," acknowledging only that SeaWorld has made "considerable progress."  Sec'y-Br. 38.  Thus, although the Secretary attempts to invoke subsequent changes to SeaWorld's business to claim that he is not attempting to redefine that business, his own brief con-

cedes that the citations could require substantial further changes to the core of SeaWorld's operations.

Any remaining doubt is eliminated by the ALJ's decision granting Sea-World's petition for modification of the citations' abatement date. The ALJ explained that SeaWorld will be "required to *significantly modify* the training program it had developed over almost half a century." Sec'y-Br. Add. 7 (emphasis added). "SeaWorld's business model was premised on the spectacle of close contact between the killer whales and trainers," the ALJ stated, and therefore the "abatement methods of minimum distances and physical barriers … represented a stark change in policy." *Id.* The ALJ recognized that SeaWorld "[n]ow … must overhaul its training program in order to reduce the proximity between the killer whales and its trainers." *Id.* These conclusions leave no doubt that the Secretary is attempting to regulate SeaWorld's "normal activities" in an impermissible manner. *Pelron Corp.*, 1986 WL 53616, at *3.

**C.**    Finally, the Secretary argues that he "has issued citations" to zoos "for exposing employees to inadvertent contact." Sec'y-Br. 53. But SeaWorld, unlike a zoo, is not in the business of merely displaying animals, nor are its trainers' interactions with whales "inadvertent." Instead, SeaWorld's operations *revolve* around purposeful contact with killer whales. The Secretary might prefer that SeaWorld's operations more closely resemble a zoo—and its *amici* would doubt-

8

less prefer to eliminate those operations altogether—but that is not a permissible use of the General Duty Clause.  If the judgment is to be made that SeaWorld's contact-based mission should be prohibited, that is a conclusion to be reached by a legislature—not the Secretary.  *See Pelron*, 1986 WL 53616, at *3.

## II.    SeaWorld Did Not Recognize "Close Contact" As A Hazard.

The ALJ also erred by concluding that SeaWorld recognized "close contact" to present a hazard.  By relying on inapposite tort cases and faulting SeaWorld for failing to make its workplace "one hundred percent" safe, Sec'y-Br. 6, the Secretary confirms that his intent was to impose strict liability rather than to require a "material reduction" of preventable hazards, as the OSH Act requires.   And the Secretary's selective presentation of the evidence below—drawn largely from incident reports that were used to *avoid* future problems—falls far short of showing that SeaWorld recognized a hazard, either involving Tilikum or its other whales.

### A.    The Secretary's Citations Are An Impermissible Attempt To Impose Strict Liability.

The OSH Act does not "impose strict liability," *Nat'l Realty & Constr. Co. v. OSHRC*, 489 F.2d 1257, 1265-66 (D.C. Cir. 1973), but instead requires only a "materia[l] reduc[tion]" in a "recognized hazar[d]," *Fabi Constr. Co. v. Sec'y of Labor*, 508 F.3d 1077, 1081 (D.C. Cir. 2007) (citation omitted).  The ALJ violated these principles by faulting SeaWorld's safety program because it did not work "all

the time" and could not "remove the element of unpredictability inherent in working with killer whales."  Order 40; *see also* SeaWorld-Br. 43, 46.

The Secretary concedes that the General Duty Clause requires elimination only of "preventable recognized hazards."  Sec'y-Br. 14.  Yet he begins his argument by claiming that *all* "wild animals, including killer whales, are an obvious danger to humans."  *Id.* at 17-18.  And to support this assertion, the Secretary cites exclusively tort cases involving *strict liability* for wild-animal attacks.  *Id.*  Indeed, the Secretary endorses the sweeping proposition that "'[n]o member of such a species, *however domesticated*, can ever be regarded as safe.'"  *Id.* at 18 (emphasis added; citation omitted).

The Secretary apparently believes these cases are relevant because his expert opined that captive whales sometimes act "in a manner consistent with hunting prey in the wild."  Sec'y-Br. 19.  But SeaWorld's whales are not "wild"; they are (much to the regret of the Secretary's *amici*) raised and trained in captivity to perform an array of highly choreographed, disciplined maneuvers.[2]  The Secretary's argument also ignores trainers' repeated affirmations that safe interactions with whales require years of training, and thus involve only a small, "calculated risk"

---

[2]  Even in the wild, killer whales have not proved a danger to humans.  As the Secretary concedes, there are no known human deaths resulting from killer whales in the wild, *see* Sec'y-Br. 7, and one of its *amici*, Ingrid Visser, claims to have explored the whales' "playful side" by swimming with them in the wild, *see* "Swimming with Killers," *available at* http://www.youtube.com/watch?v= jboavbL0Rbs.

that cannot be eliminated even with appropriate training.  SeaWorld-Br. 7-11, 40.

And in arguing that SeaWorld's safety protocols cannot "*always* … avert or stop

harmful whale behavior," Sec'y-Br. 5 (emphasis added), or render whales' behav-

ior "one hundred percent predictable," *id.* at 6, the Secretary impermissibly substi-

tutes "strict liability" for the proper test under the OSH Act.  *Nat'l Realty*, 489 F.2d

at 1265-66.  No workplace activity is "always" or "one hundred percent" safe, and

Congress did not require otherwise.  Instead, it is sufficient that SeaWorld's safety

program admittedly "does work," Order 40, and that SeaWorld took "reasonable

precautionary steps" against "foreseeable" hazards, *Brennan v. OSHRC*, 494 F.2d

460, 463 (8th Cir. 1974).

## B.    The ALJ's "Recognized Hazard" Conclusions Are Unsupported By Substantial Evidence.

The ALJ lacked substantial evidence to uphold *either* of the Secretary's two

citations, which target (a) "close contact with Tilikum during drywork performanc-

es," Order 25, and (b) "close contact" with whales "other" than Tilikum during

"waterwork" and "drywork," *id.* at 33.

It was inappropriate for the ALJ to uphold the "other"-whales citation be-

cause different whales have different characteristics, and SeaWorld develops and

maintains whale-specific safety protocols to mitigate the risks associated with each

of them.  SeaWorld-Br. 27-29.  Without considering such differences, the ALJ re-

lied on "incidents" involving a handful of whales—including Tilikum—to reach

11

the unsupported conclusion that *all* interactions between *any* whale and *any* trainer present a recognized hazard. The Secretary's brief does not even attempt to defend this "other"-whales analysis. And his *amici* confirm that whales' "self-awareness" results in whale-to-whale behavioral differences. *See Amicus* Br. 6-14. At a minimum, therefore, this Court should reject the Secretary's attempt to lump all whales other than Tilikum into a single citation.

With respect to Tilikum, the Secretary does not dispute that SeaWorld implemented Tilikum-specific safety protocols to mitigate the "dange[r]" that he would otherwise present. SeaWorld-Br. 24. The Secretary, however, turns these "special Tilikum protocols" on their head, claiming SeaWorld recognized that even drywork with Tilikum presented a hazard. But SeaWorld's use of these "protocols" to control interactions with an animal that could present a danger if not handled properly cannot support a finding that it believed a hazard to be present *when the protocols were followed*. To the contrary, trainers testified that Tilikum was "exceptionally" obedient in drywork. Tr. 598-99. The two previous deaths associated with Tilikum involved people who were in the water, not engaged in drywork like Dawn Brancheau, and one of those individuals was not even a trainer. *See id.* at 472 ("[W]e never had an incident with [Tilikum] that would have showed us any type of aggression with anybody in a land situation").

12

For similar reasons, the Secretary cannot defend his Tilikum-specific citation by arguing that "SeaWorld knew that for a trainer to be in deep water with Tilikum was tantamount to death." Sec'y-Br. 23. That is irrelevant because SeaWorld *prohibited* waterwork with Tilikum. The fact that Tilikum might have presented a hazard in waterwork does not support any inference that he *also* presented a hazard in drywork. *See Wheeling-Pittsburg Steel Corp.*, 16 BNA OSHC 1218, 1993 WL 155695, at *5 (No. 89-3389, 1993) (use of precautions does not show recognition of the need for additional precautions).

Finally, the Secretary argues that SeaWorld "knew that whales pulled trainers into the pool … fairly regularly," and that Tilikum's actions during the Dawn Brancheau incident were "entirely consistent with the conduct exhibited by other captive whales." Sec'y-Br. 23. The Secretary offers no support for these statements, nor does any exist. Indeed, the Secretary's assertion that whales "regularly" pulled trainers into the pool "consistent" with Tilikum's behavior is directly refuted by the record: The Secretary has identified only two previous instances when a whale pulled a trainer into a pool—one in 1997, and another in 2002. *See* Sec'y-Br. 26-27. Neither incident involved Tilikum. *See* Ex. C-6, at 613, 732. Following both incidents, moreover, SeaWorld took reasonable measures to prevent their recurrence. *See id.* at 615 (requiring wetsuits), 732-33 (re-conditioning the whale). This bare evidence of previous incidents involving other whales, with no causal

13

link to Tilikum and subject in both cases to prompt responses by SeaWorld, cannot

support the Secretary's sweeping claims about Tilikum's behavior.

### C.    SeaWorld's Incident Reports Do Not Establish Recognition Of The Cited Hazards.

SeaWorld's "incident reports" are an important means to improve operant

conditioning and trainers' interaction with whales.  *See* SeaWorld-Br. 28.  Like the

ALJ, however, the Secretary cites a "sampling of statements" from these incident

reports to assert that SeaWorld recognized a generalized hazard from "working

closely with killer whales."  Sec'y-Br. 21.  But the Secretary's "sampl[e]" reports

instead show that SeaWorld actively sought to remedy the concerns identified in

those reports.  Evidence of a potential hazard that was *noted and addressed* is not

evidence of a "recognized hazard" that remained.

For example, the Secretary relies on an incident report noting that the whale

Taku is "'very capable of seriously hurting somebody.'"  Sec'y-Br. 22.  But the

same report includes a page-long "Taku GamePlan" in which SeaWorld outlined

the steps to reconfigure Taku's trainer "team" and avoid future incidents, including

by "desensitiz[ing]" him to the types of contact that had caused "[p]roblem

[b]ehaviors."  Ex. C-6, at 483.  Similarly, the Secretary discusses an incident in

which SeaWorld noted a "'pattern'" of problems during waterwork with the whale

Orkid, Sec'y-Br. 28, but the report memorializes SeaWorld's decision to *cease all*

*waterwork* with Orkid, *see* Ex. C-6, at 1152; *see also* Tr. 527.  And the Secretary

14

notes an incident in which the whale Katina "pushed" a trainer after receiving inconsistent instructions from that trainer and others, Sec'y-Br. 21, but the report notes that SeaWorld subsequently "[e]stablished a universal hand signal for recall," Ex. C-6, at 434. The Secretary's selective quotation from these reports cannot obscure their true purpose of avoiding future incidents, and cannot provide the missing evidence that SeaWorld recognized an ongoing hazard of "close contact" with the whales at issue—let alone *all* whales.

The Secretary also emphasizes "eleven injuries" that he purports to have identified through a review of SeaWorld's incident reports from 1989 through 2009. The most serious of the injuries identified by the Secretary is a broken foot and puncture wounds, and there had been no incidents at SeaWorld for nearly five years before Dawn Brancheau's death. *See* Sec'y Br 10-13; *see also* Tr. 487. The Secretary asserts that, "[w]hile eleven injuries may seem few, it is important to note that the SeaWorld parks only employ a small number of killer whale trainers (27 at SeaWorld of Florida)." Sec'y-Br. 10 n.2. The Secretary then invites this Court to infer that these injuries show a recognized hazard by applying OSHA's "'one in a thousand' metric to determine whether there exists a 'significant' risk of a given occupational injury or illness in the rulemaking context." *Id.* But the "one in a thousand" method undermines the Secretary's argument. Each of SeaWorld's 27 trainers has dozens of close interactions with killer whales each day, and hun-

15

dreds every week.  Tr. 38, 625, 1357.  Extrapolating these numbers across the Sec-

retary's twenty-year period-of-interest would yield *more than a hundred thousand*

*interactions for every single trainer*.  The Secretary's "eleven injuries" plainly fails

a "one in a thousand" threshold.

## III.    The Secretary Has Not Established That SeaWorld Failed To Implement Any Additional And Necessary Safety Protocols.

The Secretary failed to carry his burden of (1) "specify[ing] the particular

steps" that SeaWorld "should have taken" while demonstrating their "likely utili-

ty," *Nat'l Realty*, 489 F.2d at 1268; and (2) establishing that SeaWorld's existing

safety protocols were "inadequate," *U.S. Postal Serv.*, No. 04-0316, 2006 WL

6463045, at *8 (OSHRC Nov. 20, 2006).

### A.    The Secretary Has Not Satisfied His Burden Of Proving That Barriers And Distances Are Feasible Means Of Abating The Alleged Hazard.

The Secretary must "'specify the particular steps [SeaWorld] should have

taken to avoid citation,'" and "'demonstrate the feasibility and likely utility of

those measures.'"  Sec'y-Br. 34-35.  He also must prove that the abatement

measures "'would have necessarily prevented [the cited] accident.'"  *Id.* at 36.  He

failed to make either showing.

**1.**    The Secretary's witnesses disclaimed having sufficient knowledge to

specify what "barriers" or "distances" would be appropriate.  Dr. David Duffus

suggested that SeaWorld should "write [him] a contract" to "engage in the ideali-

zation of what might be done," Tr. 885-86, and then speculated that SeaWorld should keep trainers "*perhaps* five to eight feet away" from whales or use a "raised barrier" of unspecified height or composition, *id.* at 905 (emphasis added). Area Director Les Grove scoffed at SeaWorld's requests for particularity, claiming "it's not that hard to determine that the feasible abatement method is to eliminate that unprotected contact." *Id.* at 947. Instead, the Secretary's witnesses consistently testified that only SeaWorld itself had the "expertise" to determine what "barriers" or "distances" the Secretary requires: Duffus deferred to "experienced trainer[s]" regarding "proximity," explaining that "'you guys are the experts'" on the subject. Tr. 798. It is, of course, the safety practices developed by SeaWorld's experts that the Secretary challenges in this litigation.

On appeal, the Secretary repeats his witnesses' shortcomings, claiming that his recommended abatement measures "are simple" and "operate under the common-sense proposition that keeping trainers out of reach of the whales will prevent … the risk of deaths or serious injuries." Sec'y-Br. 35. Thus, the Secretary maintains that he was justified in requiring *SeaWorld* to "provide precise design specifications for [his] abatement methods." *Id.* at 46.

But none of the Secretary's authorities suggest that he can shift the burden of proof by claiming that the necessary abatement measures, though unspecified, are a matter of "common-sense." In *Pepperidge Farm,* the Commission did not "ap-

17

prov[e]" the citation requiring a process-based abatement measure, as the Secretary asserts, Sec'y-Br. 46, but rather found that the Secretary "failed to meet her [feasibility] burden" with respect to that citation, 17 BNA OSHC 1993, 1997 WL 212599, at *45 (No. 89-265, 1997).  In any event, that citation required only a "process" to address the alleged hazard; it did not make the employer "implement … specific abatement measure[s]," as the Secretary does here by requiring that SeaWorld design and implement "barriers" and "distances."  *Id.* at *44.  The remaining cases cited by the Secretary involved employers that were cited for lacking a safety policy altogether.  *See Tampa Shipyards, Inc.*, 15 BNA OSHC 1533, 1992 WL 52938, at *4 (Nos. 86-360 & 86-469, 1992) (employer "had no written crane safety policy"); *Gen. Dynamics Land Sys. Div., Inc.*, 15 BNA OSHC 1275, 1991 WL 11668263, at *15 (No. 83-1293, 1991) ("the same 'confined space entry procedures' already in effect in [the employer's] facility" should have "been applied" to "M-1 tanks").

Where, as here, the Secretary requires specific abatement measures, as opposed to simply requiring a safety policy where none existed before, the law is clear that he must articulate and show the "likely utility" of those measures.  *Nat'l Realty*, 489 F.2d at 1267 n.40 (rejecting proposed abatement of "no riding" signs where the Secretary "introduced no testimony indicating the value of such precautions relative to the [employer's existing] safety policies").  There is no exception

18

for measures the Secretary deems "simple," as otherwise the Secretary could invoke such facile excuses to shirk his feasibility burden in any case.

In any event, the Secretary contradicted his argument that the abatement measures are a matter of common sense by maintaining that their implementation depends on SeaWorld's "expertise." Tr. 798. SeaWorld agrees that it is the most knowledgeable resource for "designing appropriate abatement" of the risks attendant to trainers' jobs. Sec'y-Br. 45. But SeaWorld has never identified barriers or distances as necessary to ensure safe interactions with whales. This defeats the Secretary's feasibility case, which requires showing that "experts *familiar with the pertinent industry*" would prescribe his recommended measures, *Donovan v. Royal Logging Co.*, 645 F.2d 822, 830 (9th Cir. 1981), and that "reasonably prudent employer[s] familiar with the circumstances of the industry would have protected against the hazard in the manner specified by [his] citation," *L.R. Willson & Sons, Inc. v. OSHRC*, 698 F.2d 507, 513 (D.C. Cir. 1983).

**2.** The Secretary also attempts to support the feasibility of his abatement measures by arguing that "SeaWorld [a]lready [u]ses [b]arriers and [d]istance." Sec'y-Br. 37. But the ALJ was mistaken that SeaWorld had been using the Secretary's abatement measures for whales other than Tilikum since February 24, 2010. *See* SeaWorld-Br. 51. This assertion has no support in the record, and the Secretary does not even attempt to defend it. Instead, the Secretary purports to tell this

19

Court what the ALJ *meant* to say: "that SeaWorld had implemented barriers and distance to a considerable degree." Sec'y-Br. 38 n.10. SeaWorld's "sufficient progress" toward the implementation of barriers and distances "demonstrate[d]," the Secretary maintains, that "these steps [were] plainly feasible." *Id.* at 37.

But the Secretary argues, in practically the same breath, that SeaWorld has not "necessarily" implemented barriers and distances "to the point of complete abatement." And following the ALJ's decision, the Secretary has both issued a "repeat" citation to SeaWorld for failing to abate the supposed hazards, and contested SeaWorld's petition for modification of the abatement date on the ground that SeaWorld "did not make a good faith effort to comply with [his] abatement requirements." Sec'y-Br. Add. 4. The Secretary cannot have it both ways, simultaneously claiming that SeaWorld's existing measures are insufficient to abate the alleged hazards—and indeed are not even a "good faith effort"—while also claiming that they show the feasibility of his abatement measures.

Even if one could credit the Secretary's claim that SeaWorld has implemented abatement measures to a "considerable degree," Sec'y-Br. 38 n.10, that still would not suffice to satisfy his feasibility burden. Most of the cases cited by the Secretary involved employers that had implemented the Secretary's abatement measures *in full*. *See Active Oil Serv., Inc.*, 21 BNA OSHC 1184, 2005 WL 3934873, at *2 (No. 00-0553, 2005) (employer "had established [the required] con-

20

fined space entry procedures"); *Andrew Catapano Enters., Inc.*, 17 BNA OSHC 1776, 1996 WL 559899, at *11 (Nos. 90-0050 *et al.*, 1996) (employer demonstrated the feasibility of "trench box[es]" by "using" them); *Gen. Dynamics*, 1991 WL 116263, at *15 (employer had "stopped using freon and beg[u]n using soap and water to clean [its] tanks"). In contrast, the Secretary claims here that SeaWorld has not "implemented barriers and distance" to the "point of complete abatement." Sec'y-Br. 38 n.10.[3]

**3.** Finally, the Secretary fails to rebut evidence showing that his recommended abatement measures would create greater hazards. The Secretary's expert conceded that "frequency of contact" logically "reduce[s] the risk[s] to the trainers" because "predictability rises with more contact." Tr. 877; *see also id.* at 1319-21, 1796. And SeaWorld's chief veterinarian testified that reduced contact means that trainers are less able to ensure whales' "cooperation" in husbandry and medical procedures. *Id.* at 1735-38. The Secretary dismisses this testimony as "speculat[ion]," but he has no record citation for the proposition that his abatement

---

[3] The remaining cases cited by the Secretary required an employer to apply a simple precautionary measure to another situation where it logically applied. *See Grey Wolf Drilling Co.*, 20 BNA OSHC 1293, 2003 WL 1961277, at *5 (No. 02-1228, 2003) (ALJ) (requiring "already employ[ed]" flagmen to assist drivers "when [a] truck is backed for long distances"); *ConAgra, Inc.*, 11 BNA OSHC 1141, 1983 WL 23849, at *5 (No. 79-1146, 1983) ("merely extend[ing]" an existing "pretest" procedure to "all [rail] cars"). The Secretary does not claim that SeaWorld has successfully used barriers and distances to abate other hazards in a manner that shows their feasibility for use with all killer whales.

measures "remov[e] the hazard and will prevent future injuries and deaths in killer whale performances." Sec'y-Br. 43. The Secretary cannot overcome record evidence with conjecture. And he particularly cannot do so having conceded that SeaWorld personnel "'are the experts'" in determining the safest means of interacting with trained whales. Tr. 798.

## B. The Secretary Has Not Shown That SeaWorld's Existing Safety Protocols Were Inadequate.

The ALJ erred by concluding that SeaWorld's existing safety protocols were "inadequate" given his acknowledgment that they "work[ed]" and were indicative of a "safety-conscious employer." Order 40, 45. The record required this admission: The Secretary's counsel conceded that the citations were "not saying there's something deficient about [SeaWorld's] training program." Tr. 66, 887. The Secretary attempts to overcome this concession on appeal by criticizing operant conditioning and SeaWorld's emergency procedures, invoking snippets of SeaWorld's incident reports, and attempting to rehabilitate his unqualified expert, Duffus, who challenged SeaWorld's precautions. None of these efforts is sufficient to show the "necessity" for any "controls" beyond SeaWorld's "existing precautions." *L.H.C. Inc.*, 7 BNA OSHC 1672, 1979 WL 8039, at *4-*5 (No. 78-3229, 1979) (ALJ).

1.     The Secretary maintains that SeaWorld's safety program was inadequate because "[o]perant [c]onditioning [d]oes [n]ot [k]eep [t]rainers [s]afe." Sec'y-Br. 29. But he admits that "[o]perant conditioning is a recognized scientific

22

method," *id.* at 4, and that it "allows trainers to correctly predict what whales will do in many, but not all, situations," *id.* at 5. Indeed, SeaWorld's operant conditioning "sets the industry standard for working with killer whales." Order 19.

The Secretary cannot fault SeaWorld because operant conditioning does not *eliminate* "novel or unanticipated whale behaviors." Sec'y-Br. 30. The relevant question is whether SeaWorld's safety protocols addressed "preventable forms and instances of hazardous conduct," not unexpected or unpredictable ones. *Nat'l Realty*, 489 F.2d at 1266-67. And the unpredictable behavior of living beings, in particular, is not an actionable hazard under the OSH Act. *See*, *e.g.*, *Ramsey Winch Inc. v. Henry*, 555 F.3d 1199, 1206 (10th Cir. 2009) (rejecting argument that General Duty Clause bars guns from workplace parking lots); *Megawest Fin., Inc.*, 17 BNA OSHC 1337, 1995 WL 383233, at *9 (No. 93-2879, 1995) (ALJ) (rejecting Secretary's attempt to hold an employer liable for spontaneous workplace violence). That is so because living beings, unlike "inanimate objects or processes over which [an employer can] exercise a certain degree of control," "have a will, an intention, and an intellect that drives their behavior." *Megawest*, 1995 WL 383233, at *9.

The Secretary claims that the "whole point" of his citations was that "SeaWorld *knows* killer whale behavior is "unpredictable," so it was "foreseeable that an event like Dawn Brancheau's death could occur." Sec'y-Br. 31-32. But the

23

employers in *Ramsey Winch* knew that people could use guns in their parking lots, and the employer in *Megawest* knew that violence could occur in its workplace (as, indeed, violence had already occurred there). Because those employers could not reliably predict those hazards, however, they could not reliably prevent them. *See Nat'l Realty*, 489 F.2d at 1266.

**2.**    The Secretary argues that SeaWorld's safety program was inadequate because "emergency rescue procedures meant to 'recall' or distract a whale from dangerous behavior have proven to be grossly inadequate." Sec'y-Br. 32. He invokes "seventeen instances" demonstrating this supposed problem. But in nine of them, the whale *did* respond to SeaWorld's recall attempts. *See* Ex. C-6, at 424, 522, 603, 665, 693, 775, 1152, 2668, 2725. And in the remainder, the trainer was successfully aided through other means. *See id.* at 231, 579, 612, 627, 633, 732, 749, 1374. Recalls are only one part of the broad emergency protocols that SeaWorld has developed and refined over time. SeaWorld-Br. 12-14. Even if recalls were "ineffective," therefore, that could not establish the inadequacy of SeaWorld's entire safety program. Considering SeaWorld's procedures as a whole, the ALJ properly recognized that they set the "industry standard" and are indicative of a "safety-conscious employer." Order 19, 45.

**3.**    The Secretary also claims that SeaWorld's precautions were inadequate because "[i]ncidents [o]ccurred [r]egularly for [t]wenty [y]ears [d]espite

24

SeaWorld's [e]fforts to [p]revent [t]hem." Sec'y-Br. 25. But the Secretary ignores the corrective nature of SeaWorld's incident reports, as well as the demonstrated decline in incidents over time—including the complete absence of any incidents at SeaWorld in nearly five years preceding Dawn Brancheau's death. Tr. 487.[4]

*First*, the Secretary cites "example[s]" of incident reports that show whales "grab[bing] trainers by the feet and legs," "whether the trainer [was] in or out of the water." Sec'y-Br. 28. Only five of the Secretary's thirteen examples occurred within ten years of the cited incident. And eleven of the Secretary's thirteen examples involved waterwork, which SeaWorld voluntarily discontinued following Dawn Brancheau's death. As discussed above, only two of the Secretary's examples show a whale grabbing a trainer that was "out of the water." Neither was in close proximity to the Dawn Brancheau incident—one was in 1997; the other, 2002—and both resulted in SeaWorld taking reasonable measures to prevent reoccurrences. *See supra* at 13.

*Second*, the Secretary cites "examples" of incident reports showing two "whale aggressions that contributed to Dawn Brancheau's death: grabbing trainers' hair and biting during 'layout mimics.'" Sec'y-Br. 28. Yet none of the Secretary's

---

[4] The Secretary asserts that killer-whale incidents "culminat[ed] in trainer deaths in 2009 and 2010." Sec'y-Br. 25. The 2009 death was not at SeaWorld, but instead a Spanish marine park that SeaWorld did not own or operate and was not responsible for overseeing. *See* Order 40, 44; Tr. 419. The contrary assertion by the Secretary's *amici* (at 2) is inconsistent with the record.

25

"examples" involved drywork, let alone the precise type of interaction—a poolside layout—that directly preceded Ms. Brancheau's death.  The purportedly "aggressive" whale behaviors in these "examples" occurred while trainers were engaged in a wide range of in-water activities, from "footpushes" to back-floats.  *See* Ex. C-6, at 236, 307, 417, 424, 480, 514, 579, 665, 697-99.

Far from supporting the Secretary's citations, these and other incident reports demonstrate that SeaWorld undertook rational measures to prevent the recurrence of foreseeable hazards.  *See*, *e.g.*, Ex. C-6, at 613 ("corrective ste[p]" that "Winnie will be worked only by Sr. [t]rainer[s] or above for now"), 621 ("corrective ste[p]" to "sto[p] all water work with Taku until a detailed plan [could be] outlined"); 1152 ("corrective ste[p]" that trainers would be "out of the water with Orkid until further notice").

**4.**     Finally, the Secretary attempts to defend the ALJ's reliance on Duffus to conclude that SeaWorld's precautions were "inadequate."  Order 40.  Duffus's experience is limited to observing killer whales in the wild; he has not conducted "any studies" on captive whales, Tr. 794, and does not know whether "being in captivity alters their behavior," *id.* at 808; *see also* Sec'y-Br. Add. 5 (noting that Duffus "has no expertise in the training of captive killer whales").  The Secretary's only response is that ALJs have "'great discretion'" in deciding whether to admit evidence, and that the ALJ "evaluated Dr. Duffus's qualifications and the reliabil-

ity and relevance of his proffered testimony." Sec'y-Br. 48. But the Secretary does not (and cannot) show that Duffus's testimony satisfies the applicable *Daubert* factors or supports the conclusion that the ALJ drew from it: that SeaWorld's training had not "reduced" the hazard "to a significant degree." Order 40.

The Secretary asserts that Duffus's lack of expertise with captive whales is "a question going to the weight of the testimony, not its admissibility." Sec'y-Br. 47. But Duffus himself recognized a fundamental distinction between wild and captive whales, testifying that he would not "second guess" the instincts of an "experienced trainer" with respect to appropriate "proximity" to captive whales. Tr. 903. And the Secretary admits that "[a]ny expert with knowledge of or experience in killer whale training would likely be a current or former SeaWorld employee." Sec'y-Br. 48 n.15. If the distinction between captive and wild killer whales is sufficiently pronounced that the Secretary and his expert concededly must rely on SeaWorld's expertise with the former, there is no basis for accepting expert testimony on the subject from an individual whose experience is limited to the latter.

\*        \*        \*

In *National Realty*, this Court observed the "awesomely broad discretion" that the General Duty Clause potentially conferred on the Secretary, and emphasized that "even-handed enforcement" could be assured "[o]nly by requiring the Secretary, at the hearing, to formulate and defend *his own* theory of what a cited

27

defendant should have done," "specify[ing] the particular steps a cited employer should have taken to avoid citation." 489 F.2d at 1268. In his full-on challenge to the "close contact" that is the very "premis[e]" of SeaWorld's "business model," Sec'y-Br. Add. 7, the Secretary offers only vague, shifting, and unsubstantiated theories of what he would substitute for the safety practices of the company that is the world's conceded expert on whale-human interactions. The Secretary has failed to carry his burden.

## IV.   The General Duty Clause Is Unconstitutionally Vague As Applied, And SeaWorld Lacked Fair Notice Of The Secretary's Abatement Measures.

As SeaWorld has explained, the General Duty Clause is unconstitutionally vague as applied to require the elimination of "close contact" with "barriers" and "distances." The Secretary claims (at 49) that the Court "specifically rejected this precise argument" in *Ensign-Bickford Co. v. OSHRC*, but that case considered only a *facial* challenge to the constitutionality of the General Duty Clause; it recognized that the provision could still be unconstitutional *as applied* to require more than its "narrow" purpose of "eliminat[ing] 'preventable hazards' likely to cause death or serious injury to employees." 717 F.2d 1419, 1421 (D.C. Cir. 1983). The Ninth Circuit has similarly explained that the General Duty Clause can be applied only "when a reasonably prudent employer in the industry would have known that the proposed method of abatement was required." *Donovan*, 645 F.2d at 831.

28

SeaWorld's precautions were more than just "reasonably prudent."  As the ALJ found, they were "highly detailed," "thorough," and indicative of a "safety-conscious employer" that "constantly emphasized" and "continuously refin[ed] its safety program."  Order 45.  Because neither SeaWorld nor any relevant industry groups had ever recommended or considered the Secretary's abatement measures, there is no way that SeaWorld "would have known" what "method of abatement was required."  *Donovan*, 645 F.2d at 831.

Even now, the Secretary disclaims having "expertise" to explain his own abatement measures.  Tr. 798, 947.  And his brief only adds to the confusion:  Having limited his citations to "show" activities, the Secretary now insists that this limitation "does not imply that close contact is not [also] hazardous during husbandry and medical procedures."  Sec'y-Br. 55 n.22.  Having argued that SeaWorld "did not make a good faith effort to comply with [his] abatement requirements," Sec'y-Br. Add. 4, and issued a "repeat" citation, the Secretary continues to threaten enforcement by advertising his "position that more complete implementation of barriers and distance [is] feasible," Sec'y-Br. 41 n.11.  Yet simultaneously, the Secretary argues that SeaWorld's current measures are so similar to what he seeks that they suffice to carry his burden of proving feasibility.  The Secretary's shifting positions leave SeaWorld to "guess" at the citations' required "meaning" and scope,

29

and "violat[e] the first essential of due process of law." *Connally v. Gen. Constr. Co.*, 269 U.S. 385, 391 (1926).

SeaWorld's lack of notice regarding the Secretary's abatement measures was exacerbated by the fact that those measures conflicted with guidance from Cal/OSHA. The Secretary dismisses this argument as an attempt to rely on "'OSHA's failure to identify violations in a previous inspection.'" Sec'y-Br. 50. But Cal/OSHA did not "fail to identify" the conduct that the Secretary now alleges is a violation of the OSH Act; rather, Cal/OSHA affirmatively reinforced the importance of close contact to trainers' and whales' safety. *See* Ex. R-3, at 2201 (recommending that SeaWorld "reduc[e] … activities that take away from the time that the trainers and the whales need to reinforce social bonds"); Narrative Summary at 5-7 (recognizing the importance of practicing close contact in a variety of contexts). Such prior inconsistent guidance shows that SeaWorld lacked "fair notice" of the Secretary's abatement measures. *See Erickson Air-Crane, Inc.*, 2012 CCH OSHD ¶ 33,199, 2012 WL 762001, at *3 (No. 07-0645, 2012); *Miami Indus., Inc.*, 15 BNA OSHC 1258, 1991 WL 195208 (No. 88-671, 1991).

## CONCLUSION

For the foregoing reasons, the Court should reverse the ALJ's decision and vacate the Secretary's citations.

Dated: October 4, 2013                    Respectfully submitted,

                                    /s/ Eugene Scalia

Carla J. Gunnin                          Eugene Scalia
BAKER, DONELSON, BEARMAN,                   *Counsel of Record*
  CALDWELL & BERKOWITZ, PC            Baruch A. Fellner
Monarch Plaza, Suite 1600                Scott P. Martin
3414 Peachtree Road, NE                  Daniel P. Rathbun
Atlanta, Georgia 30326                   GIBSON, DUNN & CRUTCHER LLP
(404) 589-3404                           1050 Connecticut Avenue, N.W.
                                        Washington, D.C. 20036
                                        (202) 955-8500
                                        EScalia@gibsondunn.com

*Counsel for Petitioner SeaWorld of Florida, LLC*

31

## CERTIFICATE OF COMPLIANCE

1.     This brief complies with the type-volume requirement of Federal Rule of Appellate Procedure 32(a)(7) because this brief contains 6,954 words, as determined by the word-count function of Microsoft Word 2003, excluding the parts of the brief exempted by Federal Rule of Appellate Procedure 32(a)(7)(B)(iii); and

2.     This brief complies with the typeface requirements of Federal Rule of Appellate Procedure 32(a)(5) and the type style requirements of Federal Rule of Appellate Procedure 32(a)(6) because this brief has been prepared in a proportionally spaced typeface using Microsoft Word 2003 in 14-point Times New Roman font.

Dated: October 4, 2013          /s/ Eugene Scalia
                                Eugene Scalia
                                GIBSON, DUNN & CRUTCHER LLP
                                1050 Connecticut Avenue, N.W.
                                Washington, D.C. 20036
                                (202) 955-8500
                                EScalia@gibsondunn.com

*Counsel for Petitioner SeaWorld of Florida, LLC*

## CERTIFICATE OF SERVICE

I hereby certify that on October 4, 2013, I electronically filed the foregoing Reply Brief for Petitioner SeaWorld of Florida, LLC with the Clerk of the Court for the United States Court of Appeals for the D.C. Circuit by using the appellate CM/ECF system. Service was accomplished on counsel of record by the CM/ECF system.


Dated: October 4, 2013                  /s/ Eugene Scalia
                                        Eugene Scalia
                                        GIBSON, DUNN & CRUTCHER LLP
                                        1050 Connecticut Avenue, N.W.
                                        Washington, D.C. 20036
                                        (202) 955-8500
                                        EScalia@gibsondunn.com

                    *Counsel for Petitioner SeaWorld of Florida, LLC*